## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**ANGELIQUE L. LINGARD and
SUDARIEN D. SMITH,**

        **Plaintiffs,**

**v.**                          **Case No: 6:23-cv-323-PGB-RMN**

**HOLIDAY INN CLUB
VACATIONS, INC. and WILSON
RESORT FINANCE, LLC,**

        **Defendants.**
_____/

## ORDER

This cause comes before the Court on Defendants Holiday Inn Club Vacations, Inc. and Wilson Resort Finance, LLC's (the "**Defendants**") Motion to Dismiss the Second Amended Class Action Complaint (Doc. 25 (the "**Motion**")) and Plaintiffs Angelique L. Lingard and Sudarien D. Smith's (the "**Plaintiffs**") response in opposition. (Doc. 28). Upon consideration, the Motion is due to be granted in part and denied in part.

## I.  BACKGROUND[1]

This dispute stems from Plaintiffs' financing of timeshare interests with Defendants. (Doc. 20). Plaintiffs are both active duty United States Air Force

---

[1] This account of the facts is taken from the Second Amended Complaint (Doc. 20), the well-pled allegations of which the Court must accept as true in considering the Motion. *See Linder v. Portocarrero*, 963 F.2d 332, 334 (11th Cir. 1992).

servicemembers who were in a relationship and took family vacations together. (*Id.* ¶¶ 13–14, 24, 36). Defendant Holiday Inn Club Vacations, Inc. ("**Defendant Holiday Inn**") sells and finances timeshare interests while Defendant Wilson Resort Finance, LLC ("**Defendant Wilson Finance**") jointly finances the same. (*Id.* ¶¶ 15–16). Defendants allegedly act through their agents collectively with a unity of ownership interests. (*Id.* ¶¶ 17–22).

Plaintiffs allege that Defendant Holiday Inn targets members of the military to sell them timeshare interests because:

> 1) they are required to pay their financial obligations in a timely manner under the Uniform Code of Military Justice and are subject to punishment, 2) they have a reliable source of income that is subject to garnishment, 3) they are relatively unsophisticated consumers given their average age and educational background, and 4) for those servicemembers who have a security clearance, they risk losing their job entirely.

(*Id.* ¶¶ 2–4). Although Defendant Holiday Inn allegedly targets military families, it also fails to provide the required disclosures and improperly requires mandatory binding arbitration and waiver of the right to seek class relief in violation of the Military Leave Act, 10 U.S.C. § 987, *et seq* ("**MLA**"). (*Id.* ¶¶ 5–6).

In November 2016, Plaintiffs learned of and attended a "free vacation" in Orlando, Florida that required them to attend a mandatory presentation. (*Id.* ¶¶ 24–27). The presentation lasted for four hours and offered membership in Defendant Holiday Inn's timeshare vacation points program. (*Id.* ¶ 28). During the presentation and in one-on-one conversations later, Defendant Holiday Inn's sales agents informed Plaintiffs that they could sell their timeshare interest back to

Defendants at any time because they were in the military. (*Id.*). After the presentation, Plaintiff Sudarien D. Smith entered into a timeshare contract to purchase a "fixed week" timeshare interest from Defendants' agent Orlando Acevedo, Jr., on November 16, 2016 at the Orange Lake Country Club Villas in Kissimmee, Florida. (*Id.* ¶¶ 29, 32).

While using their timeshare vacation on or about August 22, 2017 in Florida, Defendants presented the possibility of upgrading their timeshare interests, and Defendant Holiday Inn, through Daniel Foreno, again told them that they could sell back their interests at any time because they were in the military. (*Id.* ¶¶ 30–32, 133). As a result, Plaintiff Smith agreed to purchase and finance an upgraded timeshare interest from Defendants. (*Id.* ¶ 32).

Defendants continued to pitch additional timeshare interest upgrades, and Plaintiffs continued to purchase and finance them: on August 2, 2018, Plaintiffs refinanced their prior purchases and made additional purchases after a Defendant presentation by Daniel Foreno in Orlando, Florida; later in August of 2019, Plaintiffs again made an additional purchase of timeshare points; on September 21, 2020, Plaintiffs again made a further timeshare interest purchase after attending a briefing with Defendants' agent, Taylor Frommelt, in Las Vegas, Nevada; and in April of 2021, Plaintiff Smith made a final timeshare interest purchase in Galveston, Texas after a sales presentation with Defendant's sales representative, Lindsay Gilbertson. (*Id.* ¶¶ 33–40, 115–22, 132–39). Throughout this process Plaintiffs were reassured they could sell back their timeshare interests

due to their military status. (*Id.* ¶¶ 37, 115–21, 139). In addition to obtaining financing each time, Plaintiffs provided their social security numbers and their military identification cards along with the other required credit information to Defendant Holiday Inn. (*Id.* ¶ 55).

During an August 2021 trip to Galveston, Texas, Plaintiffs explained they could no longer afford their existing timeshare contracts and requested that Defendant Holiday Inn buy back the interests sold to them previously pursuant to their military status. (*Id.* ¶¶ 41–42). Defendants refused. (*Id.* ¶¶ 42–44). Instead, Defendant Holiday Inn's sales representative, Kim McCurry, again convinced Plaintiffs to consolidate and refinance their prior points in a way that "would reduce the overall maintenance costs." (*Id.* ¶¶ 43–44). At the time of the filing of this suit, Plaintiffs have two timeshare financing contracts with Defendants that collectively require them to pay 29% of their combined income on timeshare related costs. (*Id.* ¶ 46). These two contracts require mandatory arbitration, foreclose seeking relief on behalf of a class, and do not mention the Military Annual Percentage Rate ("**MAPR**") as defined by the MLA and its implementing regulations. (*Id.* ¶¶ 57–75).

