**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**CASE NO. 6:23-CV-323-JSS-RMN**

ANGELIQUE L. LINGARD and
SUDARIEN D. SMITH,
Individually and on behalf of
all others similarly situated,

        Plaintiffs,

v.

HOLIDAY INN CLUB VACATIONS,
INC. f/k/a ORANGE LAKE COUNTRY
CLUB, INC. and WILSON RESORT
FINANCE, LLC,

        Defendants.

_____/

**DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFFS'**
**PROPOSED EXPERT CHRISTOPER YOUNG**

Grace L. Mead
Andrea N. Nathan
Joseph J. Onorati
STEARNS WEAVER MILLER WEISSLER
 ALHADEFF & SITTERSON, P.A.
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida  33130

July 16, 2024

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...........................................................................................iii

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 2

    A.   The Parties and the Claims Asserted ................................................................ 2

    B.   Plaintiff Counsel's Strategic Decision Not to Offer any Class Action Expert .......... 2

        1.   Plaintiffs' counsel recognized the deadline for disclosing any class action expert, recognized their need to present a "damages model," and invoked those as reasons for two extension. ..................................................... 2

        2.   Plaintiffs' counsel never took any discovery about any out-of-network uses of the timeshares. ............................................................................. 4

        3.   Plaintiffs' counsel made a strategic decision not to serve an expert report. .......................................................................................................... 4

    C.   The Young Report and Deposition ................................................................... 4

        1.   Young had no qualifications to value timeshares or real estate. ...................... 5

        2.   Young offered no basis for his conclusion that "Mr. Habibi failed to consider relevant information that the Defendants have." ................................. 6

        3.   Young did not and could not identify "a common methodology" for valuing points and their uses. ......................................................................... 7

        4.   Young did not and could not establish a per point value for the proposed Class members. ................................................................................ 7

        5.   Young did not and could not establish a "market" value for any of the points used by the individual Plaintiffs or proposed class members throughout the class period. ............................................................................ 9

YOUNG'S REPORT AND HIS OPINIONS MUST BE EXCLUDED .................................... 15

I.   Federal Rules of Civil Procedure 26 and 37 Require Excluding Young's Report and Opinions .......................................................................................................... 15

    A.   The Federal Rules of Civil Procedure and Eleventh Circuit Precedent Require Striking the Young Report and his Proposed Opinions ............................ 15

B.    The Young Report is No Rebuttal Report ................................................................ 17

II.    Young's Opinions Must Be Excluded as Unqualified, Unreliable, and Unhelpful ............. 18

    A.    Young Had No Qualifications to Speak to the Valuation of Timeshares or Real Estate ................................................................................................... 19

    B.    Young Explained No "Common Methodology" ....................................................... 19

        1.    Young's opinion about a "common methodology" is impossible to discern. ................................................................................................. 19

        2.    Young's opinion does not and cannot explain how the "common methodology" would work for either the individual Plaintiffs or the proposed class members. ............................................................................ 20

    C.    Young Did Not Base His Opinions on Sufficient Facts or Data ............................. 21

        1.    Young's opinions must be excluded because he reached conclusions before—and without—evaluating the underlying data. .................................. 21

        2.    Young ignored all of the seemingly important data. ....................................... 23

        3.    Young offered no basis in experience for his conclusions. .............................. 24

    D.    Young Offers No Opinions That Are Helpful .......................................................... 24

CONCLUSION ................................................................................................................ 25

CERTIFICATE OF SERVICE ........................................................................................ 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Honda Motor Company v. Allen*,
  600 F.3d 813 (7th Cir. 2010) ...............................................................................18

*Benkwith v. Matrixx Initiatives, Inc.*,
  467 F.Supp.2d 1316 (M.D. Ala. 2006) ................................................................22

*Bivens v. Stein*,
  759 Fed. Appx. 777 (11th Cir. 2018)...................................................................19

*Brown v. Electrolux Home Products, Inc.*,
  817 F.3d 1225 (11th Cir. 2016) ...........................................................................15

*Buland v. NCL (Bahamas) Ltd.*,
  992 F.3d 1143 (11th Cir. 2021) ...........................................................................21

*Claar v. Burlington N. R.R. Co.*,
  29 F.3d 499 (9th Cir. 1994) .................................................................................22

*Cook v. Sheriff of Monroe County, Fla.*,
  402 F.3d 1092 (11th Cir. 2005) ...............................................................18, 20, 24

*General Electric Co. v. Joiner*,
  522 U.S. 136 (1997)..............................................................................................21

*Hughes v. Kia Motors Corp.*,
  766 F.3d 1317 (11th Cir. 2014) ...........................................................................21

*Martin v. City of Atlanta Ga.*,
  579 F. Appx. 819 (11th Cir. 2014).......................................................................23

*Perry v. United States*,
  755 F.2d 888 (11th Cir. 1985) .............................................................................21

*PODS Enterprises, Inc. v. U-Haul International, Inc.*,
  2014 WL 12628664 (M.D. Fla. June 27, 2014)...................................................23

*Reese v. Herbert*,
  527 F.3d 1253 (11th Cir. 2008) .....................................................................15, 16

*Rink v. Cheminova, Inc.*,
  400 F.3d 1286 (11th Cir. 2005) ...........................................................................21

*S. Grouts & Mortars, Inc. v. 3M Co.*,
    575 F.3d 1235 (11th Cir. 2009) ........................................................................20

*Sher v. Raytheon Co.*,
    419 F. App'x 887 (11th Cir. 2011) ...................................................................18

*Travelers Property Casualty Company v. Ocean Reef Charters LLC*,
    71 F.4th 894 (11th Cir. 2023) ..........................................................................18

*United States v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004) ..................................................................19, 24

*United States v. Hawkins*,
    934 F.3d 1251 (11th Cir. 2019) ........................................................................21

*Viterbo v. Dow Chemical Co.*,
    826 F.2d 420 (5th Cir. 1987) ............................................................................22

**Rules and Regulations**

Fed. R. Civ. P. 23............................................................................................1, 15, 16

Fed. R. Civ. P. 26............................................................................................1, 15, 16

Fed. R. Civ. P. 37...................................................................................................1, 16

Fed. R. Evid. 702 .......................................................................................1, 18, 21