The maintenance costs on Plaintiffs' timeshare interests did not decrease, so Plaintiffs ceased to make payments on the two outstanding timeshare contracts. (*Id.* ¶¶ 47–48). Defendant Holiday Inn reported Plaintiffs' failure to pay to the credit reporting agencies, and these loans are now listed as delinquent. (*Id.* ¶ 49). Because of this outstanding debt and a corresponding detrimental credit reporting,

Plaintiffs were prevented from purchasing a home, are in jeopardy of losing their security clearances, and are subject to involuntary termination from the Air Force. (*Id.* ¶ 50).

After an original and first amended complaint, Plaintiffs seek recompense on behalf of themselves and all others similarly situated in Count I of the Second Amended Complaint for three alleged violations of the MLA. (*Id.* ¶¶ 86–106). Specifically, Plaintiffs allege that the standard timeshare contracts failed to include a statement of the MAPR while also containing impermissible binding arbitration and class action waiver provisions. (*Id.*). In addition, in Count II Plaintiffs bring individual claims under Florida's Deceptive and Unfair Trade Practices Act, FLA. STAT. § 501.201, *et seq* ("**FDUTPA**"). (*Id.* ¶¶ 106–26). Finally, in Count III Plaintiffs raise individual common law fraud claims. (*Id.* ¶¶ 127–39). Defendants now move to dismiss all three counts for either lack of standing or for failure to state a claim pursuant to Rules 12(b)(1) and 12(b)(6). (Doc. 25). With Plaintiffs' response in opposition (Doc. 28), this matter is ripe for review.

## II.   STANDARD OF REVIEW

### A.   Rule 12(b)(1)

Article III, Section 2 of the United States Constitution limits federal courts' jurisdiction to actual cases and controversies. Standing is part of this limitation, as a "threshold jurisdictional question" that must be resolved before a court can turn to a claim's merits. *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005). Courts determine standing at the time of filing. *Id.* at 976.

Rule 12(b)(1) attacks on subject matter jurisdiction may be facial or factual. *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009). For facial attacks as here, the court looks to the face of the complaint and determines whether the plaintiff sufficiently alleges standing. *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys. Inc.*, 524 F.3d 1229, 1232–33 (11th Cir. 2008). In doing so, the court is limited to the complaint's allegations and exhibits, which the court must accept as true. *Id.* at 1232. Factual attacks, in contrast, allow a court "to consider extrinsic evidence such as deposition testimony and affidavits." *Carmichael*, 572 F.3d at 1279.

### B.    Rule 12(b)(6)

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(1). In order to survive a motion to dismiss made pursuant to Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In addition, "the district court may consider an extrinsic document if it is (1) central to plaintiff's claim; and (2) its authenticity is not challenged." *SFM Holdings v. Banc of America Sec.*, 600 F.3d 1334, 1337 (11th Cir. 2010).

Though a complaint need not contain detailed factual allegations, mere legal conclusions or recitation of the elements of a claim are not enough. *Twombly*, 550 U.S. at 555. Moreover, courts are "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. Courts must also view the complaint in the light most favorable to the plaintiff and must resolve any doubts as to the sufficiency of the complaint in the plaintiff's favor. *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1483 (11th Cir. 1994) (per curiam).

In sum, courts must (1) ignore conclusory allegations, bald legal assertions, and formulaic recitations of the elements of a claim; (2) accept well-pled factual allegations as true; and (3) view well-pled allegations in the light most favorable to the plaintiff. *Iqbal*, 556 U.S. at 67.

## III.   DISCUSSION

The Court first finds Plaintiffs may continue to pursue their MLA claim. The Court next discusses the insufficiency of Plaintiffs' FDUTPA claim. The Court finally explains why Plaintiffs' common law fraud claim may proceed.

### A.   Count I: MLA Claim

Congress passed the MLA following a Department of Defense ("**DoD**") study noting a steady and significant increase in the rate of revoked or denied security clearances for military personnel because of financial problems flowing from predatory lenders targeting military personnel to market high-cost credit. Steven

M. Graves & Christopher L. Peterson, *Predatory Lending and the Military: The Law and Geography of "Payday" Loans in Military Towns*, 66 OHIO STATE L. J. 653 (2005). Consequently, the MLA provides servicemembers and their families with various protections when obtaining consumer credit. 10 U.S.C. §§ 987(a), (b), (d), (e).

Plaintiffs allege Defendants violated three of those MLA protections. (Doc. 20, ¶¶ 86–106). First, the MLA requires certain disclosures to consumers, including a "statement of MAPR" applicable to the financing in question. 10 U.S.C. § 987 (c)(1)(A); 32 C.F.R. § 232. Second, the MLA renders arbitration agreements involving consumer credit unlawful and unenforceable notwithstanding § 2 of the Federal Arbitration Act. 10 U.S.C. §§ 987(e)(3), (f)(3)–(4); 32 C.F.R. § 232.9(c). Third, 10 U.S.C. § 987(e)(2) prohibits creditors from requiring covered borrowers to "waive the borrower's right to legal recourse under any otherwise applicable provision of State or Federal law"—Plaintiffs assert this includes the right to seek class action relief under Federal Rule of Civil Procedure 23. (Doc. 20, ¶¶ 100–06). In addition to potential monetary damages, "[a]ny credit agreement, promissory note, or other contract prohibited under [the MLA] is void from the inception of such contract." 10 U.S.C. § 987(f)(3).

Defendants challenge both Plaintiffs' standing to bring these claims and the sufficiency of the claims as a matter of law. For the following reasons, both challenges fail.

### 1.   *Standing*

Based on caselaw that establishes a statutory violation alone is not enough to confer Article III standing to sue in the absence of a concrete injury, Defendants argue that Plaintiffs fail to facially allege standing in the Second Amended Complaint despite allegations of procedural MLA violations. (Doc. 25, pp. 6–12). The Court disagrees.