Fed. R. Evid. 703 ....................................................................................................1

**Other Authorities**

Wright & Miller, 29 *Federal Practice and Procedure* § 6264.2 & n. 12 (Westlaw) .....................19

Wright and Miller, 29 *Federal Practice & Procedure* § 6268 (Oct. 2020 Update) ......................23

*The Litigation Services Handbook Sixth Edition*. Ex. A ¶¶ 41-42,
    52 & nn. 41-42, 45 ............................................................................................7

Defendants Holiday Inn Club Vacations, Inc. and Wilson Resort Finance, LLC (collectively, "Holiday Inn Club Vacations" or "HICV"), move, under (a) Federal Rules of Civil Procedure 23, 26, 37, and (b) Federal Rules of Evidence 702-703, to exclude the proposed expert opinions of Christopher W. Young:

### INTRODUCTION

Over 18 months ago, the individual Plaintiffs, who used over 1.7 million Holiday Inn Club Vacations points both within and outside of the HICV network, sued. They sought to represent a proposed class spanning five years, and requested relief including rescission and restitution as well as "actual damages."

Plaintiffs' counsel has never sought discovery of documents or data about the many ways in which HICV owners use their points outside of the HICV network or the value of those point uses. Last fall, Plaintiffs' counsel also chose not to serve any expert report on class certification issues when it was due, instead blowing their deadline by about two months. Defendants then timely served their real estate and timeshare expert's report.

Enter Plaintiffs' proposed expert Christopher Young. His report asserts that "a common methodology can be used to estimate the offset due to Holiday Inn using the market approach to value Holiday Inn points." Ex. A at ¶ 35(b), but that common methodology is both a muddle and a mystery. Young cites to a treatise chapter addressing the valuation of businesses and invokes the buzzword "market approach" but does little else other than misdescribe the deposition of a HICV fact witnesses. Young testified: "I asked to see all data relating to pricing, and I was told it's not available at the moment." Ex. B at 84. Instead of identifying a "common methodology," he testified "[o]nce I get all of the data, we can calculate all of—all of—I can give you thousands of calculations." Ex. B at 186. As explained below, pp. 5-15, his deposition made clear that he

1

has nothing to offer but speculation. His opinions must be excluded for all purposes for many reasons.[1]

## BACKGROUND

### A.      The Parties and the Claims Asserted

Holiday Inn Club Vacations is a multi-site vacation ownership or timeshare company that offers vacation and travel services to consumers through ownership in the Orange Lake Land Trust (the "Trust"). DE 20 ¶¶ 2, 15, 51, 52. HICV's points-based timeshare network conveys a right to use a total of 40 HICV condominiums within the network spread across 14 states. DE 77 at 3. HICV also has agreements with other companies that permit HICV owners to use their points for airline tickets, cruises, rental cars, and VIP Events. DE 77 at 3. HICV also has interconnection agreements with the exchange companies RCI and Interval International, and RCI alone has over 4,000 affiliated resorts in about 110 countries plus offers hotels, activities, flights, and more. DE 77 at 3-4.

On February 24, 2023, Plaintiffs filed this proposed class action under the Military Lending Act. DE 1. The operative Second Amended Complaint seeks to assert an MLA class claim and an individual claim for common law fraud, DE 20, and requests relief including rescission and restitution as well as "actual damages." DE 20 at 38-39.

### B.      Plaintiff Counsel's Strategic Decision Not to Offer any Class Action Expert

> **1.      Plaintiffs' counsel recognized the deadline for disclosing any class action expert, recognized their need to present a "damages model," and invoked those as reasons for two extension.**

At an October 20, 2023 hearing, Plaintiffs' counsel recognized the need to present an affirmative "damages model" that included addressing proposed class members' "use [of] the

---

[1] Citations to "DE __" are to the docket in the above-referenced case. Citations to "Ex. __" are to the Exhibits accompanying this Motion. Emphasis is added and internal citations, quotations, brackets, emphases, and objections are omitted unless otherwise indicated.

timeshare":

> [O]nce we get the list of these individuals who were active duty at the time, then we can step back to the damages. You know, how many of those people paid money? How much money did they pay? *Did they use the timeshare? Those are kind of the secondary list of discovery that we would need so that I can present a class certification, my damages model. And we've got an expert report that's coming up at the end of November* on the deadline we have.

DE 54 at 12.

On November 9, 2023, Plaintiffs' counsel wrote to HICV's counsel requesting a 60-day extension from the initial scheduling order, DE 32, because "Plaintiff's expert does not have sufficient time to evaluate class information and damages prior to Plaintiffs' current expert report deadline." Ex. C. HICV's counsel agreed, and the class certification deadlines were extended. DE 56; DE 58.

On December 19, 2023, Plaintiffs' counsel wrote: "I can confirm that Plaintiff will accept this data along with copies of the actual contracts for the 400 identified individuals as compliant with Defendant's discovery obligations at this stage of the litigation." Ex. D. He went on to ask about the timing of the production of data requested, emphasizing: "our Expert requires all of this data in order to create the necessary calculations and compilations for his report," and "[h]e cannot perform his tasks on an incomplete set of data." Ex. D.

On December 29, 2023, Plaintiffs' counsel then filed an unopposed motion to extend the class certification deadlines by 30 days. On January 3, 2024, this Court then entered the Second Amended Case Management and Scheduling Order, which specified "Plaintiff's Deadline for Disclosing Class Action Expert Report(s)" as March 26, 2024 and the discovery deadline for class certification of May 28, 2024:

| | |
|---|---|
| **Plaintiff's Deadline for Disclosing Class Action Expert Reports(s)** | March 26, 2024 |
| **Defendant's Deadline for Disclosing Class Action Expert Report(s)** | April 26, 2024 |
| **Discovery Deadline – Class Certification** | May 28, 2024 |

DE 61.