A plaintiff's standing to bring and maintain a lawsuit is a fundamental component of a federal court's subject matter jurisdiction. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). "[P]laintiff, as the party invoking federal jurisdiction, bears the burden" of establishing the "irreducible constitutional minimum" of Article III standing. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Plaintiffs must demonstrate that 1) they actually suffered or will imminently suffer an injury-in-fact that is concrete and particularized, 2) that the injury is fairly traceable to the defendant's conduct, and 3) that the injury is likely, not merely speculatively, to be redressed by a favorable judgment. *Harrell v. Fla. Bar*, 608 F.3d 1241, 1253 (11th Cir. 2010); *Kelly v. Harris*, 331 F.3d 817 (11th Cir. 2003) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). "In plainer language, the plaintiff needs to show that the defendant harmed him, and that a court decision can either eliminate the harm or compensate for it." *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020).

In plain language, Plaintiffs plausibly allege Defendants' MLA-violative contracts harmed them through interest payments on void financing contracts, a

dampened credit score, and looming professional repercussions in the military. Accordingly, a favorable Court decision to declare these contracts void from inception, enjoin their continued enforcement, and award Plaintiffs' damages for the downstream interest payments will concomitantly compensate Plaintiffs for and eliminate these harms. (Doc. 20, ¶¶ 49–50, 86–106). With this bird's eye view in mind, the Court turns to the granular standing analysis.

a.   *Injury-In-Fact*

To satisfy the injury-in-fact requirement, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts] presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (citations and quotations omitted). "But that is not a free pass—these general factual allegations must plausibly and clearly allege a concrete injury." *Muransky*, 979 F.3d at 924.  Notably, while "[a] concrete injury need be only an 'identifiable trifle,'" *Salcedo v. Hanna*, 936 F.3d 1162, 1167 (11th Cir. 2019) (quoting *United States v. Students Challenging Regul. Agency Proc's.*, 412 U.S. 669, 689 n.14 (1973)), a plaintiff does not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right"; "Article III standing requires a concrete

injury even in the context of a statutory violation . . . that is, [the injury] must actually exist." *Spokeo*, 136 S. Ct. at 1548–49. Put another way, under Article III, "an injury in law is not an injury in fact," so only plaintiffs who have been "concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Transunion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021). In *TransUnion*, for example, the Supreme Court found suspect standing flowing from a mere risk of potential future harm when seeking statutory damages for a procedural violation of a statute by which absent class were unaffected and for which there was insufficient risk of future harm. *Id.* at 2212. In addition, the Supreme Court noted that when the harms flowing from the alleged statutory violation are intangible, those harms must "bear[] a close relationship" (but not necessarily be "an exact duplicate") to harms "traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* at 2204–05. The Eleventh Circuit has summarized this inquiry as follows: federal courts preliminarily inquire "if the violation itself caused harm, whether tangible or intangible, to the plaintiff. If so, that's enough. If not, [courts] ask whether the violation posed a material risk of harm to the plaintiff. If the answer to both questions is no, the plaintiff has failed to meet his burden." *Muransky*, 979 F.3d at 928.

Here, Plaintiffs allege harms flowing from outstanding loans reported as delinquent but which were void from inception under the MLA: Plaintiffs were required to make interest payments on void loans and prevented from purchasing a home. (*Id.* ¶¶ 49–50). They also may lose their security clearances and might be

involuntarily discharged from the Air Force. (*Id*.). At least some of these alleged injuries are quintessential concrete harms.[2] *Muransky*, 979 F.3d at 926 ("Tangible harms are the most obvious and easiest to understand [examples of concrete harm]; physical injury or financial loss come to mind as examples."); *Walters v. Fast AC, LLC*, 60 F.4th 642, 648 (11th Cir. 2023)[3] (finding the lost time spent disputing a debt, a dampened credit rating, the prevention of home purchases through denied financing, and feelings of anxiety, exploitation, embarrassment, and worthlessness flowing from the failure to comply with statutory disclosure requirements in certain credit extension agreements to be concrete harms for standing analysis); *Losch v. Nationstar Mortg. LLC*, 995 F.3d 937, 943 (11th Cir. 2021) ("[T]here is no question that wasted time is a concrete harm"); *Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, 942 F.3d 1200, 1207 (11th Cir. 2019) (finding a reduced credit score and "lost credit opportunities" to be concrete economic harms). Moreover, Plaintiffs suffered these concrete harms themselves, necessarily satisfying the particularity requirement too. *See Lujan*, 504 U.S. at 560 n.1; (stating an injury is "particularized" if it "affect[s] the plaintiff in a personal and individual way").

---

[2]   The Court recognizes that some of these harms are not yet realized—for example, the risk of discharge from the military or the loss of a security clearance—and are instead risks of future harm, but as the Court finds that at least some of the harms are actual or "real," it need not probe whether these risks are "substantial" or "certainly impending." *Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1338–39 (11th Cir. 2021).

[3]   Curiously, Defendants cite to the district court's opinion which was appealed and which the Eleventh Circuit reversed and remanded on the precise issue for which Defendants cite it. (Doc. 25, p. 16 n.4 (citing *Walters v. Fast AC, LLC*, 540 F. Supp. 3d 1112 (M.D. Fla. 2021), *rev'd and remanded*, 60 F.4th 642 (11th Cir. 2023))).