### 2. Plaintiffs' counsel never took any discovery about any out-of-network uses of the timeshares.

Plaintiff Smith also testified that in addition to staying at HICV resorts, he has stayed at Intercontinental Hotel Group resorts about ten times, DE 77-8 at 173-174, that he thinks he has converted them to airline miles, DE 77-8 at 174, and that he may have converted his HICV points to rental car points, DE 77-8 at 174. HICV produced records establishing that Plaintiff Smith used 694,000 points for 30 stays at HICV resorts under his name and 1,412,951 points for stays at Intercontinental Hotel Group resorts, 231,116 points for airfare, and 150,444 points for car rentals. DE 77-11 [HICVLINGARD039359]; DE 77-1 at 91-92. Throughout 2023, Plaintiffs issued request for productions, requests for admissions, and interrogatories to HICV but never any directed toward out-of-network uses of timeshares by HICV owners. Ex. E.

### 3. Plaintiffs' counsel made a strategic decision not to serve an expert report.

On January 19, 2024, Plaintiffs' counsel wrote indicating that Plaintiffs "may not have an expert at all":

> [W]e may not have an expert at all. We are still considering whether we need one for this type of case, now that we have seen the discovery.

Ex. F.

On March 26, 2024, Plaintiffs did not identify an expert or serve an expert report. On April 26, 2024, Defendants timely served the report of real estate and timeshare expert Paul Habibi. Ex. G.

### C. The Young Report and Deposition

On the day that class discovery closed, Plaintiffs' counsel served the Expert Report of Christopher W. Young ("Young Report"). On June 13, 2024, Defendants filed an unopposed

motion for relief from the class discovery deadline to take document and deposition testimony from Young to, among other things, facilitate the resolution of a motion to strike his report and testimony. DE 67. On June 17, 2024, this Court granted the motion by docket entry "for the limited purposes identified in Defendants' Motion" and specified that "[n]o further extensions will be granted absent extraordinary circumstances." DE 68.

### 1.    Young had no qualifications to value timeshares or real estate.

Young has an MBA, with a focus in finance and professional accounting but is not a certified public accountant. Ex. B at 14-15. He has a Ph.D. in economics, with a focus on "cultural economics" and his dissertation addressed the "economics of religion." Ex. B at 15-16. He's currently studying for a master's degree at Harvard University, focused on "[t]he psychological aspect of how people make economic decisions." Ex. B at 16.

At deposition, Young admitted that his only experience with hospitality companies was in two prior cases involving hotel companies but refused to disclose the names of the cases, claiming: "I cannot disclose those to you at this time." Ex. B at 31. Young testified that "I have a confidentiality agreement related to every case I work on," Ex. B at 32, but admitted that he had not "provided any of the confidentiality agreements, from any of the litigation cases [he has] worked on, to Plaintiffs' Counsel," Ex. B at 32. He then admitted that he would not "answer any substantive questions about any of the litigation [he's] worked on, in this deposition." Ex. B at 32. When asked "[d]id you do any research into the hospitality industry that affected any of the opinions offered [] in your expert report," he testified: "No." Ex. B at 46.

Young also admitted that his only timeshare experience was with "litigation cases." Ex. B at 26, but again, refused to provide case names based on confidentiality agreements that he had not provided to any lawyer in this case. Ex. B at 26-27. Young admitted he could not remember "any other experience, in timeshare" he had "not already described." Ex. B at 29. When asked if

5

he relied "on any information not cited by Defendants' expert, Paul Habibi, in preparing your opinions in this case about the timeshare industry," Young testified: "I did not." Ex. B at 42.

Though he has substantial experience with valuing public and private companies, when pressed on real estate valuation issues, Young testified: "I would answer that question if I was a real estate appraiser, but I'm not; so I can't." Ex. B at 136. When asked about "real estate" more generally, he testified: "I can't answer. Even if I did have—even if I did know it, I can't answer it because I'm not a real estate professional, and I'm moving outside of my lines of expertise." Ex. B at 137-138.

**2.    Young offered no basis for his conclusion that "Mr. Habibi failed to consider relevant information that the Defendants have."**

The Young Report summarized his first opinion as: "In coming to his conclusions, Mr. Habibi failed to consider relevant information that the Defendants have." Ex. A ¶ 35.

In support, the Young Report asserts that "Holiday Inn *should know* the value of the underlying contracts" with each purchaser, Ex. A ¶ 36, "Holiday Inn *likely assesses* the profitability of the contract" with each purchaser, Ex. A ¶ 36, and when rolling over contracts "Holiday Inn *must be considering* the value of the point," Ex. A ¶ 37. It also references what "*a company would typically* do to assess financial performance and operations when setting the price of points." Ex. A ¶ 37. In support of those assertions, the Young Report cites nothing.

At deposition, Young also admitted that he does not know if HICV analyzes profitability at the individual owner level, Ex. B at 179, he does not know if instead HICV does global modeling to analyze pricing and profitability, Ex. B at 179-182, and that he has no experience with what timeshare companies typically do, Ex. B at 181.

The Young Report then criticizes Habibi for failing to consider the deposition testimony of Michael Gould, Senior Vice President of Inventory Management at HICV, Ex. A ¶ 38, but it

6

ignores that Habibi had one of his associates speak with Gould in preparing his report, DE 77-12 at 56-57, 103-04. The Habibi Report was timely served before Gould's deposition, [CITE], at Habibi's deposition he testified that he had since read "the Gould transcript," DE 77-12 at 56, and Plaintiffs' counsel asked no questions about any inconsistencies between Habibi's report and Gould's deposition. There are none.

### 3. Young did not and could not identify "a common methodology" for valuing points and their uses.

The Young Report summarized the second of his two opinions as "[a] common methodology can be used to estimate the offset due to Holiday Inn using the market approach to value Holiday Inn points." Ex. A ¶ 35. At deposition, Young asserted that "the entire [valuation] industry accepts my approach" and searching Amazon for books on valuation would yield "hundreds of books and they're all going to say the same thing." Ex. B at 160-161.

But the Young Report itself cites a single secondary source for his generic references to "the income method, the cost method, and the market approach method," namely Chapter 11 of *The Litigation Services Handbook Sixth Edition*. Ex. A ¶¶ 41-42, 52 & nn. 41-42, 45. At deposition, he admitted that Chapter 11 is titled "Business Valuation." Ex. B at 141. He admitted that no "part of Chapter 11 addresses" "valuing timeshares" or "valuing real estate interests." Ex. B at 141. When pressed on whether the income method, the cost method, and the market approach methods ever yield different valuations for real estate, he testified: "I would answer that question if I was a real estate appraiser, but I'm not; so I can't." Ex. B at 136.