Defendants focus on caselaw which establishes the now-familiar admonition that a procedural statutory violation, without more, does not amount to a concrete injury-in-fact. (Doc. 25, pp. 15–18).   But these authorities do not support Defendant's position. They lack a dispositive feature present here: none involved a plaintiff who identified concrete harms in addition to a statutory violation. *See, e.g.*, *TransUnion*, 141 S. Ct. at 2210 (holding "[t]he mere presence of an inaccuracy in an internal credit file" in violation of a federal statute inflicts "no concrete harm" unless it is "disclosed to a third party"); *Muransky*, 979 F.3d at 929 (holding printing customers' credit card numbers on receipts in violation of a statute was not "by itself . . . a concrete injury"); *Louis v. Bluegreen Vacations Unlimited, Inc.*, No. 21-cv-61938, 2022 WL 1793058 (S.D. Fla. June 1, 2022) (finding no standing under the MLA because the parties merely alleged statutory violations without any "downstream consequences" beyond conclusory allegations). For instance, Defendants point out that Plaintiffs do not have a concrete injury to give them standing to challenge a statutorily improper mandatory arbitration provision if there is "at most a 'perhaps' or 'maybe' chance that the arbitration agreement will be enforced . . . in the future." *Bowen v. First Family Financial Services, Inc.*, 233 F.3d 1331, 1339–40 (11th Cir. 2000). This case is different.

Here, Plaintiffs allege that the presence of the arbitration and class action waiver provisions in the timeshare financing agreements make them "void from inception" under the MLA, not merely that the terms themselves are unenforceable. (Doc. 20, ¶ 103 (quoting 10 U.S.C. § 987(f)(3)). The alleged

economic harms flowing from these allegedly void agreements, which Defendants seek to enforce, thus give Plaintiffs a concrete injury to provide Plaintiffs standing to challenge the agreements, even when Defendants have not enforced or threatened imminent enforcement of the specific terms which make the agreements void. At bottom, Plaintiffs plausibly allege far more than statutorily noncompliant financing agreements alone and thus also satisfy the injury-in-fact element of Article III standing.

> b.     *Traceability*

Defendants further challenge the traceability element of standing; indeed, some of their injury-in-fact arguments sound more in traceability than concrete harm. (Doc. 25, pp. 15–19).

Traceability requires "a causal connection" between the plaintiff's injuries and the defendant's legal violation. *Lujan*, 504 U.S. at 560. However, in the standing context, this causation element is "less stringent" than the tort-law concept of "proximate cause." *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1271 (11th Cir. 2019). "[E]ven harms that flow indirectly from the action in question can be . . . 'fairly traceable' to that action for standing purposes." *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003). That said, "a plaintiff must at least demonstrate factual causation between his injuries and the defendant's misconduct." *Walters*, 60 F.4th at 650 (citing *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019) ("Article III requires no more than *de facto* causality")). Thus, traceability is "lacking if the plaintiff 'would have been injured

in precisely the same way' without the defendant's alleged misconduct." *Walters*, 60 F.4th at 650 (citations and quotations omitted).

To illustrate, the Eleventh Circuit in *Walters* addressed how loan agreements, which did not comply with TILA-mandated disclosure requirements, factored into the traceability analysis when the plaintiff there did not read the loan agreements before agreeing to them. 60 F.4th at 650–52. On one hand, incorrect-but-provided disclosures could not satisfy traceability. *Id.* at 650–51.  On the other, the "failure to provide any disclosures at all" could satisfy traceability. *Id.* at 651–52.  Even when the plaintiff did not read the agreements, the failure to provide the required disclosures made injuries flowing from the agreements fairly traceable to the TILA statutory violations. *Id.*

So too here. Plaintiff alleges the timeshare financing agreements did not include the required MAPR disclosure under the MLA. (Doc. 20, ¶¶ 63–69, 91–94). Moreover, the agreements contained mandatory arbitration and class action waiver terms in violation of the MLA. (*Id.* ¶¶ 95–106). These violations allegedly make the agreements "void from inception." 10 U.S.C. § 987(f)(3).  Thus, any harm flowing from the continued enforcement of these allegedly void agreements flows from and is fairly traceable to the MLA violations.

### c.   *Redressability*

Redressability is also easily satisfied. Plaintiffs must show their injuries are "likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338 (citing *Lujan*, 504 U.S. at 560–61). Plaintiffs suffered alleged economic harms and

face the looming threat of losing security clearances or even their place as military servicemembers. Economic damage, "it goes without saying, is an injury which the award of damages . . . will redress." *Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1279 (11th Cir. 2022); *see Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012) ("Plaintiffs allege a monetary injury and an award of compensatory damages would redress that injury."). Likewise, injunctive and declaratory relief could end the threats which Plaintiffs face as a result of the allegedly void loan agreements to which they are now party.[4] Consequently, Plaintiffs have standing to bring their MLA claims. *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1252 (11th Cir. 2003) ("by asserting that he was an innocent party to an illegal contract, [the plaintiff] asserts the invasion of an interest legally protected by Florida's common law of contracts and thereby obtains standing.").

2.    *Failure to State a Claim*

Defendants next argue that, even if Plaintiffs have standing, Plaintiffs fail to state a claim because the MLA does not apply to the timeshare financing agreements here. (Doc. 25, pp. 20–26). The Court addresses the applicability, first,

---

[4]    Defendants raise three other puzzling arguments regarding the relief sought in the event the Court finds Plaintiffs have standing to pursue its MLA claims. (Doc. 25, pp. 27–28). However, the disputes regarding entitlement to various forms of relief will be resolved *after* adjudication on the merits. In any event, the Court finds that Plaintiffs have pled enough to adequately allege actual damages. (*See* Doc. 20, ¶¶ 12, 105).   In addition, the voiding of contracts under 10 U.S.C. § 987(f)(3) could merit both injunctive and declaratory relief; neither of these remedies need be sought as separate claims for relief. *Exum v. Nat'l Tire & Battery*, 437 F. Supp. 3d 1141, 1158 (S.D. Fla. 2020) ("injunctive relief . . . is a remedy, not a separate cause of action"); *Mangiaracina v. Orange Lake Country Club, Inc.*, No. 8:14-cv-1166, 2015 WL 685778, at *7 (M.D. Fla. Feb. 18, 2015) ("Declaratory relief can be a *remedy*, rather than a cause of action" (emphasis in original)).

of the MLA's residential mortgage exception and, next, the personal property exception.