### 4. Young did not and could not establish a per point value for the proposed Class members.

The Young Report first examines the "Cost Approach to Value Holiday Inn Points," referencing six groups of purchasers. Ex. A ¶¶ 42-50. Young proposes that, under the cost

approach, one would divide the price in the purchase agreement by the number of points purchased to obtain a price per point. Ex. A ¶¶ 43, 48-49.

In a table, the Young Report then performs division for the six groups of purchasers in eleven rows, listing them in no discernable order, with purchase dates ranging from May 4, 2019 to August 10, 2021, with points purchased ranging from 50,000 to 425,000. As shown in the two excerpted rows, his division showed a price per point ranging from $0.15 to $0.30:

| Table 2—Price Per Point | | | | |
|---|---|---|---|---|
| Name | Transaction Date | Points Purchased | Purchase Price | Price Per Point |
| Matthew Gayle & Angela Gayle | 5/4/20/19 | 50,000 | $7,500 | $0.15 |
| Bolin Belles | 8/4/2019 | 50,000 | $15,009 | $ 0.30 |

Ex. A ¶ 49. On its face, this table establishes that the values of the points based on his division diverges substantially.

The Young Report then cites Gould's deposition "that the value of the points is different than the price paid for them" given the large range of potential uses, and the Young Report concludes "[e]ssentially, market observations exist that are better indicators of value." Ex. A ¶ 49.

At deposition, Young then retreated from that conclusion and said that for value of points he does recommend using the "cost approach," Ex. B at 52-53, but gave even more reasons undermining that approach. He admitted that he does not know how the groups of purchasers were selected but testified that he asked his research assistant for a "handful." Ex. B at 182-183. He testified that they were only "an example," "a snippet of" "data," and "I don't use this, for any other purpose, in this report, other than showing an illustration." Ex. B at 57. He testified: "I do not have data to do any sampling ma'am. So no, I have not done any sampling." Ex. B at 70.

8

He further testified: "I wasn't asked to parse any damages out to individuals. At some point in the future, I may be asked to do that." Ex. B at 113. He also testified: "That was for illustrative purposes; I'm not providing you a—a damages calculation at this point in time." Ex. B at 119. For the Adams and the Paterson couples, he did not know why the point totals listed in their HICV documents did not match the points totals recited in rows of his table. Ex. B at 114-115. So it is unclear that even the inputs into his illustrations are even accurate, leaving the issue of how the table is capable of establishing a "common methodology" even more of a mystery.

**5. Young did not and could not establish a "market" value for any of the points used by the individual Plaintiffs or proposed class members throughout the class period.**

The Young Report then considers the "market approach" to valuing Holiday Inn Club Vacation points. It cites the treatise chapter on business valuation to define the "market approach" as an "analysis of market data on transactions or other relative value indicators that are comparable to the item or entity being valued." Ex. A ¶ 52 & n.45.

Young testified he defines the value of the points used by the individual Plaintiffs and proposed class members as "the price of the services received" "in a given year or given point in time." Ex. B at 56. He admitted that in preparing the Young Report he was "solely looking to market indications of value [] to define the services received by any of the proposed class members." Ex. B at 56.

**a. Young knew and learned nothing about the data about which he speculated.**

Young admitted he had no "input into any of the discovery requests that Plaintiffs issued here." Ex. B at 168. When asked if Plaintiffs had requested third-party invoices or data, he said: "I don't know. I be—I believe so, but I'm not sure. I'm not certain." Ex. B at 84. He testified: "I asked to see all data relating to pricing, and I was told it's not available at this moment; that

9

we're seeking to get that information." Ex. B at 84. As explained above, p. 1, despite the individual Plaintiffs' use of HICV points for out-of-network resort stays, car rentals, and airline tickets, Plaintiffs' counsel has never issued any written discovery requests for any such out-of-network uses by the individual Plaintiffs or the proposed class members. Ex. E.

Young identified Gould's deposition as "the one [deposition] that provided me the information that I needed to understand" "the mechanisms of how things are tracked," Ex. B at 84, but admitted that he does not know what the HICV data will show:

> Well, I'm—*I'm assuming; maybe it's a bad assumption, but I'm assuming, at some point in the future, should the case move forward, that data's going to be shared by Holiday Inn.*
>
> *Now, how does Holiday Inn produce it? Do they produce it? We're not sure.*
>
> But we're sure Holiday Inn has the data because Mr. Gould testified they had the data.

Ex. B at 79-80. As for the benefits received by Plaintiffs and proposed class members, Young testified: "perhaps I'd calculate it—I'm not sure—I'm not sure about the future until we get the data." Ex. B at 98.

He nonetheless testified: "once I get all of the data, we can calculate all of—all of—I can give you thousands of calculations." Ex. B at 186. But he was compelled to concede that he reached that even that very limited conclusion "before receiving the data":

> Q.    *And you reached that conclusion that you can make those calculations before receiving the data, correct?*
>
> A.    *I do not have the data yet; that is correct.* But Mr. Gould has said that the data exists.

Ex. B at 187.

10

      **b.**      **Young referenced six ways proposed class members used their points but knew and learned nothing about the underlying agreements and data.**

The Young Report then mentions six different ways proposed class members used their points, but he never saw any of the HICV documents or agreements governing those uses, he did not review any pricing data, he did not determine if any of the agreements changed over time, he did not try to determine whether any of the sources for pricing data might conflict, and he did not try to address how to reconcile any such conflicts.

*(1) Purchase of Points to Complete a Transaction*: The Young Report references Gould's testimony that HICV point holders have the option to purchase additional points and that purchase price is set "at the inception of the program." Ex. A ¶ 54. At deposition, Young admitted that he has never "seen any document addressing the purchase of additional points [] to complete a transaction." Ex. B at 126. When asked about the program to which Gould was referring, Young admitted: "I don't know. I'm just going by what [Gould] says here." Ex. B at 128-129.