### a.    *Residential Mortgage Exception*

Defendants argue that the timeshare financing agreements fall under the residential mortgage exception to the MLA's definition of consumer credit. (Doc. 25, pp. 20–25). Plaintiffs' financing agreement expressly states it is a mortgage. (*See* Docs. 23-1, 23-2). Is it also a residential mortgage? Ultimately, the Court agrees with much of Judge Dalton's analysis in finding that the timeshare financing agreements here do not qualify as a residential mortgage under the MLA. *See Steines v. Westgate Palace, L.L.C.*, No. 6:22-CV-629, 2022 WL 18031492 (M.D. Fla. Dec. 14, 2022). Therein, the *Steines* court held that the timeshare loans there were "consumer credit" pursuant to the MLA because they unambiguously did not qualify as "residential mortgages" under various methods of statutory and regulatory interpretation. *Id.* at *6–14. This Court follows the *Steines* court's lead.

Covered borrowers may sue creditors that violate these MLA protections as long as the loans involve "consumer credit." 10 U.S.C. § 987(a), (f)(5). However, the MLA does not itself define "consumer credit," instead delegating that task to the DoD with the caveat that the definition shall not include a "residential mortgage" or "a loan procured in the course of purchasing a car or other personal property, when that loan is offered for the express purpose of financing the purchase and is secured by the car or personal property procured." 10 U.S.C. §§

987(h)–(i)(6).[5] "A court must 'carefully consider[]' the text, structure, history, and purpose of a regulation" in determining its meaning before finding a regulation ambiguous. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (citing *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 706 (Scalia, J., dissenting)).[6] Employing those tools of interpretation here as detailed below, the Court finds that the MLA requires the real property securing a mortgage to be used as a residence to qualify as a "residential mortgage."

The statute provides no explicit direction for how the DoD should interpret "residential mortgage." *See* 10 U.S.C. § 987(i)(6). The DoD initially adopted the MLA's implementing regulations in 2007 and therein narrowly defined "consumer credit" to include only payday, vehicle title, and refund anticipation loans paid within fewer than six months. *Limitations on Terms of Consumer Credit Extended to Service Members and Dependents*, 72 Fed. Reg. 50,582 (Aug. 31, 2007). The DoD later expanded "consumer credit" in 2015 to include other forms of credit subject to the Truth in Lending Act ("**TILA**"), 15 U.S.C. § 1601, *et seq.*, and the

---

[5]   The Court explains below why the personal property exception does not apply.

[6]   The Court rejects out of hand Defendants' contention that because the MLA's legislative history does not explicitly mention timeshare financing, Congress did not intend the MLA to apply to such loans. (Doc. 25, 23–26). While timeshare loans may not share exactly the same terms and practices as those which Congress expressly mentioned when passing the MLA, the timeshare loan industry has at times engaged in sufficiently similar practices to make it reasonable Congress sought to curb lending abuses related to timeshares. In any event, as explained herein the Court finds the text is clear enough to decide this question without plumbing the murky depths of legislative history to divine congressional purposes. *Harry v. Marchant*, 291 F.3d 767, 772 (11th Cir. 2002) ("Even if a statute's legislative history evinces an intent contrary to its straightforward statutory command, we do not resort to legislative history to cloud a statutory text that is clear." (internal quotations omitted)).

corresponding Regulation Z in 12 C.F.R. § 1026. *Limitations on Terms of Consumer Credit Extended to Service Members and Dependents*, 80 Fed. Reg. 43, 560 (July 22, 2015). At that time, the DoD reiterated its regulatory purpose "to promote readiness by taking steps to reduce the risk that a Service member or his or her family could get caught in a 'debt trap.'" *Id.* at 43,566. Nevertheless, as required in the statute, the DoD carved out exceptions for residential mortgages and certain personal property financing loans.

The DoD defines a "residential mortgage" as "any credit transaction secured by an interest in a dwelling, including a transaction to finance the purchase or initial construction of the dwelling, any refinance transaction, home equity loan or line of credit, or reverse mortgage." 32 C.F.R. § 232.3(f)(2)(i). "Dwelling" is defined as "a residential structure that contains one to four units, whether or not the structure is attached to real property," which includes "an individual condominium unit, cooperative unit, mobile home, and manufactured home." 32 C.F.R. § 232.3(k).

The main issue here is the meaning of "residential" in the context of the MLA. In defining "residential mortgage," the DoD sought to "reflect the language and the scope of the exclusion in the MLA." 80 Fed. Reg. 43,579. The DoD carried the term "residential" into the definition of "dwelling" to modify "structure." 32 C.F.R. 232.3(k). Thus, the meaning of "residential structure" necessarily hinges on the meaning of "residential." Accordingly, the definition of "residential mortgage" must be understood as "any credit transaction secured by an interest in a

[residential structure of one to four units]." *See* 32 C.F.R. §§ 232.3(2)(f)(i), (k). Congress did not define "residential" in the MLA (nor did the DoD in the implementing regulations) and so the term will be accorded its ordinary meaning. *See Mills Music, Inc. v. Snyder*, 469 U.S. 153, 164 (1985). To determine the ordinary meaning, courts often turn to dictionary definitions for guidance. *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1223 (11th Cir. 2001). In the context of real estate, "residential" ordinarily means "restricted to," or "used as" "residences." *Residential*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2007). A "residence" is "a building used as a home." *Residence*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2007).