*(2) Conversion to IHG Points and Sale of IHG Points*: The Young Report says "Holiday Inn Points can be converted to IHG Points" in "a conversion rate of [HICV] points to IHG points," "IHG sells points through its own website," and "IHG points can [also] be sold in secondary markets." Ex. A ¶ 55-59. At his deposition, Young admitted that he has never seen any agreement between IHG and HICV, has never seen any invoice sent from IHG to HICV, and did not know whether or not he has seen any data about IHG. Ex. B at 81, 100. When shown Gould's testimony about the agreement between IHG and HICV, Young admitted he does not "know how that agreement has changed a few times over the last five years." Ex. B at 82. Young also admitted that he does not "know if any invoice, from IHG, breaks down the information by Holiday Inn Club Vacation owner." Ex. B at 82. As for the two websites cited in the Young

11

Report that offer to purchase IHG points on the secondary market, he did not know whether they required the sale of a minimum quantity of IHG points, Ex. B at 92, whether the type of IHG points affects the pricing, Ex. B at 93-94, does not know the date on which he tried obtain a quote, Ex. B at 94, and does not know whether any HICV owner has enough points to meet the required threshold, Ex. B at 94. He also testified that he does not know which of those two websites offers a higher price for IHG points. Ex. B at 96. He admitted: "I don't have the data, but as soon as I get the data, we'll do the calculations." Ex. B at 97.

*(3) Airfare*: The Young Report references the ability of HICV owners to "book their airfares through a third party vendor called Arrivia," cites testimony from Gould that HICV "is sent an invoice by Arrivia for their services that includes the price of an airline ticket," and asserts "t[]he value of a [HICV] point can be calculated as [] the invoiced amount of the flight divided by the total number of points that the [HICV] point holder used." Ex. A ¶ 60(a). At deposition, Young admitted that he does not know how Arrivia calculates prices, Ex. B at 82, that he has not seen any invoices sent from Arrivia to HICV, Ex. B at 67, 104, and that he has not seen any data transmitted from Arrivia to HICV, Ex. B at 68. When asked "do you have any idea whether that invoice would permit you to make any calculations about the cost of any individual purchasers booking to Holiday Inn Club Vacations," he testified: "I can't answer the question, until I have the data." Ex. B at 68.

*(4) Car Rentals*: The Young Report references the option of HICV point holders to "book rental cars that utilizes a third-party such as an Expedia subsidiary to book a car" and asserts that the number of points used could be divided by what a "rental car [] typically costs" to determine a value. Ex. A ¶ 60(b). At deposition, he admitted he had not "ever seen any agreement between any external company and Holiday Inn Club Vacations about rental cars," Ex. B at 105, "any

document from someone outside of Holiday Inn Club Vacations transmitted to someone at Holiday Inn Club Vacations about rental cars," Ex. B at 106, or "any data from any third party about the use of Holiday Inn Club Vacation points for rental cars," Ex. B at 106. The Young Report also identifies no source or methodology for determining the "typical[] cost" of a car rental.

*(5) Maintenance Fees*: The Young Report references that HICV point holders can "use points to pay for the maintenance fees they owe" and asserts for such payments "a value for the points could be determined by taking the value of the maintenance fees paid divided by the [] points used." Ex. A ¶¶ 60(a)-(c). But, at deposition, when asked "[w]hat, if anything, did you do to research the maintenance fee payments for this case," Young testified: "Nothing." Ex. B at 52.

*(6) TimeshareWare and HICV Property Rentals*: The Young Report references "TimeshareWare" and says it "includes information on the number of points used by a [HICV] point holder for a week at a hotel as well as the cost" for the general public, and says one of those stay costs can be divided by the points used. Ex. A ¶¶ 38, 60(a). Young testified that he has never used TimeshareWare and only took "a demo" after serving his report "[b]ecause I didn't think it was relevant, and I still don't think it is relevant." Ex. B at 79. Instead, he testified his opinion is based on "assuming; maybe it's a bad assumption" but "that data's going to be shared by Holiday Inn." Ex. B at 79. As for the cost to the general public, Young testified he did not investigate any differences in rental pricing to the general public based on seasonality, Ex. B at 60, and that he knows that companies offer different rental pricing through different marketing channels but did not investigate those pricing differences," Ex. B at 60-62. Then, contrary to his report, he testified actual rental prices have "nothing to do with my analysis." Ex. B at 64.

**c.    Young has never addressed three ways that proposed class members used their points.**

The Young Report makes no mention of three out-of-network uses by Holiday Inn Club Vacation owners, and, at deposition, Young admitted he had seen none of the relevant agreements or data about that pricing:

*(1) External Exchanges*: HICV owners can use their points with the exchange companies, most notably Interval International and RCI. DE 77-1 at 20, 41, 61. RCI alone has over 4,000 affiliated resorts in about 110 countries plus offers hotels, activities, flights, and more. DE 77 at 3-4. HICV does not have information on how its members use their RCI points, DE 77-1 at 105, and does not have access to information about any dollar value associated with that point use, De 77-1 at 105. Young also admitted he had never "seen a copy of any agreement between RCI and Holiday Inn Club Vacations, "any document sent by RCI to Holiday Inn Club Vacations," or "any data transmitted from RCI to Holiday Inn Club Vacations." Ex. B at 100-101.

*(2) VIP Experiences*: HICV point holders can use their points for VIP Experiences, such as "backstage passes to entertainment venues, tickets to live shows, and outdoor adventures." Ex. A ¶ 43 (citing Holiday Inn Club Vacations Member Guide). At deposition, Young testified: "I know the VIP events require more points than a non-VIP event; I'm not sure how many points though." Ex. B at 102.

*(3) Cruises*: Through Arrivia, HICV points-holders can also book cruises. DE 77-1 at 75. At his deposition, Young admitted that he had not "seen any agreement between any third party and Holiday Inn Club Vacations about booking cruises on cruise ships," Ex. B at 107, any "document transmitted by any third party, to Holiday Inn Club Vacations, about Holiday Inn Club Vacation owners taking cruises," Ex. B at 107, or "any data from any third party about cruise trips taken by Holiday Inn Club Vacation owners," Ex. B at 108.