With these definitions in mind, the timeshare interests here are not buildings "used as a home." *Id.* Plaintiffs financed a "time in a space, but not the space itself." *Steines*, 2022 WL 18031492, at *10; (Doc. 23-1, Doc. 23-2, Doc. 25-2). Instead, Plaintiffs' financing agreements convey an interest in the trust and timeshare plan to which Defendants' properties are subject, not an interest in a specific home or dwelling within those properties. (Doc. 23-1; Doc. 23-2; Doc. 25-2). Plaintiffs did not finance a specific room within a specific multi-dwelling property. (Doc. 25-2). They financed the possibility of reserving—for a limited period of time—one of many, many rooms in many, many properties subject to the trust, and all beneficiaries of the trust compete to reserve these various potential

spaces. (*Id.*). In short, the ordinary meaning of "residence" and "residential" does not square with the financing agreements and financed timeshare interests here.[7]

What is more, in analyzing the ordinary meaning of "residence" in other contexts, some courts consider a continuum with a hotel and a residence as bookends. *See e.g.*, *Schwarz v. City of Treasure Island*, No. 8:05-cv-1696, 2006 WL 2521399, at *9 (M.D. Fla. Aug. 1, 2006) ("*Schwarz I*"). Specifically, the Eleventh Circuit notes, "the house, apartment, condominium, or co-op that you live in is a 'residence,' but the hotel you stay in while vacationing at Disney World is not." *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1214 (11th Cir. 2008) ("*Schwarz II*"). Other lodgings can fall somewhere in the middle:

> Differences between a home and a hotel suggest at least two relevant principles: (1) the more occupants treat a building like their home—e.g., cook their own meals, clean their own rooms and maintain the premises, do their own laundry, and spend free time together in common areas—the more likely it is a "dwelling"; and (2) the longer the typical occupant lives in a building, the more likely it is that the building is a "dwelling."

---

[7] Bolstering this conclusion, the Court also notes that the National Credit Union Administration ("**NCUA**"), one agency charged with administrative enforcement of the MLA, interprets the residential mortgage exemption not to cover timeshare loans. *NCUA Regulatory Alert 16-RA-04*, Guidance on Regulatory Changes Affecting Military Members 3 n.11 (March 2016), https://www.ncua.gov/regulation-supervision/letters-credit-unions-other-guidance/complying-recent-changes-military-lending-act-regulation.

The DoD is required to consult the NCUA when issuing rules and regulations. 10 U.S.C. § 987(h)(3)(f). After the 2015 update to the DoD definition of consumer credit, the NCUA stated that a dwelling-secured transaction "does not include a timeshare interest" in a letter to credit unions. See id. Although seller-financing by timeshare developers falls outside the NCUA's scope of enforcement as it only oversees credit unions' compliance with the MLA, the NCUA interpretation adds credence to the conclusion that not all timeshare loans are residential mortgages.

*Id.* at 1215. To evaluate where a building falls on this continuum, courts consider several factors. On one hand, "the right to return every year to the same residential unit is the most important factor," and paying taxes on a timeshare also weighs towards finding it a residence. *Steines*, 2022 WL 18031492, at *11 (collecting cases) (citations and quotations omitted). In contrast:

> the sale of stay intervals in increments of one week or less, recording restrictive covenants that substantially limit the rights of ownership (where owners have no right to occupy, alter, or exercise other control over any specific unit), providing exchange programs, and operating the timeshare property like a hotel (e.g., furnishing front desk operations, central booking, housekeeping, room service, etc.) all indicate that the property serves more as a transient accommodation than a residence.

*Id.* Here, Plaintiffs have no right to return to the same unit; there is nothing in pleadings or the documents properly under consideration before the Court suggesting they pay property taxes on their timeshare interest or a specific unit; and they book a specific unit in one of about forty different properties with points from the trust in around week-long increments. (*See* Doc. 25-2, pp. 165–303). In sum, Plaintiffs did not finance an interest in a "residential structure, but rather" something much more like "a transient vacation accommodation." *Steines*, 2022 WL 18031492, at *10.[8] As such, the residential mortgage exception to the MLA's definition of consumer credit does not apply.

---

[8] These factors further demonstrate why Defendants' contention that the timeshare property interest at issue in this case is akin to a condominium and cooperative units by reference to the Condominium and Cooperative Abuse Relief Act is unavailing. (Doc. 25, pp. 22–23 (citing 15 U.S.C. § 3603(9)-(13)). While Defendants note such dwellings "provide[] ownership rights to a parcel of real property for a fixed duration of time," such a focus ignores the critical inquiry related to length of stay. (Doc. 25, pp. 22–23). Not to mention, Plaintiffs' timeshare interest is

> b.   *Personal Property Exemption*

Defendants also argue briefly in two short paragraphs with almost no analysis or citations to legal authority beyond the text of the regulation itself that, if the Court finds the residential mortgage exception does not apply, then the Court should find loans here are not consumer credit because they instead qualify for the personal property exemption. (Doc. 25, p. 23). Not so.

The MLA exempts "any credit transaction that is expressly intended to finance the purchase of personal property when the credit is secured by the property being purchased" from the definition of "consumer credit." 32 C.F.R. § 232.3(f)(2)(iii).[9] In a conclusory fashion, Defendants argue, "This [regulatory] would sweep in 'any' personal property transaction for things like jewelry, furniture, boats, and televisions, which would include Plaintiffs' characterization of the purchase here as one of points." (Doc. 25, p. 23). Defendants do not explain why timeshare points qualify as "personal property" under the MLA; Defendants do not explain why timeshare points do not instead qualify as real property, even

---

not an interest in a specific condo or coop unit but instead an interest which provides the right to make a reservation in multiple potential units in multiple potential locations for an unspecified but limited period of time. Had Plaintiffs financed an interest in a specific vacation home, the Court would not hesitate to find the MLA inapplicable; instead, the financed interest is in a trust which provides Plaintiffs the benefit of choosing various vacation lodging options from a menu of options. This limited interest is not a condominium or cooperative; more importantly, it is not sufficiently similar to either to make it "residential" under the MLA.