14

**YOUNG'S REPORT AND HIS OPINIONS MUST BE EXCLUDED**

I.    **Federal Rules of Civil Procedure 26 and 37 Require Excluding Young's Report and Opinions**

A.    **The Federal Rules of Civil Procedure and Eleventh Circuit Precedent Require Striking the Young Report and his Proposed Opinions**

Federal Rule of Civil Procedure 26(a)(2) requires a party to make expert disclosures "at the times and in the sequence that the court orders." The "expert disclosure rule is intended to provide opposing parties a reasonable opportunity to prepare for effective cross examination and perhaps arrange for testimony from other witnesses." *Reese v. Herbert*, 527 F.3d 1253, 1265 (11th Cir. 2008). The operative scheduling order identified "Plaintiff's Deadline for Disclosing Class Action Expert Report(s)" as March 26, 2024 and the discovery deadline for class certification as May 28, 2024. DE 61.

As explained above, Plaintiffs sued here some 18 months ago, the scheduling orders have never provided for expert rebuttal reports on class issues, and Plaintiffs' counsel sought and obtained two extensions of the scheduling order to serve an expert report by the March 26 deadline. On that date, Plaintiffs' counsel served no expert report.

The Young Report is an initial report addressing issues on which Plaintiffs squarely bear the burden of proof. In *Brown v. Electrolux Home Products, Inc.*, 817 F.3d 1225, 1233-1234 (11th Cir. 2016), the Eleventh Circuit explained that the Supreme Court has long held that "[t]he party seeking class certification has the burden of proof," to "affirmatively demonstrate his compliance with Rule 23 by proving its requirements are in fact satisfied."

Long before the March 26 deadline, Plaintiffs' counsel should have known how that burden would play out in this MLA case. The operative complaint seeks "actual damages" and rescission and restitution. DE 20 at 38-39. As explained in Defendants' Opposition to Plaintiffs' Motion for Class Certification, DE 77, which is incorporated by reference in its entirety, for the

15

rescission and restitution remedy they seek, Plaintiffs must show that the unwinding of performance (as opposed to a remedy by money judgment) is both feasible and equitable on the facts of the case" a and "[a] judicial decree of rescission typically provides for," among other things "the restoration of performance on either side" and "a mutual accounting in which each party pays for benefits received from the other side." DE 77 at 23 (quoting *Restatement of Restitution* and collecting cases). As also explained in that Opposition, to establish "actual damages," "a plaintiff must present evidence to establish a causal link between the [any] noncompliance and his damages." *Id.* (collecting cases).

Indeed, Plaintiffs' counsel not only should have known of the need to offer an expert to meet their burden at class certification, they did know. As explained above, Plaintiffs' counsel repeatedly invoked their expert's need to review documents and data, including about timeshare uses within the HICV network at a hearing, in emails, and in a motion to this Court seeking and obtaining an extension of the class certification deadlines.

Under Federal Rule of Civil Procedure 37(c)(1), the failure to disclose "all opinions" from a retained expert means that "the party is not allowed to use that information or witness to supply evidence on a motion . . . or at a trial, unless the failure was substantially justified or is harmless." Untimely disclosure that prejudices the ability to depose the expert, cross-examine the expert, and offer competing expert testimony is neither substantially justified nor harmless but rather prejudice that warrants exclusion. *Reese*, 527 F.3d at 1264-66.

The Young Report—disclosed some two months too late and on the day class certification discovery closed—must be excluded. Though HICV's counsel had an opportunity to depose Young, at his deposition it was plain that there were many topics that could not be fully explored because of the late-breaking deposition. As explained above, Young refused to answer

16

questions about his prior cases and invoked confidentiality agreements that he had not even supplied to Plaintiffs' counsel for their review. He repeatedly speculated about the contents of contracts and data, which Plaintiffs never sought in discovery and Young had never reviewed. Though Young's opinions did not survive cross-examination, HICV's counsel and its expert should have had the opportunity to fully explore all of these topics before serving the Habibi report and before the close of class discovery. Blowing the deadline for serving the Young Report was neither substantially justified nor harmless. Fed. R. Civ. P. 26(a)(2)(d) ("[a] party must make these disclosures at the times and in the sequence that the court orders"): *see also, Jetport, Inc. v. Landmark Aviation Miami, LLC*, 2017 WL 7732868, at \*7 (S.D. Fla. July 10, 2017) (striking expert witness after disclosing the expert "mere three (3) days before the close of discovery").

### B.  The Young Report is No Rebuttal Report

The Young Report is not titled a rebuttal report and it is not. Though parts of the Young Report quote and discuss Habibi's report, the core of the Young Report was his assertion that "[a] common methodology can be used to estimate the offset due to Holiday Inn using the market approach to value Holiday Inn points." Ex. A ¶ 35. As explained above, pp. 15-16, that is an issue on which Plaintiffs squarely bear the burden of proof both as the movant for class certification and the party seeking rescission and restitution as well as actual damages.

In their Motion for Class Certification, Plaintiffs argue that as for "Class Members' use of their timeshare points," "Defendants' plead setoff as an affirmative defense" DE 72 at 33. But Defendants made clear that they were "assert[ing] the following defenses, without assuming the burden of proof where the burden is otherwise on Plaintiffs and without waiving the right to argue that any actually defeat the elements that the Plaintiffs must prove to establish their

17

claims." DE 39 at 14. That is precisely the argument made in Defendants' Opposition to Class Certification and here.

Under governing Eleventh Circuit precedent that means Plaintiffs' counsel cannot camouflage the Young Report as a rebuttal report. In *Travelers Property Casualty Company v. Ocean Reef Charters LLC*, 71 F.4th 894, 898 (11th Cir. 2023), the Eleventh Circuit ruled the plaintiffs could not sneak in an expert report on an issue on which they bore the burden of proof by labeling it a rebuttal report. The Eleventh Circuit began by ruling that the plaintiff insurer "bore the burden of proof under Florida law." *Id.* at 904. It then ruled that "[b]ecause [plaintiff insurer] did not disclose an expert to testify in its case-in-chief, it lacks evidence from which a jury could reasonably find in its favor." *Id.* at 906. It then rejected the characterization of an untimely expert report as "rebuttal" because the expert addressed an issue that the Plaintiff insurer would "need to prove." *Id.* at 908. The core of Young's report likewise addressed an issue on which Plaintiffs bear the burden of proof, and quoting from the Habibi report and characterizing the Young Report as a rebuttal report is far too little, far too late, to salvage it.