9    The statute providing for the DoD's authority to prescribe these definitions states, "The term 'consumer credit' has the meaning provided for such term in regulations prescribed under this section, except that such term does not include . . . a loan procured in the course of purchasing a car or other personal property, when that loan is offered for the express purpose of financing the purchase and is secured by the car or personal property procured." 10 U.S.C. § 987(i)(6).

if not "residential" real property under the MLA; Defendants do not explain whether the financing agreements are "secured" by this property, whether real or personal; Defendants do not explain whether the financing agreements were "expressly intended" for financing such a purchase. (*See id.*). Such *ipse dixit* without explanation or citation to binding (or even persuasive) authority does not require the Court to address it in full. *United States v. McCluskey*, 954 F. Supp. 2d 1224, 1270 (D.N.M. 2013) ("Since [d]efendant fails to cite specific, persuasive authority," "the [c]ourt need not develop [d]efendant's conclusory arguments or address arguments unsupported by authority.").[10] Regardless, Defendants admit in the Motion that the timeshare interests here are "beneficial interests in the Trust, which by law constitutes real property." (Doc. 25, pp. 21–23). Consequently, the Court finds the timeshare interests to be best categorized as non-residential real property with respect to the MLA. *See Lennen v. Marriott Ownership Resorts,*

---

[10]   In any event, the throwaway examples of personal property Defendants provide are all tangible property interests. (Doc. 25, p. 23). The canon of statutory interpretation *ejusdem generis*, however, counsels that when "general words follow specific words in a statutory enumeration, the general words are usually construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Yates v. United States*, 574 U.S. 528, 544 (2015) (quotations and citations omitted). Here, the term "personal property" comes after "car," a type of personal property. 10 U.S.C. § 987(i)(6). Following the logic of *ejusdem generis*, it would be strange if "personal property" was interpreted so broadly that it swept in any and all other types of personal property, tangible or not, because to do so would make the express mention of "car" superfluous. As such, the Court finds it most likely that "personal property" be tangible property with a value independent from that which is financed and which can be physically repossessed upon default. That is not the case here with timeshare points, which are beneficial interests in a timeshare trust and which give the holders the right to use the trust property according to the terms in the various timeshare agreements and trust documents. (*See* Doc. 23-1, 23-2).

*Inc.*, No. 19-13215, 2021 WL 5834264, at *8–9 (11th Cir. Dec. 9, 2021)[11] (finding that beneficial interests in timeshare vacation trusts, like the one involved here, are real property under both the Florida Land Trust Act and the Florida Timeshare Act). Plaintiffs' MLA claim thus survives the Motion.

### B.    Count II: FDUTPA Claim

Defendants argue moreover that the FDUTPA forecloses the claims arising from conduct that occurred outside of Florida, and the conduct that occurred within Florida is barred by the applicable statute of limitations. (Doc. 25, pp. 29–30). The Court agrees.

To establish a claim under the FDUTPA, Plaintiffs must allege (1) a deceptive act or unfair practice, (2) causation, and (3) actual damages. *Rollins, Inc. v. Butland*, 951 So.2d 860, 869 (Fla. 2d DCA 2006). An unfair practice is one that offends established public policy and that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. *Samuels v. King Motor Co. of Fort Lauderdale*, 782 So. 2d 489, 499 (Fla. 4th DCA 2001). In addition, FDUTPA claims must arise out of conduct that "occurred within the state of Florida." *Five for Ent. S.A. v. Rodriguez*, 877 F. Supp. 2d 1321 (S.D. Fla. 2012) (citing *Millennium Commc'ns & Fulfillment, Inc. v. Off. of Att'y Gen., Dep't of Legal Affs.*, 761 So. 2d 1256, 1262 (Fla. 3d DCA 2000) (noting the FDUTPA "seeks

---

[11] "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007).

to prohibit unfair, deceptive and/or unconscionable practices which have transpired within the territorial boundaries of this state")).

Plaintiff's rejoinder is that:

> Defendants ignore their own contractual provisions which contain a choice of law provision which provides that Florida law applies and that all disputes not brought in arbitration must be brought in Orange County, Florida. Defendants [sic] principal place of business is also in Florida and they sell timeshare interests in Florida. Based on Defendants' own contract, Plaintiffs are required to bring a FDUTPA claim as Florida law controls.

(Doc. 28, p. 20). Assuming that Florida law controls, Florida provides no relief *under the FDUTPA* for claims that arose due to conduct that occurred outside its territorial boundaries; the underlying contractual choice of law provision and Defendants' principal place of business does not alter Florida's substantive law—it instead affects which sovereign's substantive law the Court must apply, where proper venue is, which parties the Court may exercise personal jurisdiction over, and so on. Consequently, the only potential conduct in the pleadings that occurred within Florida that could give rise to a FDUTPA claim occurred in 2018 at the latest. (Doc. 20, ¶¶ 116–18).

Florida's statute of limitations for FDUTPA claims, however, is four years, and the doctrine of delayed discovery does not apply to FDUTPA claims. *See* FLA. STAT. § 95.11(3); *State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Center, Inc.*, No. 6:06-cv-1757, 2008 WL 11333443, at *19 (M.D. Fla. Dec. 24, 2008) (citing *Yusuf Mohamad Excavation, Inc. v. Ringhaver Equipment Co.*, 793 So. 2d 1127,

1128 (Fla. 5th DCA 1991)). Plaintiffs do not rebut these points of law. (*See* Doc. 28). Accordingly, Plaintiffs' FDUTPA claim, filed in 2023, fails as a matter of law.