## II.     Young's Opinions Must Be Excluded as Unqualified, Unreliable, and Unhelpful

Under Federal Rule of Evidence 702, the proponent of expert testimony must show by a preponderance of evidence that "the witness is qualified to testify competently, that his opinions are based on sound methodology, and that his testimony will be helpful to the trier of fact." *Cook v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1107 (11th Cir. 2005). At class certification, the Court must "conduct a *Daubert*-like critique of the proffered expert's" qualifications and opinions before considering them in connection with a motion for class certification. *Sher v. Raytheon Co.*, 419 F. App'x 887, 890 (11th Cir. 2011); *see also American Honda Motor Company v. Allen*, 600 F.3d 813, 815-816 (7th Cir. 2010).

A.      **Young Had No Qualifications to Speak to the Valuation of Timeshares or Real Estate**

An expert must be "qualified to testify competently regarding the matters he intends to address," and the Eleventh Circuit has affirmed the exclusion of expert testimony where an expert "needed more specific experience in the area he was dealing with." *Bivens v. Stein*, 759 Fed. Appx. 777, 781 (11th Cir. 2018). "[Q]ualification to testify as an expert [] requires that the area of the witness's competence matches the subject matter of the witness's testimony." Wright & Miller, 29 *Federal Practice and Procedure* § 6264.2 & n. 12 (Westlaw) (collecting cases).

As explained above, though Young has an educational background in international finance topics and valuing companies, he did not testify about any relevant background in hospitality or timeshare. And, when pressed on real estate valuation issues, he testified: "I would answer that question if I was a real estate appraiser, but I'm not; so I can't." Ex. B at 136. When pressed again, he further testified: I can't answer. Even if I did have—even if I did know it, I can't answer it because I'm not a real estate professional, and I'm moving outside of my lines of expertise." Ex. B at 137-138. That requires excluding his opinions about timeshare and real estate values here.

B.      **Young Explained No "Common Methodology"**

Young failed to explain any "methodology" in his report or at his deposition, let alone a "sound" one that could pass muster under the Federal Rules of Evidence, *Daubert*, or its progeny.

1.      **Young's opinion about a "common methodology" is impossible to discern.**

An expert opinion is unreliable where an expert describes his opinion differently in different places in a report, "making the very meaning of his basic opinion [] uncertain" and "[t]he specific meaning of the opinion impossible to discern." *United States v. Frazier*, 387 F.3d

19

1244 (11th Cir. 2004) (en banc); *see also Cook v. Sheriff of Monroe County, Florida*, 402 F.3d 1092 (11th Cir. 2005).

As explained above, the Young Report rejects the cost approach for determining the value of points. It cites Gould's deposition "that the value of the points is different than the price paid for them" given the large range of potential uses, and concludes "[e]ssentially, market observations exist that are better indicators of value." Ex. A ¶ 49. But at deposition Young then retreated from that conclusion and said that for value of points he does recommend using the "cost approach," Ex. B at 52-53. His proposed opinion about the role of the value per point he calculates in his analysis is impossible to discern.

More broadly, it is impossible to discern the source of value for any of the six different types of transactions identified in the Young Report. As explained above, he has not reviewed any of the relevant, underlying contracts, invoices, or data and only speculates about what they may show. He also frequently points to sources that may establish conflicting values, most notably the data he speculates TimeShareWare may house about the number of points required for a stay or the prices charged to the general public. But he does nothing to explore those specific values at any point in time, whether those values conflict, or how to reconcile any conflicting values. So his opinions there too are impossible to discern.

> **2.    Young's opinion does not and cannot explain how the "common methodology" would work for either the individual Plaintiffs or the proposed class members.**

Courts should also exclude opinions disclosed in reports "pervaded by conclusory statements" and that contain "no explanation" underlying the conclusions reached. *S. Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1245 (11th Cir. 2009). "To be admissible," "an expert's opinion must be supported by good grounds for each step in the analysis," and "unsupported assumption[s]" and those based on "speculation" make proposed expert testimony "unreliable."

20

*Buland v. NCL (Bahamas) Ltd.*, 992 F.3d 1143, 1150 (11th Cir. 2021). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the [say-so] of the expert," *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). And the Eleventh Circuit has repeatedly held that opinion testimony should be excluded where an expert's assumptions are based on "speculation." *E.g., United States v. Hawkins*, 934 F.3d 1251, 1264 (11th Cir. 2019).[2]

Neither Young's Report nor his opinions are supported by any methodology. The Young Report's only reference to a valuation treatise is to the valuation of businesses, not timeshares or real estate interests. Although he speculates that some sort of calculations could be performed based on agreements with third parties and data he's not seen, he falls far short of offering "good grounds for each step in [any] analysis" that he's not yet performed.

### C.    Young Did Not Base His Opinions on Sufficient Facts or Data

Federal Rule of Evidence 702(b) requires an expert base any opinion testimony on "sufficient facts or data." Fed. R. Evid. 702(b).

### 1.    Young's opinions must be excluded because he reached conclusions before—and without—evaluating the underlying data.

An expert must evaluate the facts or data before reaching conclusions. In *Perry v. United States*, 755 F.2d 888, 892 (11th Cir. 1985), for example, the Eleventh Circuit affirmed the district

---

[2] *See Buland*, 992 F.3d at 1150 (affirming exclusion of proposed testimony from expert economist where assumption that plaintiff "did not have career opportunities more lucrative than working as a part-time university teacher or member of a corporate board was entirely speculative");; *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1328 (11th Cir. 2014) (affirming the exclusion of expert testimony as unreliable where the expert did not explain how his experience and relevant literature support his opinion and only vaguely described his methodology); *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1290 (11th Cir. 2005) (affirming district court's exclusion of expert where there was "simply too great an analytical gap between the data relied on by Dr. Matson and his proffered opinions").

court's rejection of expert testimony where the expert "had reached a conclusion as to the connection between encephalitis and [a] vaccine before commencing his research."[3]

As explained above, pp. 6-15, at deposition, Young testified that he reached the conclusions in the Young Report before—and without even—reviewing the relevant data. Young criticized Mr. Habibi for failing to address that HICV "likely assesses the profitability of the contract" and "must be considering the value of the point." Ex. A at ¶ 36. But at Young's deposition, he was compelled to concede that he does not know if HICV analyzes profitability at the individual owner level, Ex. B at 179, he does not know if instead HICV does global modeling to analyze pricing and profitability, Ex. B at 179-182, and that he has no experience with what timeshare companies typically do, Ex. B at 181.