### C.    Count III: Common Law Fraud

Finally, Defendants unsuccessfully argue Plaintiffs' individual fraud claims are not sufficiently pled. (Doc. 25, pp. 31–33). Claims of fraud in federal court are subject to the Federal Rules of Civil Procedure's heightened pleading standard under Rule 9(b) which requires that plaintiffs plead these claims "with particularity;" this means "identifying the who, what, when, where, and how of the fraud alleged." *Omnipol, A.S. v. Multinational Def. Servs., LLC*, 32 F.4th 1298, 1307 (11th Cir. 2022) (citing *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008)). "Malice, intent, knowledge, and other conditions of a person's mind," however, "may be alleged generally." FED. R. CIV. P. 9(b). This heightened pleading standard ensures a dual purpose: first, it "alert[s] defendants to the precise misconduct with which they are charged" and second, it "protect[s] defendants against spurious charges of immoral and fraudulent behavior." *Ziemba v. Cascade Int'l., Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001).

The elements of common law fraud under Florida law are "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) the consequent injury by the party acting in reliance on the representation." *Omnipol*, 32 F.4th at 1307 (quoting *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010)).

Plaintiffs properly plead with particularity four instances of alleged fraud. They identify the statements on which they allegedly relied—that they could sell back their timeshare interests to Defendant Holiday Inn at any time due to their military status—and the specific dates, agents, and settings related to these statements. (Doc. 20, ¶¶ 12, 131–36). In addition, Plaintiffs properly allege that they relied on these statements because, in their absence, they would not have purchased the timeshare interests in question. (*Id.* ¶¶ 129–39).

Defendants nevertheless argue the fraud claims fail as a matter of law due to the contractual disclaimers which Plaintiffs agreed to when purchasing the timeshare interests. (Doc. 25, pp. 30–33). Specifically, the Defendants point the Court to two contractual provisions: "This Agreement, the Trust Documents, the Public Offering Statement and its exhibits, and all other Governing Documents represent the entire agreement between the parties regarding the subject matter hereof and supersedes any and all prior agreements, understandings, statements, representations, undertakings or courses of dealing regarding the subject matter hereof" and "Purchaser understands and agrees that Purchaser will not receive any assistance from Seller or any of its agents in the rental of accommodations *or resale of the Interest.*" (Doc. 23-1, ¶¶ 9, 32; Doc. 23-2, ¶¶ 9, 32) (emphasis added). Defendants also point out that in Florida parties cannot reasonably be defrauded by any oral statements that were at variance with written terms to which they agreed. *Silver v. Countrywide Home Loans, Inc.*, 483 F. App'x 568, 570 (11th Cir. 2012) (citing *Hillcrest Pac. Corp. v. Yamamura*, 727 So. 2d 1053, 1056 (Fla. 4th

28

DCA 1999) ("A party cannot recover in fraud for alleged oral misrepresentations that are adequately covered or expressly contradicted in a later written contract.")); *Dixon v. Countrywide Home Loans, Inc.*, 710 F. Supp. 2d 1325, 1331 (S.D. Fla. 2010) ("Florida courts have routinely concluded that a party may not recover in fraud for an alleged false statement when proper disclosure of the truth is subsequently revealed in a written agreement . . . ." (citations omitted)); *Linville v. Ginn Real Estate Co., LLC*, 697 F. Supp. 2d 1302, 1307–08 (M.D. Fla. 2010) (concluding that the plaintiff's reliance on "alleged oral misrepresentations, which contradict the express terms of the loan documents, is unreasonable as a matter of law.").

Plaintiffs respond that these disclaimers do not contravene Defendants' alleged statements that they would buy back Plaintiffs' timeshare interests at any time due to Plaintiffs' military status. (Doc. 28, p. 21). In the Court's view, the issue is thus whether the contractual term "Purchaser will not receive any assistance from Seller or any of its agents in the . . . resale of the Interest" adequately covers or expressly contradicts Defendants' alleged promise to buyback the timeshare interests due to Plaintiffs' military status. Put simply, is a buyback a resale?

Contract interpretation is generally "a question of law" to be decided by the court "by reading the words of a contract in the context of the entire contract and construing the contract to effectuate the parties' intent." *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1104 (11th Cir. 2014). "Under Florida law, if the terms of [a contract] are clear and unambiguous, [then] a court must interpret the contract in

accordance with its plain meaning." *Key v. Allstate Ins. Co.*, 90 F.3d 1546, 1549 (11th Cir. 1996). "Although contract interpretation is generally a question of law for the Court, if the contract contains ambiguities, [then] a question of fact for the jury may be presented." *Assa Compania De Seguros, S.A. v. Codotrans, Inc.*, No. 13-23563, 2014 WL 11906600, at *3 (S.D. Fla. Sept. 12, 2014). "The initial determination of whether the contract term is ambiguous is a question of law for the court. Where the terms of the written instrument are disputed and reasonably susceptible to more than one construction, an issue of fact is presented as to the [contracting] parties' intent." *Strama v. Union Fid. Life Ins. Co.*, 793 So. 2d 1129, 1131 (Fla. 1st DCA 2001).

One authoritative dictionary defines "resale" as "the act of selling again usually to a new party" or "a secondhand sale." *Resale*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/resale (last visited May 26, 2023). Since this dictionary notes that a resale is "usually to a new party," the Court finds that whether a buyback is a resale is ambiguous. *Id.* Accordingly, this contract interpretation issue is a question of fact, and at this procedural posture, the Court is required to view well-pled factual allegations in the light most favorable to Plaintiffs. The Court therefore finds that the written contracts themselves do not foreclose Plaintiffs' individual fraud claims.

## IV.   CONCLUSION

For the aforementioned reasons, it is **ORDERED AND ADJUDGED** that:

1.    Defendants' Motion (Doc. 25) is **GRANTED IN PART AND DENIED IN PART** as follows:

    a.    Count II is **DISMISSED WITH PREJUDICE**; and

    b.    The Motion is otherwise **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on July 20, 2023.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record
Unrepresented Parties