The Young Report states that "[a] common methodology can be used to estimate" the value of the proposed class members uses of their points, but Young made that assertion without doing any analysis. As for his statements about the price per point, Young took a random walk through the purchase agreements for six groups of purchasers but admitted that they were only "an example," "a snippet of" "data," and "I don't use this, for any other purpose, in this report, other than showing an illustration." Ex. B at 57. He testified "I do not have data to do any sampling ma'am. So no, I have not done any sampling." Ex. B at 70. He further testified: "I

---

[3] *See also, e.g., Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502-03 & n.5 (9th Cir. 1994) ("Scientists whose convictions about the ultimate conclusion of their research is so firm that that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method."); *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 423 n.2 (5th Cir. 1987) ("The district court rejected [the expert's] reliance on [plaintiff's] oral history on the ground [the expert] formed his opinion before conducting any test. We agree that an expert who forms an opinion before he begins his research is biased and lacking objectivity."); *Benkwith v. Matrixx Initiatives, Inc.*, 467 F.Supp.2d 1316, 1325 (M.D. Ala. 2006) ("This experiment appears to have been undertaken more to bolster a conclusion than to test a hypothesis. It does not meet the requirements of Rule 702.").

wasn't asked to parse any damages out to individuals. At some point in the future, I may be asked to do that." Ex. B at 113.

As for what he described as the market approach, far from identifying a "common methodology" he testified "once I get all of the data, we can calculate all of—all of—I can give you thousands of calculations." Ex. B at 186. Then Young repeatedly admitted that he had not even reviewed that "data" and that he "reached that conclusion that you can make those calculations before receiving that data." Ex. B at 187. For those reasons too, all of Young's opinions here are unreliable and inadmissible.

### 2.    Young ignored all of the seemingly important data.

Ignoring data can also render expert opinions unreliable. "The question is whether the expert considered enough information to make the proffered opinion reliable," or "ignored a significant portion of seemingly important data." Wright and Miller, 29 *Federal Practice & Procedure* § 6268 (Oct. 2020 Update). "If an expert 'cherry picks' favorable data in this manner but ignores a significant quantity of other important facts, the trial court would be justified in concluding the expert's testimony is not based on sufficient facts or data." Wright & Miller, 29 *Federal Practice & Procedure* § 6268 (Oct. 2020 Update) (collecting cases).[4]

These cases apply with even greater force to require excluding Young's opinions here. As explained above, Young speculates that there is voluminous data bearing on every aspect of his opinions but he has reviewed none.

---

[4] *See also, e.g., Martin v. City of Atlanta Ga.*, 579 F. Appx. 819, 826-27 (11th Cir. 2014) (affirming exclusion of statistics expert where he failed to take information into account); *PODS Enterprises, Inc. v. U-Haul International, Inc.*, 2014 WL 12628664, at *4 (M.D. Fla. June 27, 2014) (excluding expert opinion because of "blind acceptance and reliance on one-sided data" and "failure to apply any analytical methodology whatsoever").

23

### 3.    Young offered no basis in experience for his conclusions.

Where an expert is "relying solely or primarily on his experience," the proponent has the burden "to explain how that experience led to the conclusion he reached, why that experience was a sufficient basis for the opinion, and just how that experience was reliably applied to the facts of the case." *United States v. Frazier*, 387 F.3d 1244, 1265 (11th Cir. 2004) (en banc). On its face, the Young Report makes no connection between Young's experience and his opinions here. Young cannot make any such connection—he has an educational background in economics but, as explained above, pp. 5-7, he disclaimed any connection between any timeshare or hospitality experience and his opinions here. As explained above, pp. 5-7, he also disavowed any ability to offer any opinions about real estate valuation. There is no connection between any of Young's experience and his opinions here.

### D.    Young Offers No Opinions That Are Helpful

Federal Rule of Evidence 702 requires Plaintiff to show that Young's opinions are helpful, or "assist[] the trier of fact, through application… technical[] or specialized expertise, to understand the evidence or determine a fact in issue." *Frazier*, 387 F.3d at 1260. "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue." *Cook v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005)

The Young Report is little more than a book report that misdescribes Gould's deposition testimony, and Gould works in an industry where Young has little or no expertise. Neither Young himself nor his report tied his analysis of Gould's testimony to any relevant experience or to any valuation methodology supported in the literature. Instead, he used Gould's transcript as a jumping off point for speculation about what data not yet requested and not produced might show. There is no purpose for which that is helpful.

24

## CONCLUSION

For the above reasons, Young's report and opinions must be excluded for all purposes.

## LOCAL RULE 3.01(g) CERTIFICATION

Defendants' counsel conferred with Plaintiffs' counsel by telephone on July 3, 2024, who indicated that Plaintiffs oppose the relief requested in this Motion.

Date:  July 16, 2024

Respectfully submitted,

By: /s/ *Grace L. Mead*
GRACE L. MEAD, FL Bar No. 49896
gmead@stearnsweaver.com
ANDREA N. NATHAN, FL Bar No. 16816
anathan@stearnsweaver.com
JOSEPH ONORATI, FL Bar No. 92938
jonorati@stearnsweaver.com
STEARNS WEAVER MILLER WEISSLER
  ALHADEFF & SITTERSON, P.A.
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida  33130
Telephone: 305-789-3200
Facsimile:  305-789-3395

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day of July, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ *Grace L. Mead*
Grace L. Mead

## SERVICE LIST

Janet R. Varnell
jvarnell@vandwlaw.com
Brian W. Warwick
bwarwick@vandwlaw.com
Christopher J. Brochu
cbrochu@vandwlaw.com
VARNELL & WARWICK, P.A.
400 N Ashley Drive, Suite 1900
Tampa, Florida 33602
Telephone: (352) 753-8600

*Counsel for Plaintiffs, individually and on behalf of the putative class*