UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.: 6:23-cv-323-JSS-RMN

ANGELIQUE L. LINGARD and SUDARIEN D. SMITH, Individually and on behalf of all others similarly situated,

Plaintiffs,

vs.

HOLIDAY INN CLUB VACATIONS, INC., f/k/a ORANGE LAKE COUNTRY CLUB, INC., and WILSON RESORT FINANCE, LLC,

Defendants.

_________________________________/

VIDEOTAPED & VIDEOCONFERENCE DEPOSITION OF: CHRISTOPHER W. YOUNG, Ph.D.

TAKEN BY: COUNSEL FOR THE DEFENDANTS

DATE: FRIDAY, JUNE 28, 2024

TIME: 9:01 A.M. - 1:33 P.M.

LOCATION: ASTORIA, OREGON 97103

VIA: VERITEXT VIRTUAL ZOOM

STENOGRAPHICALLY REPORTED BY: COURTNEY N. LANGHOFF, RDR, CRR, FPR-C
ORANGE LEGAL/VERITEXT LEGAL SOLUTIONS
201 EAST KENNEDY BOULEVARD, SUITE 712
TAMPA, FLORIDA 33602

A P P E A R A N C E S:


BRIAN W. WARWICK, ESQUIRE (Via Videoconference)
OF: Varnell & Warwick, P.A.
400 North Ashley Drive
Suite 1900
Tampa, Florida 33602
(352) 753-8600, FAX-(352) 504-3301
bwarwick@vandwlaw.com
APPEARING ON BEHALF OF THE PLAINTIFFS

GRACE L. MEAD, ESQUIRE (Via Videoconference)
ANDREA N. NATHAN, ESQUIRE (Via Videoconference)
JOSEPH J. ONORATI, ESQUIRE (Via Videoconference)
OF: Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.
150 West Flagler Street
Suite 2200
Miami, Florida 33130
(305) 789-3200, FAX-(305) 789-3395
gmead@stearnsweaver.com
anathan@stearnsweaver.com
jonorati@stearnsweaver.com
APPEARING ON BEHALF OF THE DEFENDANTS

CULLEN BRADFORD WILLIAMS, ESQUIRE (Via Videoconference)
OF: Holiday Inn Club Vacations, Incorporated
9271 South John Young Parkway
Orlando, Florida 32819
(407) 395-6938
cwilliams@holidayinnclub.com
APPEARING AS IN-HOUSE COUNSEL ON BEHALF OF HOLIDAY INN CLUB VACATIONS, INC.


ALSO PRESENT:

Leslie Canales, Paralegal, Stearns Weaver Miller (Via Videoconference)

Orlando Jimenez, Videographer (Via Videoconference)

Carlos Canino, Multimedia Specialist, Stearns Weaver Miller (Via Videoconference)

------

S T I P U L A T I O N S

It is hereby stipulated and agreed by and between the counsel for the respective parties and the witness that the reading and signing of the deposition transcript be reserved.

* * * * *

# I N D E X


| EXAMINATION OF CHRISTOPHER YOUNG, Ph.D.: June 28, 2024 | PAGE |
|---|---|
| DIRECT EXAMINATION BY MS. MEAD | 11 |
| CERTIFICATE OF OATH | 192 |
| CERTIFICATE OF REPORTER | 193 |
| READ & SIGN LETTER | 194 |
| ERRATA SHEET | 195 |

| DEPOSITION EXHIBITS | | INITIAL REFERENCE |
|---|---|---|
| Exhibit 1 | Expert Report of Christopher W. Young, Ph.D., MBA, MAFF, CVA, Dated: May 28, 2024 | 48 |
| Exhibit 2 | State of the Vacation Timeshare Industry 2023 Edition, a United States Study (HICVLingard-Habibi000118 - 164) | 58 |
| Exhibit 3 | Practice Article: Optimizing vacation exchange, Received (in revised form); 13th August 2012, authored by Srinidhi Melkote, Dasong Cao, and others (HICVLingard-Habibi000019 - 25) | 73 |
| Exhibit 4 | Deposition of Michael Gould, taken Wednesday, May 15, 2024, in this case | 76 |
| Exhibit 5 | MilesBuyer.com webpage entitled: Sell Hotel Points | 91 |
| Exhibit 6 | Top Dollar Payouts webpage entitled: Sell IHG Points at Top Dollar Payouts now | 96 |

I N D E X (Continued)


| DEPOSITION EXHIBITS | | INITIAL REFERENCE |
|---|---|---|
| Exhibit 7 | Page of typewritten notes listing various individuals and their reservation details, including: Matthew Gayle, Bolin Belles, Brian Adams, Myrtle Paterson, and Torrence Gilliam | 109 |
| Exhibit 8 | CONFIDENTIAL: Purchase Agreement with Seller/Developer: Orange Lake Country Club, Inc.; Trust Plan: Orange Lake Land Trust; Purchaser(s): Matthew Nicholas Gayle and Angela Denise Sampson-Gayle dated 5/4/19 (HICVLINGARD026013 - 26027) | 112 |
| Exhibit 9 | CONFIDENTIAL: Holiday Inn Club Exchange Program Membership Agreement for Brian S. Adams and Lindsey Joann Adams dated 4/19/19 (HICVLINGARD017310 - 17319) | 114 |
| Exhibit 10 | CONFIDENTIAL: Holiday Inn Club Exchange Program Membership Agreement for Myrtle Louisa Paterson and Kevin Erwin Paterson dated 12/29/19 (HICVLINGARD023828 - 23835) | 116 |
| Exhibit 11 | CONFIDENTIAL: Holiday Inn Club Exchange Program Membership Agreement for Torrence Lamar Gilliam and Samantha Torre Fidilio dated 6/3/17 (HICVLINGARD023566 - 23569) | 119 |
| Exhibit 12 | Valuation of a 22.5% Interest In: River Rock Sports Bar & Grille, Corp., by Christopher W. Young, Ph.D., The Red Maple Group | 130 |

I N D E X (Continued)


| DEPOSITION EXHIBITS | | INITIAL REFERENCE |
|---|---|---|
| Exhibit 13 | Journal of Forensic Economics 28(1-2), 2019, pp. 197-209, article published by the National Assoc. of Forensic Economics: Incongruent Court Advice: Examining Fair Value and Fair Market Value Standards in Commercial Damage Cases Pursuant to Minority Claims, authored by Christopher Young and James Janos | 134 |
| Exhibit 14 | Litigation Services Handbook - The Role of the Financial Expert, Sixth Edition, Edited by Roman L. Weil, Daniel G. Lentz, and Elizabeth A. Evans | 143 |
| Exhibit 15 | Expert Report of Paul Habibi dated April 26, 2024, in this case | 155 |
| Exhibit 16 | E-mail from Brian Warwick to Andrea Nathan, Joseph Onorati, and Grace Mead dated 11/9/23, Subject: Lingard Schedule | 162 |
| Exhibit 17 | E-mail chain between Brian Warwick, Andrea Nathan, and others dated 11/21/23-12/18/23, Subject: HICV production meet and confer w/attachments | 162 |
| Exhibit 18 | E-mail chain between Andrea Nathan, Brian Warwick, and others dated 11/21/23-12/29/23, Subject: HICV production meet and confer w/attachments | 163 |
| Exhibit 19 | Plaintiffs' Unopposed Motion to Modify Scheduling Order dated 12/29/23 | 163 |

I N D E X (Continued)


| DEPOSITION EXHIBITS | | INITIAL REFERENCE |
|---|---|---|
| Exhibit 20 | PRIVILEGED AND CONFIDENTIAL: Letter from Christopher W. Young, Ph.D., with Resolution Economics, LLC, to Brian W. Warwick, Esq., dated 5/8/24, RE: Lingard, et al. v. Holiday Inn Club Vacations, Inc., et al. | 164 |
| Exhibit 21 | Jersey Datacomm & Cable, LLC, by Christopher W. Young, Ph.D., MBA, CVA, MAFF, and James A. Janos w/Sobel & Co., LLC, dated November 30, 2015 | 169 |
| Exhibit 22 | NOT FOR PUBLICATION: Order in the Jersey Datacomm & Cable, Inc. V. Walker and Associates, Inc., case dated 12/2/16 | 171 |
| Exhibit 23 | Order by Judge Robin J. Cauthron dated 10/18/19 in the case Hamilton vs. Bayer Healthcare Pharmaceuticals, Inc., et al., and Mutual of Omaha Insurance Company | 173 |

(Attached to original and copy transcripts.)

| PREVIOUSLY MARKED DEPOSITION EXHIBITS: | INITIAL REFERENCE |
|---|---|

(None)

I N D E X (Continued)

QUESTIONS WITNESS REFUSED TO/INSTRUCTED NOT TO ANSWER

(26, 18)
(26, 20)
(26, 22)
(30, 19)
(30, 22)
(31, 1)
(31, 4)
(31, 22)
(31, 24)
(39, 23)
(41, 12)
(41, 15)

INFORMATION TO BE PROVIDED

(189, 23)

P R O C E E D I N G S

*********

THE VIDEOGRAPHER: Okay. Good morning. The time is 9:01 a.m. We're going on the record on June 28th, 2024.

Please note that this deposition is being conducted virtually. Quality of recording depends on quality of camera and Internet connection of participants. What is seen on the -- what is seen from the witness and heard on the screen is what will be recorded. Audio and video recording will continue to take place, unless all parties agree to go off the record.

This is Media Unit 1 in the video deposition of Christopher W. Young, taken in the matter of Angelique Lingard, et al., versus Holiday Inn Club Vacations, Inc., et al., filed in the United States District Court, Middle District of Florida, Orlando Division, Case No. 6:23-cv-323-JSS-RMN.

This deposition is being conducted remotely, using virtual technology.

My name is Orlando Jimenez, representing Veritext Legal Solutions, and I am the videographer.

The court reporter is Courtney Langhoff from

the firm Veritext Legal Solutions.

I'm not authorized to administer an oath, I'm not related to any party in this action, nor am I financially interested in the outcome.

If there is any objections to proceeding, please state them at the time of your appearance.

Counsel and all present, including remotely, will now state their appearances and affiliation for the record, beginning with the noticing attorney, please.

MS. MEAD: Grace Mead, Andrea Nathan, and Joseph Onorati, from Stearns Weaver Miller, on behalf of the defendants here, Holiday Inn Club Vacations, Inc., and Orange Lake County (sic) Club, Inc. It's the former name of Holiday Inn Club Vacations, as well as Defendant Wilson Resort Finance, LLC; although -- also with us is Leslie Canales, a paralegal at our law firm, and Carlos Canino, who is a multimedia person at our law firm.

MR. WARWICK: Good morning. Brian Warwick.

Jeff Newsome will also be joining us later today, on the call, from Varnell & Warwick, on behalf of the plaintiffs.

THE COURT REPORTER: Would you raise your right

hand, please?
Do you solemnly swear or affirm that the testimony you're about to give in this cause is the truth, the whole truth, and nothing but the truth?
THE WITNESS: I do.
THE COURT REPORTER: Thank you.
You may proceed.

DIRECT EXAMINATION

BY MS. MEAD:
Q. Can you state and spell your name, please?
A. My name is Christopher Warren Young, Junior. C-h-r-i-s-t-o-p-h-e-r, Warren, W-a-r-r-e-n, Young, Y-o-u-n-g, Junior, J-r, dot.
Q. Have you been deposed before?
A. Yes.
Q. About how many times have you been deposed before?
A. More than 50.
Q. I'll go over some ground rules to make sure you and I have a shared understanding.
I will ask -- ask questions. I will try to be clear. If I'm unclear, can you ask me to clarify the question?
A. Yes.
Q. Your counsel may make two types of objections

today.

The first is an objection to form. If your counsel makes an objection to form, you should go ahead and answer the question.

Do you understand?

A. Yes.

Q. Your counsel may also make an objection based on privilege and instruct you not to answer. If your counsel instructs you not to answer, you should not answer the question.

Do you understand?

(At this time, Mr. Williams entered the Zoom videoconference deposition room.)

THE WITNESS: Yes.

BY MS. MEAD:

Q. If at any point today you want to take a break, simply ask me, and we will. I would only ask that you answer the pending question before we take the break.

Do you understand?

A. I do.

Q. Are you on any medications or substances that would interfere with your ability to testify truthfully today?

A. No.

Q. Are you on any medications or substances that

would interfere with your ability to testify accurately today?
A. No.
Q. Are you suffering from any illnesses that would interfere with your ability to testify truthfully today?
A. No.
Q. Are you suffering from any illnesses that would interfere with your ability to testify accurately today?
A. No.
Q. Did you go to high school?
A. I did.
Q. Where did you go to high school?
A. I went to Belleville Senior High School, in Belleville, New Jersey.
Q. When did you graduate?
A. 1990.
Q. Did you go to an undergraduate college or university?
A. I did.
Q. Which one?
A. Montclair State University.
Q. Is that in New Jersey?
A. Yes.
Q. When did you graduate?
A. 1995.

Q. What was your major?
A. Undergrad was in arts and economics.
Q. Did you have a particular concentration in economics?
A. No.
Q. What was the first postgraduate school you attended, if any?
A. Montclair State University.
Q. Did you receive a degree from Montclair State University?
A. I did.
Q. What degree was that?
A. I got my undergrad at Montclair State University.
Q. Okay. Did you receive a postgraduate degree from Montclair State University?
A. I did not.
Q. Okay. Do you have any postgraduate degrees?
A. Yes, I do.
Q. What was the first postgraduate degree you received?
A. I received an MBA from Rutgers University.
Q. When did you receive that MBA?
A. 1999.
Q. Did that MBA have any particular focus or

concentration?
A. Finance and professional accounting.
Q. Are you a certified public accountant?
A. I am not.
Q. Have you ever been a certified public accountant?
A. I have not.
Q. Do you have any other postgraduate degrees, other than your MBA?
A. I do.
Q. What other postgraduate degrees do you have?
A. I have a Ph.D. from Rutgers University.
Q. A Ph.D. in what subject?
A. Economics and international finance.
Q. Did you write a dissertation in that Ph.- -- Ph.D.?
A. I did.
Q. What was the subject of your dissertation?
A. Economics.
Q. What kind of economics?
A. I was looking at cultural -- what's called "cultural economics."
Q. What is cultural economics?
A. Trying to understand how the various types of cultural institutions move and change, based upon

economic variables.
Q. What was your thesis?
A. My thesis was on what's called the "economics of religion." I explained how economics, particularly market forces, change the identity of a -- of an organization or an institution.
Q. Was the focus contemporary, historical, or both?
A. Both.
Q. And when did you receive that Ph.D.?
A. 2009, I believe.
Q. Do you have any other postgraduate degrees?
A. Not a -- I'm presently studying for another degree, but I do not have it yet.
Q. What degree are you studying for?
A. I'm studying for a master's degree in behavioral economics.
Q. Where are you studying for that?
A. Harvard University.
Q. What is "behavioral economics"?
A. The psychological aspect of how people make economic decisions.
Q. What is the efficient capital markets hypothesis, if you know?
A. Yes, I know.

Q. What is it?
A. Efficient --
Q. Go ahead.
A. Efficient market hypothesis is -- is a -- is a hypothesis that suggests that the market has all information embedded within such market.
Q. Okay. What is the strong view of the efficient market hypothesis?
A. The strong view of the efficient market hypothesis is that the market, it could -- includes all information.
Q. What is the weak view?
A. Is that it does not have all information, and there's lots of information not within a market structure.
Q. Who is Eugene Fama, if you know?
A. Yeah, of course. Eugene Fama is a Nobel Prize wimmer -- winner. In fact, it was called the Fama- -- Fama-French discount rate model. I believe he's act- --
Q. And --
A. I believe he's actually from your university, the University of Chicago.
Q. And is he associated with the strong or the weak view of the efficient capital markets hypothesis?
A. I don't remember.

Q. Who is Robert Shiller, if you know?
A. Robert Shiller's also a professor of economics.
Q. And what are his views, generally, of the efficient capital markets hypothesis, if you know?
A. I don't remember.
Q. Okay. Who is Daniel Kahneman, if you know?
A. Kahneman -- Kahne- -- Daniel Kahneman, he is a behavioral economist.
Q. And who is Amos Tversky, if you know?
A. Tversky is Kahneman's -- most often known as his writing colleague. Both Tversky and Kahneman are behavioral economists.
Q. Who is Cass Sunstein, if you know?
A. Sure. Cass Sunstein is a lawyer. I believe he's at Harvard, worked under the Obama Administration, wrote a book on -- on nudge theory, with -- I forget his co- -- co-writer, I believe also from Harvard University.
Shiller. Yeah, I think he wrote with Shiller, to be honest, but I forget.
Q. Do you subscribe to the strong or the weak view of the efficient capital markets hypothesis?
A. It depends on what market you're talking about.
Q. The domestic -- strike that.
Do you subscribe to the strong view that the United States domestic stock market is efficient?

A. Which part of the stock market are you referring to?
Q. The NYSE index.
A. Large-cap or small-cap companies?
Q. Small-cap.
A. No, I do not.
Q. Why not?
A. Because small companies have information that is not always available or provided to the marketplace.
Q. So the strong version of the efficient capital markets hypothesis assumes information is disseminated quickly in the market, correct?
A. No. It assumes all information is disseminated in the marketplace.
Q. For large-cap stocks traded on the NYSE -- strike that.
For large stocks contained in an NYSE index, do you subscribe to the strong view of the efficient capital markets hypothesis?
A. No, I do not.
Q. Why not?
A. Because I don't believe all information is in the marketplace.
Q. Why don't you think all information is in the marketplace?

A. Because there's information that companies have that is available only to the company and it's not provided to the marketplace; so, therefore, that market cannot make an efficient decision or the most efficient decision. What's in the marketplace is what's regulated to be in the marketplace.

Q. So do you believe that the stock price of a given security, traded in the NYSE index, necessarily reflects that stock's value?

MR. WARWICK: Object to form.

THE WITNESS: Value is a -- is a subjective term, so I'm not sure what you mean by "value."

You mean price?

BY MS. MEAD:

Q. Hmm. Why is "value" a subjective term?

A. Because each of us value things differently.

Q. Do you believe that the stock price of an individual security, traded in the NYSE index, necessarily reflects its economic value?

MR. WARWICK: Object to form.

THE WITNESS: How are you defining "economic value"?

BY MS. MEAD:

Q. Hmm. Well, what -- what definitions do you think exist for "economic value"?

MR. WARWICK: Object to form.
THE WITNESS: Well, it depends on what you're -- what you're referring to. You're talking about market value, total market?
Are you talking about individuals' value?
I'm not understanding the question, to be honest.
BY MS. MEAD:
Q. Sure. So what is "market value"?
MR. WARWICK: Object to form.
THE WITNESS: There's market price. There's such a thing called "market price," but there's no such thing necessarily known as "market value."
There's fair market value, but I don't know of something called "market value." I don't know how that's defined by you, and I can't define that.
BY MS. MEAD:
Q. What is "investment value," if you know?
MR. WARWICK: Object to form.
THE WITNESS: I have -- I don't know where you're getting the definition, so I can't ans- -- I can't answer the question.
BY MS. MEAD:
Q. But there are different definitions of "value," correct?

A. There's different definitions of "value," yes.
Q. And there are different definitions of "fair market value," too, correct?
A. Not that I am aware of.
Q. What is the financial accounting standards codification?
A. I don't know.
Q. What is the Financial Accounting Standards Board?
A. The Financial Accounting -- but the Board?
Q. Correct.
A. From a -- FASB?
Q. Correct.
A. So it's an organization that regulates rules for the accounting profession.
Q. Do you know what its definition of fair market value is?
A. I do not. I know what the AICPA's definition of "fair market value" is.
Q. What is that, ASPCA's (sic) definition of "fair market value"?
A. AICPA, as well as pretty much all other organizations, such as the NACVA and ASA.
It's the value between a buyer and seller, neither of whom have more information than the other;

neither of whom have a required compulsion to buy or sell.
Q. And you are a member of the NACV (sic); is that correct?
A. NA- -- NACVA, yes, I am a member of that organization.
Q. How long have you been a member?
A. I think since 2012, maybe '13.
Q. After graduating from high school, what was the first job you had?
A. I joined the United States Army right after high school. I had part-time jobs in between there.
Q. And can you give a general overview of your service background?
A. Yes. I joined the military in 1990; October 28th, 1990. I was on active duty for a short period of time and then was on reserves. My first -- my first term of enlistment was eight years, ended in 1998.
I went back in after 9/11. I was there for three or four more years, and I am presently in the military.
Q. And you're presently in the active military?
A. Presently in Active Reserves.
Q. Active Reserves.
Did your service -- strike that.

Does your service have any relevance to any of the opinions you seek to offer in this case?

A. No.

Q. What jobs have you held outside the military?

A. I started a company early 19- -- hmm, mid 1990s. I sold that company. That company was called Results.

I then went to go work for Ernst & Young. I was at Ernst & Young as an auditor, and then I went to their mergers and acquisitions practice. I believe I was there from 1995 to 1999.

1999, I took a job with a company called the CIT Group -- well, at that time, it was called Newport Capital, which later became the CIT Group.

At that company, I was responsible for venture capital investing. One of my co-investors was Dell Financial Services and Intel Capital. I was there for a few years.

I left to go work for a company called Comvest Ventures, where I ran a venture capital and private equity fund. I stayed there until 2000 -- until 9/11.

After 9/11, for the most part, financial markets shut down in New York. I went back into the service for a very short period of time.

I came back out of the -- I came back from the military, and I went to work for a company called Thompson Financial, which you probably now know as Thompson Reuters. I worked at that company for about five years, in multiple capacities. I was the CFO of one of its largest divisions. I was the COO of its European operations. I was head of business strategy. I was head of mergers and acquisitions. I did that all within the first five years.

I left Thompson Financial to -- to go to what's called Dow Jones; you might also have known them as The Wall Street Journal. And I was head of strategy for The Wall Street Journal, for a few years.

I left The Wall Street Journal and became a managing director of an investment bank called Berkery Noyes.

And I left Berkery Noyes to work for Dr. Frank Turney, in forensic economics. I became a partner at that firm. I left that firm in 2008 (sic), to start my own firm, called Red Maple Economics.

From 2018 to 2023, I ran Red Maple Economics, which is a forensic -- forensic economics and general economic firm. My firm was purchased in December of 2023, by Resolution Economics.

Q. In your professional history, have you worked

on the acquisition of publicly traded companies?
A. Yes, I have.
Q. Okay. And have you worked on valuing publicly traded companies?
A. I have.
Q. And in -- in your history, have you worked on the acquisition of private companies?
A. I have.
Q. And have you worked on valuation of private companies?
A. I have.
Q. What, if any, of your professional experience, before this case, touched on the timeshare industry?
A. I worked on a few cases, prior cases, that were in the timeshare industry.
Q. Were those litigation cases?
A. They were.
Q. What were the names of those cases?
A. I can't tell you. They're confidential.
Q. Can you tell me the name of the cases?
A. I cannot.
Q. Can you tell me the courts in which the cases were pending?
A. I cannot.
Q. Have you produced to Counsel a copy of the

confidential agree- -- confidentiality agreement you executed for those cases?
A. I have not.
Q. Do you still have copies of the confidentiality agreements you executed for those cases?
A. I do not.
Q. Have you ever taken a class on timeshare?
A. On timeshare?
Q. Correct.
A. Well, it depends on what you call "class."
I -- I got suckered in to go to a timeshare pitch, at one point in time.
Q. Where was that?
A. Hmm. I believe it was the Hilton, in Florida.
And it was definitely a Dis- -- a Disney -- a Disney property.
Q. Do you believe Hilton owns Disney?
A. No. I said, "and" it was a Disney property. Two times, two different instances.
Q. Why did you reference Hilton?
A. That was the first instance.
Q. But it was Hilton and Disney; is that what you're saying?
A. No. Let me -- let me be clear.
I went to one for Hilton --

Q. Uh-huh.
A. -- and then I went to another for Disney.
Q. So you went to two timeshare pitch -- pitches?
A. Correct.
Q. Have you ever owned a timeshare?
A. I have not.
Q. Have you ever taught a class on timeshare?
A. I have not.
Q. Do you --
Have you ever taught a class?
MR. WARWICK: Object to form.
THE WITNESS: A class in what? any class?
BY MS. MEAD:
Q. Correct.
A. Sure.
Q. Have you ever taught a class related to economics?
A. Yes.
Q. What class?
A. Okay. Let's go back. Seton Hall University, I taught microeconomics; macroeconomics; international economics; global/political economics; economics of crisis in the 20 Cent- -- 21st Century; business and society, which is an economics course; I taught money in banking.

All of those courses are at the undergrad and the graduate level.

Q. Is Se- --

A. I also -- I -- I also taught the certi- -- the CFA exam course, at Rutgers University. I also taught economic and strategy and international management, at Rutgers University, all of which touch upon economics. And I presently teach business ethics that touches heavily upon economics.

Q. Do you presently teach at Rutgers as well?

A. I do. I'm an -- I'm an associate professor at Rutgers University.

Q. Okay. Do you have any other experience, in timeshare, you've not already described to me?

A. Not that I remember.

Q. What experience do you have, if any, that touches on the hospitality industry?

A. I worked on multiple valuations of time- -- of travel portals, the early iterations of the Expedias, valuing them, as well as offering strategic guidance to those types of corporations, in the late 1990s all the way through about 2007 or so.

Q. Have you had any experience with hospitality, since 2007?

A. Other than --

MR. WARWICK: Objection.
THE WITNESS: -- the cases that I mentioned already.
BY MS. MEAD:
Q. Did you say other than the cases you've mentioned now?
A. Yeah. And I'm thinking. And I'm -- and I'm still thinking. Since 2007? I think I may have mistaken and given you a bad date.
I would say through 2013, to be -- to be exact, I stopped consulting with a -- with a hospitality vendor that was offering online services, in or around 2013/2014.
Q. Since 2013 or 2014, have you had any experience with the hospitality industry?
A. Well, I've done multiple cases, in the hospitality industry, as it relates to economic damages or valuation.
Q. Can you identify any of those cases?
A. I cannot. I can identify them, but I cannot provide those to you.
Q. You mean you cannot identify, in your testimony today, those cases, correct?
A. I can identify them, but I -- I can physically identify them, but I can't give them to you.

Q. You will not disclose the hospitality litigation cases you've worked on, correct?
A. Correct.
Q. And is that because of confidentiality agreements?
A. Yes, ma'am.
Q. And have you provided those confidentiality agreements to Plaintiffs' Counsel?
A. I have not.
Q. What experience, if any, do you have with the hotel industry?
A. I valued two hotel companies that went -- that were -- were harmed, one with a breach of contract and one through a -- an environmental devastation, both of which I valued. One was in 2019/'20, 2019 or 2020, and the other one was probably 2018.
Q. Was that for litigation purposes?
A. I'm not sure if one went to litigation or it was pre-litigation, and one was definitely litigation.
Q. And do you know the names of those cases?
A. I do.
Q. What are they?
A. I cannot disclose those to you at this time.
Q. And do you have a confidentiality agreement related to those cases?

A. Yes. I have a confidentiality agreement related to every case that I work on.

Q. Have you provided any confidentiality agreements, from any of the litigation cases you've worked on, to Plaintiffs' Counsel?

A. I have not.

Q. And you have a confidentiality agreement for every litigation case you've worked on, correct?

A. I do.

Q. Would you answer any substantive questions about any of the litigation cases you've worked on, in this deposition?

A. No.

Q. What experience, if any, do you have with the real estate industry?

A. Well --

MR. WARWICK: Object to form.

THE WITNESS: -- I'm an investor in various real estate properties.

BY MS. MEAD:

Q. Where are those properties located?

A. Well, they're all over the place. Most of them are through a private fund, so the -- the homes are pretty much all throughout the United States. Most of them are in resort-related areas.

And my wife and I own real estate, in North Carolina, as well. We manage properties in North Carolina.

Q. Are those all single-family homes?

A. They are.

Q. Do you have any investments in any condominiums?

A. I'm sure they're part of the fund, but I can't verify for you now.

Q. Do you have any other experience, with real estate, you've not already described?

A. I valued -- I valued multiple real estate companies, in the past. I performed commercial economic damages, for real estate companies. I've probably now valued -- I don't know -- over -- well over a hundred real estate companies, as it relates to private company valuations.

Q. Has any of that work been done outside of the litigation context?

A. Yes. Almost all of it is --

Q. Okay.

A. Almost all of it is outside of litigation. Almost all of it is tax estate work.

Q. And over what period of time did you perform that work?

A. Since 2018 to present.
Q. And is that work subject to any confidentiality agreements?
A. Yes, they all are.
Q. If I were to --
A. Especially --
Q. Go ahead.
A. Especially -- especially personal information related to someone's estate, yes; all -- all of that is confidential information.
Q. So if I were to ask you any questions about your work related to tax and real estate, would you be able to answer those questions?
MR. WARWICK: Object to form.
THE WITNESS: In the general sense, I'm happy to answer any question, but I can't give you any personal information about the case.
BY MS. MEAD:
Q. Okay. What geographic regions have that real estate been located in?
A. Primarily, the East Coast; Texas; Arizona; Southern California; Northern California, San Francisco, to be exact; Vail, Colorado; Thunderbird, which I forget where it is; and a couple -- a couple other resort areas.

Q. Do you have any other experience, with real estate, you've not already described to me?

MR. WARWICK: Object to form.

Go ahead.

THE WITNESS: Not that I remember at this time.

BY MS. MEAD:

Q. Do you have any experience with the airline industry?

MR. WARWICK: Object to form.

THE WITNESS: I helped value an airline company that was -- that was ultimately sold.

BY MS. MEAD:

Q. When was that?

A. 2000, perhaps.

Q. Can you tell me what airline company?

A. I forget the name of it, at the -- at this moment.

Q. Okay.

A. It was a private jet company, a fraction -- a fractional jet company, to be exact.

Q. Okay. Do you have any experience with the commercial airline industry?

MR. WARWICK: Object to form.

THE WITNESS: Well, not the jets themselves, but the software that underlines it, yes.

BY MS. MEAD:

Q. What is that experience?

A. Well, as part of consulting the -- the companies I was mentioning earlier, around portals, all of them connected to airlines, the Sabre system, and so I'm aware of how the connection to the Sabre system works, at least in a very general sense, and the Sabre system is the airlines' reservation system, or it was the airlines' reservation system.

Q. And that experience ended in about 2013; is that correct?

A. That's correct.

Q. And you said the Sabre system was the airline reservation system.

Has the Sabre system been replaced?

A. I don't know. It was, in 2013.

Q. Do you have any experience with the airline reservation system, since 2013?

MR. WARWICK: Object to form.

THE WITNESS: Well, I have a present case that's open in New York, where my client connects to the Sabre system. And I'm not sure if we call it "Sabre system," but connects to the airline system, and they buy -- they buy airline tickets, at wholesale; they buy tickets in bulk.

BY MS. MEAD:
Q. Is that a litigation case?
A. It is.
Q. Do you have a confidentiality agreement there?
A. I do.
Q. All right. Does that confidentiality agreement forbid you from discussing the substance of that case?
A. Yes, it does.
MR. WARWICK: Object to form.
THE WITNESS: It does.
BY MS. MEAD:
Q. Have you provided a copy of that confidentiality agreement to Plaintiffs' Counsel here?
A. I have not.
Q. Do you have any other experience with the airline industry you've not already described?
A. Not that I know of at this time, that I remember.
Q. Do you have any experience with the car rental industry?
MR. WARWICK: Object to form.
THE WITNESS: In the same capacity that the portal that -- the portal companies that I was advising, they connected to rental cars; they connected to airlines; they connected to hotel

rooms/motel rooms.

So to the extent that there's a connection between the two parties, between a portal, a reservation portal, and a car rental company, I'm somewhat aware of how that works.

BY MS. MEAD:

Q. And that's the consulting work you did that ended in 2013, you're referring to?

A. Yes, ma'am.

Q. Do you have -- strike that.

What is Crane Resorts (sic), if you know?

A. I don't remember. I don't know what Crane Resorts is.

Q. Okay. Do you have any experience with the cruise industry?

MR. WARWICK: Object to form.

THE WITNESS: Other than the -- the same connection between these travel portal companies that I was referencing and, you know, their ability to sell cruises. But, no, I have not worked with -- not that I remember at this time, that I've worked with a cruise company.

BY MS. MEAD:

Q. And that consulting experience ended in 2013, correct?

A. Actually, let me just restate that.
I just valued a company that provides -- it's the number one provider of security services to the cruise industry, so tangentially, I've -- I've been around the cruise industry, but more so from a security viewpoint.
Q. Here you're referring to physical security?
A. Physical, as well as computer and technology security.
Q. Do you have --
A. It was phone -- phone security, logistics security.
Q. Do you know what software systems the cruise lines use?
A. I do not.
Q. Did you do any work, in terms of making their electronic security more robust?
A. I did not, no.
Q. The security services engagement you just described, is that subject to a confidentiality agreement?
A. It is.
Q. Can you discuss the substance of that engagement, concerning security services for cruise -- cruise lines?

A. I can tell you the basics of what they do, but I can't tell you the company.
Q. Okay. Was there --
Do you have any experience with pricing, in the cruise industry?
A. Other than the portal business that was -- that I've mentioned to you multiple times, that -- when they were connecting to the cruise industry, there's obviously pricing, and there's pricing mechanisms that are considered over that platform.
Q. Do you have any recollection about how the cruise industry stood their pricing?
A. I do not remember.
Q. Do you have any experience with timeshare external exchange companies?
A. Do you have a name for me, or is it just, generally, that?
Q. Start with generally that.
A. No, I don't.
Q. Do you know what a timeshare external exchange company is?
A. I'm not sure if I have -- understand it by that -- those terms.
If it's an exchange program, such as -- I believe it's I- -- I- -- IGV or HGI, I'm vaguely

familiar with what they do.
Q. What is Resort Condominiums, International, if you know?
A. RCI, that is a -- from my understanding, that is a consortium of hotels/properties, where one property can be exchanged for another property.
Q. Has any of your professional experience touched on RCI?
A. Just, again, the -- the same -- the same with this -- with this portal. RCI is a -- a major provider of properties to it.
Q. Did you testify you cannot identify the name of that portal?
A. I don't believe I could do that.
Q. All right. And that's because of a confidentiality agreement?
A. Yes, ma'am.
Q. What, if anything, for this case, did you do to investigate the timeshare industry?
A. Well, I read all of the legal documents that were provided to me, as well as the ec- -- your -- your expert's report, as well as I pulled down an IBISWorld report, on the industry.
Q. An IBISWorld report?
A. Yes, ma'am.

Q. Did you provide that to Plaintiffs' Counsel?
A. I don't know. I only -- I only provided information that was relied upon.
Q. Okay. So did you rely on any information not cited by Defendants' expert, Paul Habibi, in preparing your opinions in this case about the timeshare industry?
A. I did not.
Q. What steps, if any, did you take to investigate the hospitality industry, for your opinions in this case?
A. Oh, well, again, I looked at the IBISWorld report, to understand the hospitality industry, to read from -- to familiarize myself with the industry.
I have multiple websites that I viewed -- reviewed, prior to writing a report.
Q. Did you do anything else to investigate the industry?
A. Other than doing research that I just mentioned, no.
Q. Did you do any research, specifically for this case, into the real estate industry?
A. No.
Q. For this case, did you do any research into the airline industry?
A. No.

Q. For this case, did you do any research into the pricing of timeshares, in the industry, generally?
A. Yes.
Q. What was that research?
A. I looked at multiple exchanges that buy and sell timeshare.
Q. Okay. Did you do anything else?
A. I looked at the way timeshare was being sold presently, pulled down, again, an IBISWorld report on the timeshare industry. I read that.
I believe I have a couple files from Statista, which is another research institution, to familiarize myself with the industry and the pricing of that -- of the products in the industry.
Q. Did you turn over the files from Statista to your -- to Plaintiffs' Counsel here?
A. I did not.
Q. Why not?
A. Because they were not relied upon or cited in my report.
Q. Okay. Did you do any research into the car rental industry, for your work here?
A. I did not.
Q. Did you do any research into the cruise industry, for your work here?

A. No.
Q. Did you do any research into Expedia, for your work here?
A. Yes.
Q. What was that --
A. Expedia -- Expedia was part of the IBISWorld reports that we pulled down on travel -- on the travel-related industry.
By the way, we touched upon multiple -- many of the other areas, such as car rentals and hotel stays and the cruise industry.
Q. Do you know if you cited the IBISWorld report, in your expert report that you provided in this case?
A. I do not believe I did.
Q. Why not?
A. Because it wasn't relevant.
Q. Did you cite the IBIS- -- or strike that.
Did you --
You did not cite any of the Statista information you just referred to earlier, did you, in your expert report here?
A. That's correct.
Q. Did you do any research you considered relevant, into the timeshare industry, for your work here?

MR. WARWICK: Object to form.
THE WITNESS: I think everything that I just said to you was relevant.
BY MS. MEAD:
Q. Well, except for the IBISWorld report, correct?
A. No, I didn't say it wasn't relevant; I said I didn't rely upon it. I didn't cite it.
Q. Well, you told me you didn't cite it in your expert report because it was not relevant, correct?
A. Yeah. It's not relevant to the calculations or to this report.
Q. Okay. Did you do any research into the timeshare industry that is relevant to your report here?
A. No. None of the -- none of the research is relevant to -- to the -- the underlying issues in this case.
Q. Did you do any research into the hotel industry that is relevant to your report here?
A. Again, it's a -- you asked if I did research. I just want to be crystal clear, for the record.
I performed research. I've got a basic understanding of what -- you know, of -- of the marketplace. I got a detailed understanding of various other areas, including Expedia and online portals and how they work and how they price.

But as it relates to, is it relevant here? I think it's all -- and I'll probably have to restate that. I think it's all relevant, in giving me an understanding of the marketplace, but as it relates to the case, the issues, none of that research is relevant to -- or let me restate that -- relevant enough, to be cited in the report.

Q. Did you do any research, into the timeshare industry, that affected any of the opinions offered in your expert report?

MR. WARWICK: Object to form.

THE WITNESS: No.

BY MS. MEAD:

Q. Did you do any research into the hospitality industry that affected any of the opinions offered, in your expert report?

A. No.

Q. Did you do any research into the airline industry that did any -- that had any relevance to any of the opinions offered, in your expert report?

A. No.

Q. Did you do any research into the car rental industry that had any relevance to the opinions offered, in your report?

A. No.

Q. Did you do any investigation into the cruise industry that had any relevance to any of the opinions offered, in your report?
A. No.
Q. Did you do any investigation of Expedia that had any relevance to any of the opinions offered into your -- in your report?
A. No.
Q. Did you do any investigation into the exchange companies that had any relevance to any of the opinions offered, in your report?
A. Can you repeat that?
Q. Did you do any research into any of the exchange companies that had any relevance to any of the opinions offered, in your report?
A. Which exchange companies are you referring to?
Q. RCI, for example.
A. Yes.
Q. What was that research?
A. I'm going to open my report. Okay?
Q. Yeah. Let me just mark it as Exhibit 1, if you don't mind.
A. Yep.
MS. MEAD: So I will mark, as Young Exhibit 1, a document titled, "Expert Report of

Christopher W. Young," that is dated May 28th, 2004 (sic).

(Deposition Exhibit 1 was marked.)

BY MS. MEAD:

Q. And I will share my screen.

Did you do --

And I'll ask the question again, for clarity.

Did you do any research, into RCI, that had any relevance to any of the opinions offered, in your report?

A. I think you said any of the exchanges; i.e., example of RCI.

Does it --

Did you change the question just to be -- to RCI-related only?

Q. Well, I thought you'd clarified it, but I'll re-ask it again, in the way you just suggested.

Did you do any research into any of the exchange companies -- for example, RCI -- that has any relevance to any of the opinions offered in your report?

A. I did.

Q. What was that research?

A. Yep. Bear with me one moment. Okay?

Q. (Indicates affirmatively.)

(Pause in the proceedings.)

THE WITNESS: If you go to page -- or go to Paragraph 58 -- 57, Paragraph 58, Paragraph 59, you'll see that I analyzed the -- the IHG business, to understand the exchange between Holiday Inn points and IHG points.

BY MS. MEAD:

Q. Do you understand that IH- -- IHG is an exchange company?

A. I believe it is a company where you can exchange points, yes.

Q. What does "IHG" stand for, if you know?

A. I don't remember. I forget. I forget.

Q. How does IHG compare to RCI, for example?

A. I don't remember.

Q. Do you know how many resorts IHG has?

A. I do not.

Q. Do you know how many people use IHG?

A. I do not.

Q. Did you look at -- strike that.

Do you know whether IHG offers rooms over Internet bookings, like Expedia?

MR. WARWICK: Object to form.

THE WITNESS: I do not know.

BY MS. MEAD:

Q. Do you know if IHG offers more than hotel

rooms?

A. I do not remember.

Q. Do you know if IHG is a public company?

A. I don't remember. And I -- I --

For some reason, I'm not remembering the acronym, IHG. I think I know, but I -- I don't want to state it.

Q. Do you know if there is any relationship between IHG and Holiday Inn Club Vacations?

A. How do you define "relationship"?

Q. Well, I'll ask it -- I'll use a different word.

Do you know of any connection, between Holiday Inn Club Vacations and IHG?

MR. WARWICK: Object to form.

THE WITNESS: Well, there's a relationship in the -- in the -- in the understanding that Holiday Inn points can be converted to IHG points, so there's got to be some relationship there.

BY MS. MEAD:

Q. And what can IHG points be used for?

A. IHG points, from my understanding, are used for hotel reservations.

Q. Do you know what brands of hotels IHG offers?

A. I believe so.

Q. What are they?

A. I believe the Hampton Inn, Hilton Tapestry and Curio, LXR maybe, Tru.
I forget all of them, but that's the -- the -- I believe those are the brands or some of the brands.
Q. Do you know where IHG offers stays to guests --
MR. WARWICK: Object to form.
BY MS. MEAD:
Q. -- geographically?
A. No, I do not.
Q. Do you know how many states in which IHG offers stays to guests?
A. No.
Q. Do you know how many resorts Holiday Inn Club Vacations has?
A. I don't remember.
Q. Do you know how many states Holiday Inn Club Vacations has resorts in?
A. I do not remember.
Q. Do you know how many owners are in Holiday Inn Club Vacations' network?
MR. WARWICK: Object to form.
THE WITNESS: I don't remember.
BY MS. MEAD:
Q. Do you know whether Hol- -- strike that.
What, if anything, did you do to research the

maintenance fee payments for this case?
A. Maintenance fee payments, as it relates to a timeshare or a trav- -- or a --
Is that what you're asking?
Q. Yes.
A. Nothing.
THE WITNESS: And we're about an hour.
Can we take a five-minute break? I just want to refill my coffee.
MS. MEAD: Of course.
Back at 10:07?
THE WITNESS: Sounds great.
MS. MEAD: All right.
THE WITNESS: Thank you.
MS. MEAD: Bye.
THE VIDEOGRAPHER: All right. The time is 10:02 a.m. We're going off the record.
Please stand by. Clear.
(Recess taken from 10:02 a.m. to 10:09 a.m.)
THE VIDEOGRAPHER: Okay. The time is 10:09 a.m. We're back on the record.
BY MS. MEAD:
Q. Good morning, Dr. Young.
In your expert report, Young Exhibit 1, you do not recommend using the cost approach, to determine the

value of Holiday Inn Club Vacation points, do you?
MR. WARWICK: Object to form.
THE WITNESS: I do.
BY MS. MEAD:
Q. You do recommend using the cost approach?
A. For the value of the -- of said "points," yes.
Q. I'll point you to Paragraph (a).
You say --
A. What paragraph, ma'am?
Q. Well, it's called Paragraph (a). It's 50(a). There is no (b). It's on Page 17.
A. (Witness perused document.)
Q. And --
A. Fifty -- fifty, okay.
Q. And in the last sentence, you write, "Essentially, market observations exist that are...better indicators of value."
Correct?
A. That's for the offset.
Q. Okay. So if I point you to Paragraphs 48 and 49, you discuss dividing the number of points by the purchase subscribe- -- price, in the purchase agreement, to determine the value per point, correct?
A. Correct.
Q. How would that be used, in any damages analysis

here?

MR. WARWICK: Object to form.

THE WITNESS: This is just simply suggest- -- 49 is just suggesting what the value per point is.

Like, somebody mentioned -- and I'm not sure if it was Mr. Habibi or not -- that you cannot identify points, you cannot identify a price per point.

This is just clearly showing that purchase price divided by points, you obviously have a price per point. You know what that point -- you know what that price is, going into -- into the purchase. We know we can use those points later, for -- for exchange value.

And so what I'm suggesting is that the value of the -- the -- the damages here, should liability be found, it's the cost approach, less an offset, and that offset can come from the market approach.

BY MS. MEAD:

Q. In Paragraph (a), you quote Mr. Gould's testimony?

A. 50(a), ma'am?

Q. Yes.

A. 50(a)?

Q. "Those points can be used -- it's a lifetime of points."

Do you see that?

A. Yes.

Q. "You can stay at different properties. You can stay at different times of the years (sic). You can stay in different units. You can use those points to go to exchange companies and stay in different resorts. You can use those points to, you know, purchase other travel products. You can use those points to go through our IHG reward program if you're part of the Global Access program."

And then it goes on to say, "Essentially, market observations exist that are...better indicators of value."

What did you mean by, "better indicators of value"?

A. Yeah. So as I just mentioned to you, there's going to be a damages component, which is -- I'm suggesting is the purchase price. Should liability be found, damages are purchase price.

If there's a requirement for an offset, well, you have to figure out what's the value of the -- of the properties that were used during the period, and what I'm suggesting to you is that that market observation is a better indicator of value.

That's -- from -- from my -- my belief, the

only way that you can actually get an offset is by going into the market, using the data that's available to IHG, to come up with what that offset is, and that's what I'm referring to here; market observations exist that are better indicators of value.

Q. And the offset is the benefit conferred, on the individual plaintiff, correct?

MR. WARWICK: Object to form.

THE WITNESS: The offset is the price of the services received, in given -- in a given year or a given period of time.

BY MS. MEAD:

Q. So you were solely looking at market indicia of value, to determine the value of the services received, by any individual proposed class member, correct?

MR. WARWICK: Object to form.

THE WITNESS: Yeah. Can --

Can you ask that question a little differently? I'm not sure I'm understanding it.

BY MS. MEAD:

Q. You were solely looking to market indications of value, to define the value of the services received, by any of the proposed class members, correct?

MR. WARWICK: Object to form.

THE WITNESS: I believe that's right, yes.

BY MS. MEAD:
Q. When you were doing your analysis of the price per point, in Paragraph 49, Table 2, you look at some ten transactions, for individuals other than Sergeant Smith and Lingard, correct?
A. Yes, ma'am.
Q. Why did you look at ten?
A. That was just an example. That's all this is here for, is an example.
Q. Why didn't you look at, for example, just Mr. Gayle, who's referenced in Paragraph 48?
A. I could have looked at any of them. This is just giving you a snippet of -- of -- of the data. It's showing you that the price per point is going to be different, depending on when the purchase was, the number of points purchased, et cetera.
Q. So this is only illustrative?
A. Yeah. I don't --
MR. WARWICK: Object to form.
THE WITNESS: I don't use this, for any other purpose, in this report, other than showing you an illustration.
BY MS. MEAD:
Q. Who is ARDA, if you know?
A. I'm sorry. All of a sudden, your screen's gone

blue. I can't see anything.

Q. I wasn't pointing to anything.

What is ARDA, if you know?

A. I don't remember.

MS. MEAD: All right. I will mark, as Young Exhibit 2, a document titled, "State of the Vacation Timeshare Industry 2023."

(Deposition Exhibit 2 was marked.)

BY MS. MEAD:

Q. And I'll share my screen.

Do you recall seeing this document before today?

A. I'm not sure. Let's see.

I believe I have. Just give me a second. I'm trying to see if I can remember that cover.

MR. WARWICK: Grace, could you flip to the next couple pages? And maybe that will refresh his recollection, rather than just the cover.

BY MS. MEAD:

Q. Here's the second page with sponsors. Here's the third page, with the table of contents, with the executive summary, industry overview, industry health, industry --

A. Slow -- slow down, slow down, slow down, slow down. (Witness perused document.)

I believe I saw this report, yes.
Q. Okay. I'll point you to Page 5, and it says, "Results contained in this report are primarily sourced from a survey of timeshare resorts, developers, and management companies."
It goes on to say, "The study focuses on timeshare resorts that sell and maintain interval and points-based vacation lodging products. It excludes fractional resorts and private residence or destination clubs. Of the 1,541 identified timeshare" sports -- "resorts, 759 responded -- a 49 percent response rate." It goes on to describe the responses.
And in the below paragraph, it --
A. Can you go back to --
Can you go back to that and let me read, if you don't mind?
Q. Not at all.
Go ahead.
A. Yeah. Thank you. (Witness perused document.)
(Pause in the proceedings.)
THE WITNESS: Okay. Thank you.
BY MS. MEAD:
Q. I will then point you to Page 14, Figure 2.5, Types of Rental Programs (sic) Offered.
Now, you referenced rentals as a potential way

to value the services received by proposed class members in this case, correct?

A. That was one -- one of the various approaches I discussed, yes.

Q. Did you do anything to investigate the difference in pricing, as between daily, weekly, and monthly rentals?

A. Not --

MR. WARWICK: Objection.

THE WITNESS: Not -- not at this time, I have not.

BY MS. MEAD:

Q. Did you do anything to investigate how seasonality affects the pricing of rentals?

A. Not for this project, no. I have in the past, but not for this project.

Q. If you look at Page 15, Figure 2.7, Publicizing Rentals, did you do anything to investigate whether different rental pricing is offered, depending on the channel through which the rental is publicizing?

A. I have not done this work at this time.

Q. Do you know --

Do you know if different pricing for rentals is offered on resort websites?

A. It is.

Q. Do you know, one way or another?
A. Yes, it is.
Q. It is?
Do you know if different pricing is offered for rentals on social media?
MR. WARWICK: Object to form.
THE WITNESS: Yeah. Are you asking me --
Can I -- can I -- can I get a --
Can I get access, to a rental, on social media?
BY MS. MEAD:
Q. I'm asking: Do you know whether or not the pricing, for a rental, depends on the way it is marketed?
A. Yes.
Q. Did you look --
A. Yes, it is.
Q. Did you look at any prices, for any rentals, on resort websites to form your opinion here?
MR. WARWICK: Object to form.
What do you mean, "opinion"?
Are you saying this is his report?
MS. MEAD: No. I'm using the report, as a foundation to ask questions about his report.
MR. WARWICK: Well, you just asked him if he's ever seen it. He said, maybe I have.

So if you're going to ask him if he relied on this report or this document, in any way -- you have it pulled up as if he --

MS. MEAD: Well, I will take the document off --

MR. WARWICK: -- has it with him.

MS. MEAD: I will take the document off the screen.

MR. WARWICK: Okay.

BY MS. MEAD:

Q. Dr. Young, did you look at any prices, for any rentals, on resort websites, in forming your opinions in this case?

A. I did not do a formal -- I did not --

MR. WARWICK: Object.

THE WITNESS: I did not do a formal analysis of pricing out websites, for this case, at this time.

BY MS. MEAD:

Q. Did you look at a single price, on a single website, for a single rental, for your work in this case?

A. For a --

MR. WARWICK: Objection.

THE WITNESS: For a -- for a -- a single rental rented timeshare?

That's what you're asking?

BY MS. MEAD:

Q. Correct.

A. Yes, I have.

Q. And it's cited in your report?

A. No, it's not cited in my report.

Q. Why not?

A. Because it's irrelevant to the -- my analysis.

Q. Did you look at a single price, for a single rental, on social media, in forming your opinions here?

MR. WARWICK: Object to form.

THE WITNESS: Not that --

No, I did not look at social media.

BY MS. MEAD:

Q. Did you look at a single price, for a single rental, on television, in forming your opinions here?

MR. WARWICK: Object to form.

THE WITNESS: No, I do not watch television.

BY MS. MEAD:

Q. Did you look at a single price, for a single rental, offered through a paid search affiliated marketing channel?

A. Yes.

Q. Which one?

A. I believe it was Expedia.

Q. Okay. Is it cited in your report?
A. No.
Q. Why not?
A. Because it's irrelevant to my analysis.
Q. Did you look at a single price, for a single rental, on an external rental website, in forming your opinions here?
MR. WARWICK: Object to form.
THE WITNESS: What do you mean by "external website," ma'am?
BY MS. MEAD:
Q. Like RedWeek.com.
A. What, ma'am?
Q. RedWeek.com.
MR. WARWICK: Objection to form.
THE WITNESS: I did, yes.
BY MS. MEAD:
Q. What did you look at?
A. I looked at rentals, for properties, in the Florida area.
Q. Is it cited in your report?
A. No, it's not.
Q. Why not?
A. Because it has nothing to do with my analysis.
Q. Did you look at a single price, for a single

rental, offered by a timeshare broker, in forming your report here?

MR. WARWICK: Object to form.

THE WITNESS: I'm not sure the differ- -- the differentiator between a broker and -- and your last question, which is an external site.

BY MS. MEAD:

Q. Do you know what a timeshare broker is?

A. Yeah. A person that is selling or renting something for another party; "broker."

Q. Did you look at a single price, for a single rental, offered by radio -- radio, in forming your opinions in this case?

A. I did not.

MR. WARWICK: Object to form.

BY MS. MEAD:

Q. You did?

A. I did not.

Q. Okay. Do you know whether different marketing channels offer different prices for rentals?

A. I believe I --

MR. WARWICK: Object to form.

THE WITNESS: I believe I already said "yes" to that.

BY MS. MEAD:

Q. And you believe they do, correct?
A. Yes, ma'am.
Q. Do you know if different marketing channels offer different prices for airline tickets?
A. Yes, they do.
Q. Did you do anything to analyze how those differences should be rec- -- reconciled, for the purpose of forming your opinion in this case?
MR. WARWICK: Object to form.
THE WITNESS: I'm not sure I understand your question.
BY MS. MEAD:
Q. Okay. Well, you say one can look at the market value of airline tickets, for example, to quantify the value of that service received, by a proposed class member, correct?
A. Can you tell me where you're looking, ma'am?
What paragraph in my report?
Q. Sure. If you look at Paragraph 60(a) of your report --
A. Did you say 68 (sic)?
Q. 60(a).
A. (Witness perused document.) Yep. Okay.
I'm there.
Q. Here --

A. Please ask me.
Q. Here, you're referencing Holiday Inn Club Vacations' contract with Arrivia, correct?
A. Yes.
Q. And have you ever seen an invoice sent by Arrivia to Holiday Inn Club Vacations?
A. No. I have not received that information at this time.
Q. Do you know if Plaintiffs ever requested a copy, in discovery, of invoicing for airline services to Holiday Inn Club Vacation?
A. I do not know.
Q. Did you ever ask to see any invoice sent by Arrivia to Holiday Inn Club Vacations, for their services?
A. Yes. I asked for any information where there is an exchange between -- between the parties, and I was told that that information is not yet available, which includes -- which includes their receipts for the invoices that you're talking about.
Q. Do you have any idea how those invoices are broken down?
MR. WARWICK: Object to form.
THE WITNESS: I do not. At this time, I do not, because I haven't received the data.

BY MS. MEAD:
Q. So do you have any idea whether that invoice would permit you to make any calculations about the cost of any individual purchasers booking to Holiday Inn Club Vacations?
MR. WARWICK: Object to form.
THE WITNESS: Once I have the data, I can -- I can't answer that question, until I have the data.
BY MS. MEAD:
Q. Well, do you know if you can answer that question until you have the data?
A. That's correct. I -- I cannot answer that question until I have the data.
Q. And you do not know if you can answer that question, until you see the data, correct?
MR. WARWICK: Object to form.
THE WITNESS: I can't answer the question.
It's -- I don't know what's on -- I -- I don't know what's on the schedules. The information has yet to be provided, but if I have the information that's required, such as the person and the price or the owner and the price paid, for the -- for the airfare and points, I can determine what the price per point is going to be, or was, historically was.
BY MS. MEAD:

Q. Well, you're speculating that if that information is broken out on an invoice, you can make that mathematical calculation, correct?

MR. WARWICK: Object to form.

THE WITNESS: Well, I'm not speculating on that. I believe Mr. Gold -- Gould suggests all that information is tracked.

BY MS. MEAD:

Q. We will get there. We're turning to Young 2.

THE VIDEOGRAPHER: Ma'am, I'm sorry to interrupt.

Before we continue, could we go off the record for a quick media change?

MS. MEAD: Of course.

THE VIDEOGRAPHER: Thank you very much. Appreciate.

The time is 10:30 a.m. This concludes Media Unit Number 1.

Please stand by.

(Recess taken from 10:30 a.m. to 10:32 a.m.)

THE VIDEOGRAPHER: Okay. The time is 10:32 a.m. We're back on the record. This is the beginning of Media Card Number 2.

BY MS. MEAD:

Q. Dr. Young, before we go back to Young Exhibit 2,

did you do any sampling, in your expert work here?
MR. WARWICK: Object to form.
THE WITNESS: I do not have data to do any sampling, ma'am.
So, no, I have not done any sampling.
BY MS. MEAD:
Q. Let me point you to Young Exhibit 2, now, Exhibit (e) (sic), and there's a figure, E3 here, that shows timeshare sales since 1974, and --
A. I'm sorry. Did you --
Did you hear me? It seems like my mic -- my microphone went out for a split second.
I said I did not do sampling. I'm not sure if you heard that or not, and I apologize.
Q. I heard it.
A. Okay.
Q. I heard it.
In Young Exhibit 2, looking at Figure E.3, it describes timeshare sales since 1974, correct?
A. Yes.
Q. And do you understand the class period here begins in February 2018?
A. Yes.
Q. Did you look at how demand for timeshares could have affected timeshare pricing, in the period from

February 2018 to February 2023?
A. I have not. Mainly because it's irrelevant to my analysis, correct.
Q. Well, your analysis, in one table, you analyze the value of points an individual purchases over many years, including in the class period, correct?
A. Incorrect.
Q. Okay. What is the purpose of that table?
A. That wasn't your question; your question was that was the only analysis that I did, and my answer to that question is that's wrong because I've explained to you the approach that we're going to take when we receive the data.
And so I walked you through the various analyses on how we're going to approach that problem.
Q. I'll point you to Figure E.4, timeshare average sales price since 1984.
Do you analyze, at all, any changes in timeshare prices and their affect, in your report?
MR. WARWICK: Object to form.
THE WITNESS: Again, I -- I have not. Because it's irrelevant at this time; however, if I had and the prices have gone up, then the cost approach, meaning the purchase price for the plaintiffs in this case would be higher if we were going to use

current prices.

And so at this point in time, I have not looked at anything related to change in prices. I'm just simply looking for the data so that I can prove to the Court what the offset would look like.

BY MS. MEAD:

Q. Well, for illustrative purposes, you do some arithmetic about the value of the services, correct?

MR. WARWICK: Object to form.

THE WITNESS: To just simply illustrate the -- the simplicity, to suggest that there's a value per point. When somebody says that there's no such thing as values per point, we know there's values per point.

And so that -- that illustration is just simply to show the trier of fact that, of course, we can come to a value per point. We can come to a value per point at the purchase price; we could come to the value per point upon an offset.

We can clearly come to a value per point in -- in -- in -- in any case, in any case.

MS. MEAD: Let me mark, as Young Exhibit 3, a document titled, "Timeshare and Vacation Ownership Executives'" -- strike that.

Let me mark, as Young Exhibit 3, a document

titled --

THE WITNESS: Can you blow that up, ma'am? This is really small.

MS. MEAD: Yes.

-- "Optimizing vacation exchange," by Srinidhi Melkote, and others, dated August 13th, 2012.

(Deposition Exhibit 3 was marked.)

BY MS. MEAD:

Q. And I'll point you to the "Abstract."

Do you recall reading this before today?

A. (Witness perused document.)

(Pause in the proceedings.)

THE WITNESS: Okay. I read it.

Yes, I believe I've read this.

BY MS. MEAD:

Q. Okay. And I'll point you to Page 626, the paragraph before the number says, "Traditionally, revenue management has been practiced in industries such as airlines, car rentals, and hotels where revenue from perishable inventory is maximized using inventory controls and/or dynamic pricing under capacity constraints."

What is "dynamic pricing," if you know?

A. Yeah. "Dynamic pricing" -- oh -- is prices

change upon -- depending upon supply and demand.
Q. And is dynamic pricing typical, in the airline industry?
A. Yes, it is.
Q. Is dynamic pricing typical, in the car rental industry?
A. I'm not so sure about all car rental industries using dynamic pricing.
Q. Is dynamic pricing typical, in the hotel industry?
A. Yes.
Q. How would your market measure of the price, for airline tickets, in this case, accommodate for dynamic pricing, if at all?
A. It doesn't have to take -- it doesn't have to take in dynamic pricing, whatsoever. It's irrelevant -- irrelevant -- it's irrelevant.
Q. Why not?
A. Because I'm not forecasting price; I'm actually looking at actual price.
Q. But the only document you identified is an Arrivia invoice to Holiday Inn Club Vacations you have never seen, correct?
MR. WARWICK: Object to form.
THE WITNESS: Well, that's -- that's not true.

You're misclassifying my testimony.
I said that there's multiple approaches to calculating the offset, but the -- calculating the offset is not based upon some future price; it's based upon what was actually -- what was actually utilized.
I can go, and I could find out what as -- only as the offset; I'm not talking about the up-front costs. I'm not talking about the purchase price. I'm talking about the offset.
You don't need any of this stuff. You don't need dynamic pricing. You don't need to take into consideration capacities. It's all -- it's all irrelevant.
All I need to know is: What did the plaintiff use, at what time, and how was that exchanged for the various services, and will identify a price.
BY MS. MEAD:
Q. How do you ascribe a dollar value to that?
A. A dollar value to what?
Q. To the service used.
A. What service are we talking about?
Q. Airline.
A. Okay. So as Mr. Gould testified to, they keep -- they track all of this information. They

know -- they know that their -- a point, a vacation point, one of the plaintiffs' points, if it's -- if it's being utilized to purchase airline tickets, they -- they know what the value of that point is because there has to be some invoice.

And we -- we -- we know that, from testimony, that there is an invoice.

Q. I'll mark --

A. And so once we --

Once we figure out what that invoice looks like and we look at all the various exchanges, we can clearly come up with prices per point.

MS. MEAD: I will mark, as Young Exhibit 4, the deposition of Michael Gould, dated May 15th, 2024.

(Deposition Exhibit 4 was marked.)

BY MS. MEAD:

Q. Is this the Gould deposition to which you've been referring?

A. Can you just blow it up a little bit?

Q. Sure.

A. It's just really hard to see.

(Witness perused document.)

I believe that's the one, yes.

Q. Okay.

MR. WARWICK: And, Grace, just to clarify, on

the record, are you going to put the whole deposition in, as Exhibit 4?

MS. MEAD: Yes.

MR. WARWICK: Okay.

MS. MEAD: Okay.

BY MS. MEAD:

Q. Now, Mr. Gould, here, is testifying about car rentals, and he says:

"So if somebody, for example, had points in Holiday Inn timeshare and they wanted to use those points to rent a car and they didn't want to go outside of the HIVC umbrella, they would do it through the Global Access Program. Is that fair?

"Answer: It is a feature. There probably are other ways for them to get to that, but that is a feature" --

And then the question is asked:

"What other ways would there be?

"Answer: I do believe -- and, again, I think -- well, like I said, I think through the exchange companies that feature might be available. They might also be able to do that through IHG rewards. So I think there might be other ways for them to do it. But it is a feature -- I definitely know it's a feature of Holiday Inn Club, but I suspect there's other ways for

them to get a rental car."
Did you do any analysis of how one would price the car rentals received through exchange companies?
MR. WARWICK: Object to form.
THE WITNESS: I -- I did not because it's irrelevant at this time. I don't have to do that. All I need to do is understand the actual exchange between Holiday Inn and the car company. I don't have to do any outside analysis.
All I need to know -- and it's a simple analysis -- how many points were used to get a car over the platform.
BY MS. MEAD:
Q. Did you do any analysis to ascribe any value to rentals obtained through the IHG rewards system?
A. At this moment in time, I do not have the data for that; so, no, I did not.
Q. Okay. Have you seen any documents concerning Holiday Inn Club Vacations' Global Access Program?
A. I don't remember.
Q. Do you know what Holiday Inn Club Vacations' Global Access Program is?
A. I believe it's one of their exchanges, where they can choose different resorts.
Q. Do you know if they can choose any other -- any

other services, through that program?

A. I don't remember. I don't remember where -- where -- where they can get their other services from, if it's that platform or another platform.

Q. Have you ever used TimeShareWare?

A. No. But I did take a -- a demo of TimeShareWare, most recently.

Q. When?

A. Yesterday, I believe -- no, two days ago.

Q. Why did you not do that before you prepared your expert report?

A. Because I didn't think it was relevant, and I still don't think it's relevant.

Q. Why don't you think TimeShareWare is relevant?

A. Because the information that's going to come from Holiday Inn will ultimately be Holiday Inn's choice, on where they get it from, and that's why --

Q. How do you know that information will come from a Holiday Inn?

A. Well, I'm -- I'm assuming; maybe it's a bad assumption, but I'm assuming, at some point in the future, should this case move forward, that data's going to be shared by Holiday Inn.

Now, how does Holiday Inn produce it? Do they produce it? We're not sure.

But we're sure Holiday Inn has the data because Mr. Gould testified that they had the data.
Q. Do you know whether any subpoenas have been issued to any third parties in this case?
A. I do not know, ma'am.
Q. And I'll point you to Page 75, which is -- begins, Mr. Gould's testimony about Arrivia, which you cited, and then I'll point to Page 76, lines 13 through 19.
"Question: Okay. And what website do they," meaning Arrivia, "use to make that calculation?
"Answer: They have a proprietary aggregate of travel, so they can go and look through multiple channels and multiple networks that they have access to, to find the cheapest guest price for the customer."
What is an algorithm?
A. An algorithm is an equation.
Q. Okay. And is that "proprietary aggregate of travel" likely an algorithm?
MR. WARWICK: Object to form.
THE WITNESS: Is -- "They have a proprietary aggregate of travel."
I'm not sure what he's referring to there.
BY MS. MEAD:
Q. Well, correct.

And you don't know how Arrivia establishes those prices, correct?
A. I don't. But, again, it's irrelevant.
Q. Okay. Have you ever seen an agreement, between IHG and Holiday Inn Club Vacations, that determines how much Holiday Inn Club Vacations pays for IHG's services?
A. I have not.
MR. WARWICK: Object to form.
THE WITNESS: I have not.
BY MS. MEAD:
Q. And I'll point you to Page 95 of Mr. Gould's testimony, starting at Line 3.
"Question: Okay. How much does" -- "How much" -- "How much does IHG know to bill you for?
"Answer: They track how many points they add to a member's account.
"Question: That's the number of points that are sent, but" do you know how "the dollar value to charge for each point transferred?
"Answer: There's an established price per point."
And --
"Question: Okay. And how is that established?
"Answer: There's a -- I think, an agreement that's been established.

"Question: Okay. How often is that agreement updated?

"Answer: It changed a few times through" -- "over the last five years. So there was a schedule established on the price per point."

Do you see that?

A. Yes, ma'am.

Q. Do you know how that agreement has changed a few times over the last five years?

A. I do not.

Q. Have you ever seen any invoices from IHG?

A. I have not.

Q. Do you know if any invoice, from IHG, breaks down the information by Holiday Inn Club Vacation owner?

A. I do not know that.

Q. Do you know if Holiday Inn Club Vacations receives any invoice, from any third party providing services to Holiday Inn Club Vacation owners that breaks it down by owner?

MR. WARWICK: Object to form.

THE WITNESS: I don't. But the thing is, with an invoice, there has to be supporting documentation.

So in any invoice, you don't just give an invoice, and it's just -- it's just blank. You

don't have an invoice with no data behind it.
So if there is an invoice, then there has to be data behind such invoice, which means that I have to be able to get to the individual; otherwise --
BY MS. MEAD:
Q. Do I --
A. -- other -- otherwise, you could not create an invoice.
Q. Do you know whether that would require a subpoena to a third party?
MR. WARWICK: Object to form.
THE WITNESS: I don't know how it would have a -- a subpoena to a third party, if the invoice is going to your client --
BY MS. MEAD:
Q. But --
A. -- Holiday Inn.
Q. But you're assuming the breakdown of invoices, by owner, correct?
A. I'm not assuming it. There's no way you can get to an invoice price, without owner.
So there has to be underlying data, associated with an invoice, because especial- -- especially a company, like -- like Holiday Inn; it's not going to pay an invoice without the support, so the support is

available.

Q. Do you know if the plaintiffs here have ever requested it?

A. I don't know. I be- -- I believe so, but I'm not sure. I'm not certain.

Q. Did you ask to see it?

A. I asked to see -- I already testified to this before, but I -- I asked to see all data relating to pricing, and I was told it's not available at the moment; that we're seeking to get that information.

Q. Do you know if there's a pending discovery request that seeks that information?

A. I don't --

MR. WARWICK: Object to form.

THE WITNESS: I -- I don't know.

BY MS. MEAD:

Q. Can you name the deposition of any Holiday Inn Club Vacations employee that was important to your analysis, other than Mr. Gould?

A. No. Mr. Gould's was the one that provided me the information that I needed to understand the -- the -- the mechanisms of how things are tracked.

Q. And when we've spoken of the value charged to Holiday Inn Club Vacations, by these third-party providers, is that the same as the value conferred on an

individual owner, who uses those services?
MR. WARWICK: Object to form.
THE WITNESS: I'm not sure I understand that question, ma'am.
BY MS. MEAD:
Q. Well, you told me earlier a value was subjective, correct?
MR. WARWICK: Object to form.
THE WITNESS: A value is subjective.
BY MS. MEAD:
Q. And these --
A. That's right. Price --
Q. And these --
A. Price is -- price is not.
Q. And these invoices would reflect -- strike that.
Price is not subjective?
A. Right. Price is what was actually paid, so -- meaning it's not subjective; it's -- we know what it was.
Q. And you -- you are pointing to prices paid by Holiday Inn Club Vacations to third-party service providers, correct?
MR. WARWICK: Object to form.
THE WITNESS: Well, that's part of it, but

it's -- the other part is understanding how many points the plaintiff gave up for said service.

BY MS. MEAD:

Q. And for that, you're looking to your cost approach?

MR. WARWICK: Object to form.

THE WITNESS: No. There -- there --

It's the market approach, right? So the cost -- the cost approach is simple. The cost approach is: This is what they paid for the -- this is what they paid for the asset, or this is what they paid for the timeshare. We know that. That's -- that's definitive.

Now, what are we looking at is -- we're understanding is what has -- how's the market valued the points? So how do you -- what's the exchange value for a rental car in -- with -- with in- -- by the way, with inside the Holiday Inn exchange program, right? That's one way we can look at it.

How many points do they use to rent a car through Avis or through some other third party? And we're going to get the actual data that's used; meaning, we're going to get the plaintiffs' actual history, and we're going to figure out/determine what the value of the points that they used were, in

a given year, and that will be the offset.

BY MS. MEAD:

Q. And do you know if, for example, Holiday Inn Club Vacations receives any volume discounts, from these third-party providers?

A. It's -- again, it's irrelevant because we're looking at what they actually paid.

Q. To measure the cost to Holiday Inn Club Vacations, correct?

A. The cost or the value -- the cost, in this instance --

Remember, I said price and value -- or value is subjective; price is not, so if I used points to get an airline ticket, I -- I have different subject- -- subjective values, but as soon as I push that button and say, I want that, that's the price, meaning that is now the value that I assigned to it.

So as soon as I get the -- as soon as I get the data that -- the historical data for the plaintiffs that show, plaintiff used this number of points, in this given year, in this given month, in this given quarter, we can determine what -- the actual price of those services, and that would be the offset to the cost of the asset.

Q. Who are the individual plaintiffs here?

A. It's a class.
Q. Do you know if they're individual plaintiffs?
MR. WARWICK: Object to form.
THE WITNESS: What do you mean by "individual plaintiffs"?
You mean people?
BY MS. MEAD:
Q. What does the name Sergeant Smith mean to you?
A. Tech Sergeant --
MR. WARWICK: Objection.
THE WITNESS: -- Smith and Sudarien are the two main plaintiffs in this matter.
BY MS. MEAD:
Q. Have you performed any calculations of the actual damages to either Sergeant Smith or Sergeant Lingard?
MR. WARWICK: Object to form.
THE WITNESS: Well, the damages, at this moment in time, are what they paid for their -- their properties.
BY MS. MEAD:
Q. Have you done any calc- --
Have you done that calculation?
A. I have not put it in this report, no.
Q. Have you done any calculation of the value of

the services rendered to them, outside the Holiday Inn Club Vacation resort network?

MR. WARWICK: Object to form.

THE WITNESS: What do you mean by that?

BY MS. MEAD:

Q. Have you done any calculation of the value -- strike that.

Have you done any calculation of the price paid for their stays at IHG resorts?

A. Well, as I -- as I -- as I testified, I do not have the data to do that, but as soon as I get the data from Holiday Inn, I plan to make that calculation.

Q. Have you --

A. For your client, I would imagine your expert would make that calculation.

Q. Have you done any calculation of the price paid for the services used by Sergeant Smith or Sergeant Lingard for car rentals?

A. I just got to re- --

MR. WARWICK: Object to form.

THE WITNESS: -- just because something jogged my memory. I just want to make sure I clarify my testimony.

If you go to -- give me one second.

(Pause in the proceedings.)

THE WITNESS: If you go to Page 16, Para -- Para (sic) 49, you asked, did I do any calculations for the cost approach, or do I provide it anywhere?

And the answer is, yes, I have.

For Lingard and Smith, you'll see that their purchase price was about $138,000; that is their damages at this moment in time.

BY MS. MEAD:

Q. Okay. Have you done any calculation of the price paid for any car rental services used by Sergeant Smith or Sergeant Lingard, in this case?

A. Well, as I -- as I testified already, I don't have the data. As soon as that data becomes available, I will make that calculation, but I would imagine your expert's going to be the one that makes that calculation, as to the offset.

As soon as that --

Q. Have you done --

A. As soon as that -- as soon as that data is available, I will make that calculation.

At the moment, I do not have the data to perform that calculation.

Q. Have you done any calculation of the price of any airline miles used by Sergeant Smith and Sergeant Lin- -- Lingard?

A. You mean air- -- their airline miles, in some other airline program?

Is that what you're asking?

Like a United Club program or something?

Q. I'll rephrase it.

Have you done any calculation about the value of the services obtained by Sergeant Smith and Sergeant Lingard, using Holiday Inn Club Vacation points, for airline tickets?

MR. WARWICK: Object to form.

THE WITNESS: Again, I do not have the data.

As soon as the data's provided, we will make those calculations.

MS. MEAD: I will mark, Young Exhibit 5, a document from MilesBuyer.com.

(Deposition Exhibit 5 was marked.)

BY MS. MEAD:

Q. And I'll share my screen.

Is this a document you cited in your expert report?

A. (Witness perused document.) Can you go back to the --

MR. WARWICK: You blew up the -- yeah, you just blew it up.

Let him look at the whole document, first.

THE WITNESS: All right. Thank you, thank you.
(Perused document.) Yes, ma'am, that's it.
And, by the way, before -- just, again, to clarify my testimony, you asked me if I relied on any other deposition, and, I -- I believe, in my report, I have the Brandow deposition, but I just wanted to make sure that that's clear.
BY MS. MEAD:
Q. There is --
A. So, yes, this is -- this is the report.
Q. There is a statement here, "We buy all quantities of InterContinental Hotel Group points starting at 20,000 points minimum."
Do you see that?
A. Yes.
Q. Do you know if this website would permit you to get any pricing, for any quantity of InterContinental Hotel Group below 20,000?
A. I don't --
MR. WARWICK: Object to form.
THE WITNESS: I don't remember.
BY MS. MEAD:
Q. And it says, "Get a free quote."
A. Yep.
Q. Did you, in fact, try and get a quote?

A. We did.
Q. Okay. For how many points?
A. I don't remember the -- the number of points.
Q. Do you remember the price that resulted from that quote?
A. Hold on. One moment. I know I -- one second.
(Witness perused document.) I might do it at -- I'm using print, and it's not the easiest to navigate.
Can you go -- yeah. Okay.
So I'm there, ma'am, yes. I -- I -- I -- I used this tool.
Q. Okay. Well, can you describe your use of the tool to me?
A. I don't remember. I mean, we put in our information. I put in our information, and I got back a -- a quote.
Q. Do you remember how many points you put in?
A. (Witness perused document.) Two hundred fifty thousand points.
Q. What price did that yield?
A. Twenty-five hundred dollars.
Q. What type of points did you put in?
A. Can you click the --
Can you click the type of miles and points for

me?

Q. I did not. I cannot.

A. Yeah.

Q. This is static, as it's captured.

A. Yeah. So I don't --

Q. Do you have --

A. I don't remember what I chose on that.

Q. What date did you do that on?

A. I don't remember the date.

Q. Was it only one date?

A. Yeah, I believe so.

Q. Do you know what types of points IHG offers?

A. Not at this moment, no.

Q. Do you know whether anyone at -- strike that.

Do you know whether any Holiday Inn Club Vacations owner has enough points to obtain 20,000 or more IHG points?

MR. WARWICK: Object to form.

THE WITNESS: I -- I -- I --

I don't know, but, again, you know, it's an -- it's an irrelevant -- it's -- it's irrelevant to my analysis, but I don't know.

BY MS. MEAD:

Q. I'll point you to what's Page 3 of this PDF.

It says, "How much are IHG points worth?"

And it says, "The value of IHG points varies depending on a number of factors, like seasonality, market demand, number of points, et cetera. However, it's best to sell IHG points in bulk to avail of the high rates."

Do you know how seasonality affects the value of IHG points?

A. I don't know, but I assume I -- I assume how it works, but the reality is it's irrelevant to the calculation.

Q. Well, do you know if MilesBuyer has historical information about the value of IHG points, on any given day, from 2018 to 2023?

A. I --

MR. WARWICK: Object to form.

THE WITNESS: I don't know, but it's irrelevant to my calculation.

MS. MEAD: Okay. I will mark as Young Exhibit 5 -- Exhibit 6 --

MR. WARWICK: Grace, do you have a name for that exhibit you just put in as Exhibit 5?

MS. MEAD: It's the MilesBuyer website.

MR. WARWICK: Thank you.

MS. MEAD: And I'm marking, as Young Exhibit 6, a doc -- a document from the top dollar payouts

website.

(Deposition Exhibit 6 was marked.)

BY MS. MEAD:

Q. And here, there is a reference to, getting the best value for your points.

Do you know whether MilesBuyer or Top Dollar offers a higher value for IHG points?

A. I don't know.

Q. Well --

A. But, again, irrelevant -- irrelevant to the calculation that I'm considering.

Q. Well, if they offer different prices for the points, might you need to reconcile those prices?

A. What do you mean recon- -- what do you mean by "reconcile those prices"?

Q. So if, on the same day, the same type, and the same amount of points, MilesBuyer and Top Dollar offer different prices, which would you use?

MR. WARWICK: Object to form.

THE WITNESS: Well, I would use the actual.

BY MS. MEAD:

Q. Well, do you know whether a single Holiday Inn Club Vacations owner sold IHG reward points, through either Top Dollar or Miles Buyer?

A. I do not.

MR. WARWICK: Object to form.

THE WITNESS: Again, as I said to you, I don't know because I don't have the data, but as soon as I get the data, we'll do the calculations. But the calculations aren't done on a hypothetical. The calculations are done on the actual -- the actual transaction, the actual historical transactions.

Once you find the actual historical transactions, we can come up with values for points. I could cut the data in thousands of different ways, but -- and it's not hard to do. It's very -- very straightforward.

BY MS. MEAD:

Q. But you've not seen any of this data, correct?

A. Correct. This data has not yet been provided, but as soon as it's provided, we will do the calculations. Or like I -- I already --

Q. Do you remember --

A. Like I said before, your expert's probably going to do the offset calculation.

Q. Do you --

A. I already told you what the cost -- what the cost approach is going to be for the illustrative examples, which is the purchase price. What they purchased -- and just to be clear, the damages to the

plaintiff in this case, at this moment in time, is what they purchased the -- what they purchased the property for, plus the maintenance and other fees that they expensed over time.

That's the cost approach.

Q. For the term --

A. Now, if there's a -- if there's an offset, that's most likely going to be your expert that calculates that. Perhaps -- perhaps I'd calculate it, but I'm not sure -- I'm not sure about the future, until we get the data.

Q. Well, that's correct. You don't know what the data will say until you see the data, correct?

A. Oh, well, I mean, look, again, as -- as -- as I mentioned to you before, data has to be captured at the individual level; it has to be. It absolutely has to be.

And so without it being captured at the individual -- once -- once I get the information that's captured at the individual plaintiff level, I'll clearly be able to calculate the offsite -- offset.

Q. Do you know of any reason why, since February 2023, the plaintiffs here could not have asked for that data?

MR. WARWICK: Object to form.

THE WITNESS: Ma'am, I don't -- I don't know what the lawyers asked for or not asked for. I -- I know what I asked the lawyers for, and so as soon as I get the data, I'll make the calculations.

BY MS. MEAD:

Q. And you did ask for that data, correct?

A. I spoke to Counsel, as I mentioned to you already, and I said, If I have this data, I can make the calculations.

And from my understanding, that data will -- will eventually come.

MS. MEAD: Do we want to take another break? It's been about an hour.

THE WITNESS: That would be great.

Thank you.

MS. MEAD: Ten minutes; 11:20?

MR. WARWICK: Sure.

THE WITNESS: Yeah, that's great.

Thank you.

MS. MEAD: Thank you.

THE VIDEOGRAPHER: Okay. The time is 11:10 a.m. We're going off the record.

Please stand by. We're clear.

(Recess taken from 11:10 a.m. to 11:22 a.m.)

THE VIDEOGRAPHER: The time is 11:22. We're

back on the record.
BY MS. MEAD:
Q. Good morning again, Dr. Young.
A. Good morning.
Q. Have you ever seen a copy of any contract between Holiday Inn Club Vacations and IHG?
A. I have not.
Q. Have you ever seen a copy of any document sent by IHG to Holiday Inn Club Vacations?
A. Not that I remember.
Q. Have you ever seen a copy of any invoice sent by IHG to Holiday Inn Club Vacations?
A. Not that I remember, no.
Q. Have you ever seen a copy of any data sent by IHG to Holiday Inn Club Vacations?
A. I have some data here that Mr. Habibi references. I'm not sure if that's coming from IHG, or if that's coming from -- from Holiday Inn vacations, so the answer is I don't know.
Q. Have you ever seen a copy of any data from IHG itself?
MR. WARWICK: Object to form.
THE WITNESS: I don't know.
BY MS. MEAD:
Q. Have you ever seen a copy of any agreement

between RCI and Holiday Inn Club Vacations?
A. No.
Q. Have you ever seen a copy -- a doc- -- strike that.
Have you ever seen any document sent by RCI to Holiday Inn Club Vacations?
A. Not that I know of. Not -- not at -- not at this time.
Q. Have you ever seen a copy of any invoice sent by RCI to Holiday Inn Club Vacations?
A. No.
Q. Have you ever seen any data transmitted from RCI to Holiday Inn Club Vacations?
A. Not that I'm aware of.
Q. Have you ever seen any data from RCI?
MR. WARWICK: Object to form.
THE WITNESS: Have I ever seen data from RCI?
Data in what capacity? any data?
Like on their website data?
BY MS. MEAD:
Q. Correct.
A. Well, if you go to the RCI website, they have data; I've seen that.
Q. Okay. Have you ever seen any pricing data from RCI?

MR. WARWICK: Object to form.
THE WITNESS: Pricing data?
You're talking about pricing data from RCI to -- to any vendor? to anybody?
BY MS. MEAD:
Q. To Holiday Inn Club Vacations.
A. Not that I know of, no.
Q. Okay. Have you --
What is a VIP event, if you know?
MR. WARWICK: Object to form.
MS. MEAD: I'll ask a better question.
I apologize.
BY MS. MEAD:
Q. If a Holiday Inn -- Inn Club Vacations owner is using their points for a VIP event, do you know anything about how many points are required for that?
MR. WARWICK: Object to form.
THE WITNESS: Well, I -- I know the VIP events require more points than a non-VIP event; I'm not sure how many points, though.
BY MS. MEAD:
Q. Have you ever seen a copy of any agreement related to airfares between Holiday Inn Club Vacations and anyone else?
A. Not at this time, no.

Q. Have you --
A. As I said, this is the data -- this is all of the data we're requesting --
Q. Have you ever --
A. -- now.
Q. Have you ever seen any document transferred by someone outside of Holiday Inn Club Vacations to someone at Holiday Inn Club Vacations about airfare price?
MR. WARWICK: Object to form.
THE WITNESS: Not data; just statements that Mr. Gould made about the pricing.
BY MS. MEAD:
Q. Have you ever seen any invoice transmitted by someone outside of Holiday Inn Club Vacations to anyone at Holiday Inn Club Vacations about airfare?
A. No, not at this time.
Q. Have you ever seen any data from Expedia --
MR. WARWICK: Object to form.
BY MS. MEAD:
Q. -- related to this case?
A. Are you talking about Expedia's subsidiary that works with --
Q. Any --
A. -- timeshare?
Q. Any -- any Expedia affiliate.

A. Have I looked at any Expedia content related to this case? I am going to say yes.
Understanding how Expedia works, I mean, I -- I use Expedia on a regular basis if my assistant can't help with travel. I think all of that's relevant to the case.
Q. But you have no ownership interest or timeshare, do you?
A. Thankfully, no.
Q. All right. And have you ever seen any invoice from Expedia to Holiday Inn Club Vacations?
A. No, not at this time. This is the information that we're requesting.
Q. Have you ever seen any agreement between Arrivia and Holiday Inn Club Vacations?
A. No.
Q. Have you --
A. This is -- this is the information we're requesting.
Q. Have you ever seen any invoice from Arrivia to Holiday Inn Club Vacations?
A. No.
Q. Have you ever --
A. This is all -- all of the information that we're requesting.

Q. Have you ever seen any tran- -- data transmitted from Arrivia to Holiday Inn Club Vacations?
A. No. And, again, all -- this is all the information that we need to do our calculation.
Q. Have you ever seen any data from Arrivia itself?
A. What kind of data are you asking about?
Any data from Arrivia?
Q. Sure.
A. Such as pricing data?
Q. Sure.
A. Yes.
Q. Have you ever seen any related to any issue in this case?
A. No. That's the information that we're requesting to do the -- perform our calculations.
Q. Have you ever seen any agreement between any external company and Holiday Inn Club Vacations about rental cars?
A. No.
Q. Have you ever --
A. That's all -- that's all the information we're requesting.
Q. Have you ever seen any document transmitted by anyone outside of Holiday Inn Club Vacations to anyone

at Holiday Inn Club Vacations about rental cars?
MR. WARWICK: Object to form.
THE WITNESS: Can you repeat that question, ma'am?
BY MS. MEAD:
Q. Have you ever seen any document from someone outside of Holiday Inn Club Vacations transmitted to someone at Holiday Inn Club Vacations about rental cars?
MR. WARWICK: Object to form.
THE WITNESS: No. That's the -- all of the information that we're requesting for our calculations.
BY MS. MEAD:
Q. Have you ever seen any data about rental cars from anyone outside Holiday Inn Club Vacations transmitted to anyone in Holiday Inn Club Vacations?
A. No.
MR. WARWICK: Object to form.
THE WITNESS: Not -- not at this time. This is all the information that I'm requesting to do my calculations.
BY MS. MEAD:
Q. Have you ever seen any data from any third party about the use of Holiday Inn Club Vacation points for rental cars?

MR. WARWICK: Object to form.
THE WITNESS: No.
BY MS. MEAD:
Q. Have you ever seen any agreement between Holiday Inn Club Vacations and anyone about cruising?
MR. WARWICK: Object to form.
THE WITNESS: About cruising?
So any -- any type of cruising?
Like, what do you mean by --
You mean related to this case? I'm -- I'm misunderstanding that one now.
BY MS. MEAD:
Q. Have you ever seen any agreement between any third party and Holiday Inn Club Vacations about booking cruises on cruise ships?
A. No.
Q. Have you ever seen any agreement with any third party and Holiday Inn Club Vacations about the price for booking cruises on cruise ships?
A. No. That's the information we're requesting to perform the calculations.
Q. Have you ever seen any document transmitted by any third party, to Holiday Inn Club Vacations, about Holiday Inn Club Vacation owners taking cruises?
A. No.

MR. WARWICK: Object to form.
BY MS. MEAD:
Q. Have you ever seen any invoice from any third party to anyone at Holiday Inn Club Vacations for any cruise trips?
MR. WARWICK: Object to form.
THE WITNESS: No. This is the information that I'm requesting for my calculations.
BY MS. MEAD:
Q. Have you ever seen any data transmitted to -- by any third party to anyone at Holiday Inn Club Vacations about cruise trips?
A. Was that not the same question?
Q. It was data, not invoice.
A. No. That's the information that the -- I'm requesting to perform my calculations.
Q. Have you ever seen any data from any third party about cruise trips taken by Holiday Inn Club Vacations owners, using their Holiday Inn Club Vacations points?
A. No. That's the information that we're requesting to perform my calculations.
MS. MEAD: I will mark as Young Exhibit --
MS. CANALES: Seven.
MS. MEAD: -- 7, a document with -- the first

line, "Matthew Gayle, four reservations, one contract. He is not listed in the spreadsheet," open paren, "tab point usage summary, but he is on the reservation list tab."

(Deposition Exhibit 7 was marked.)

BY MS. MEAD:

Q. And there's notes about lines.

Have you seen this document before today?

A. Can you -- can you blow it up so I can see it?

Q. Sure. I will blow up the first top half, of the page.

A. (Witness perused document.)

Where is this document from?

Q. It was produced by Plaintiffs.

A. Okay. So I read it, ma'am.

Q. Do you remember seeing it before today?

A. I do not remember seeing this.

Q. You referenced the assistance of additional individuals at your firm, in preparing your report, is that correct, in your report?

A. Yes, I do.

Q. Who were those individuals?

A. Sabera Choudhury.

Q. Was it only Mr. or Ms. Choudhury?

A. Ms. Choudhury.

Q. Okay. Was it only Ms. Choudhury?
A. No. And the second is Tyler Ford.
Q. Was it only Ms. Choudhury and Mr. Ford?
A. Yes.
Q. All right. Do you know if either Ms. Choudhury or Mr. Ford prepared this document?
A. No, I -- huh-uh.
Q. What is --
A. I don't remember -- I don't remember seeing this document.
Q. Okay. What is Ms. Choudhury's background?
A. She is -- has a -- well, she's been working in the forensic industry for 25 years. She has an MBA from the University of Chicago. I think she has an undergraduate degree from the University of Virginia. She's a certified public accountant, CVA, ACFE.
Q. What work did she do in this case?
A. She helped me get through the discovery documentation.
Q. Did she play any role in the drafting of your report?
A. The drafting of my report?
Q. (Indicates affirmatively.)
A. Yes. She had a role in drafting some of my report, yes.

Q. Well, what was that role?
A. She drafted some of the report.
Q. Do you know what part she drafted?
A. I don't remember.
Q. Did she create the first draft?
A. The first draft is a -- it's -- it's a team effort. Like I said, there's multiple people working on the report at the same time.
Q. Does she have any experience in the timeshare industry?
A. Not that I'm aware of.
Q. Does she have any experience in the hospitality industry?
A. I can't answer that. I don't know.
Q. Does she have any experience in real estate?
A. Don't know.
Q. What was Mr. Ford's educational background?
A. Mr. Ford is a CPA. He's got an undergraduate degree from -- oh, I think NYU. He's been a CPA auditor for a bunch of years. Now he's been working in forensics for the past about three years.
Q. What role did Mr. Ford play in your work here?
A. He played a junior role to Ms. Choudhury, and so he would take inventory of -- of discovery. He would help me put together the binder that's in front of me,

which is my discovery binder. He would help print materials, spell check, do administrative work, as necessary.

Q. Did he play a role in the drafting of the report?

A. He did not.

Q. Does he have any experience in timeshare?

A. I don't know.

Q. Does he have any experience in hospitality?

A. Don't know.

Q. Does he have any experience in real estate?

A. I don't know.

Q. And returning to Young Exhibit 7, do you know if this was prepared by Plaintiffs' Counsel?

A. I don't know.

MS. MEAD: I will mark, as Young Exhibit 8, a document titled "Purchase Agreement," with the purchasers of Matthew Nicholas Gayle and Angelique Denise Simpson-Gayle, and it is dated May 4, 2019.

(Deposition Exhibit 8 was marked.)

BY MS. MEAD:

Q. And are you offering any opinion here about how the purchase agreements can be rescinded?

A. No, I am not.

Q. Okay. Are you offering any opinion here about how the purchase agreements can be unwound?
A. No.
MR. WARWICK: Object to form.
THE WITNESS: I'm just -- I'm giving -- I'm -- I'm providing value only; I'm not providing any legal opinion whatsoever.
BY MS. MEAD:
Q. Okay. Did you do any analysis of how it might affect damages if the purchasers were married?
MR. WARWICK: Object to form.
THE WITNESS: No. No, I did not, and I'm not -- I wasn't asked to do that.
BY MS. MEAD:
Q. And have you done any analysis of how it might affect damages if the purchasers were not married?
A. Again, I'm not --
MR. WARWICK: Object to form.
THE WITNESS: I'm not -- I wasn't asked to parse any damages out to the individuals.
At some point in the future, I may be asked to do that.
MS. MEAD: Okay. I will mark, as Young Exhibit 9, a document titled, "Holiday Inn Club Exchange Program Membership Agreement," last name

Adams, dated April 19, 2019.
(Deposition Exhibit 9 was marked.)
BY MS. MEAD:
Q. And I will point you to subsection C, Ownership Info- -- Information, and a table below it.
Do you know what the number of points column on this reflects?
A. It's a number of points that he has ownership.
Q. Okay. And here, do you see 121,000, 190,000, 190,000, and 275,000, 225,000, correct?
A. Yep.
Q. I'll point you back to Young Exhibit 1, your Table 2, a reference to the Adams, and there is only a reference to 190,000, 275,000, and 225,000.
Do you see that?
A. Yes.
Q. Do you know why there's a reference to so many fewer points, in your report, Young Exhibit 1, than there is in Young Exhibit 9?
A. I do not.
Q. Do you know if the points already owned by a purchaser affected the amount they paid per point, at the time of purchase?
MR. WARWICK: Object to form.
THE WITNESS: I -- I don't know what --

Can you ask that question differently? I'm not understanding the question.
BY MS. MEAD:
Q. Do you know if the points already owned by any purchaser affected the purchase price for additional points, when they purchased additional points?
MR. WARWICK: Object to form.
THE WITNESS: Still not following the question, ma'am.
BY MS. MEAD:
Q. Okay. Do you know if any of the purchasers, including the Adams, already had points, when they made any of the purchases reflected on your table?
MR. WARWICK: Object to form.
THE WITNESS: No, I don't know. I don't know.
BY MS. MEAD:
Q. Do you know whether already owning points affected the purchase price per point for any of these purchasers?
MR. WARWICK: Object to form.
THE WITNESS: Again, I don't know, but it's all irrelevant. All you need to understand is what they paid; that's it, what they paid for total points.
MS. MEAD: I will mark, as Young Exhibit 10, a document titled, "Holiday Inn Club Exchange Program

Membership Agreement," last name Paterson, dated
December 28, 2019.
(Deposition Exhibit 10 was marked.)
BY MS. MEAD:
Q. And I'll point you to C, Ownership Information.
And there is a reference to number of points,
45,000, then 300,000, then 155,000.
Do you see that?
A. Yes.
Q. And if we look at Young Exhibit 1 and your
table's references to the Patersons, there's a reference
only to 100,000, 300,000, and 155,000.
Do you know why those point totals are
different?
A. Oh, off the top of my head, no, I do not.
But do you mind going back to the other
document for a second?
Q. Sure. This is Young Exhibit 10, the Paterson
agreement, under Ownership Information.
A. (Witness perused document.)
MR. WARWICK: Dr. Young, if you'd like to see
the whole document, she can close the blowup and let
you look at the whole document.
THE WITNESS: Well, I mean, I -- I -- I --
What I can't -- I mean, yes. Yes, I'd like to

see that. But there's no dates in here; that's what I'm -- that's what I'm trying to understand there, are the dates.

Do you mind letting me see the date of that report? the date of the file you're looking at, ma'am?

BY MS. MEAD:

Q. Not at all. It's -- it's titled "Holiday Inn Club Exchange Program Membership Agreement." It's dated December 28th, 2019.

A. And -- and the -- the number of points on that document?

Q. Sure. If you look down here, there is a reference to Resort Access, Signature Collection, Number of Points, 45,000; then East Village, 300,000; then Colonial Crossings Resort, 155,000.

A. Right. Okay.

Q. And then if we go back to Young Exhibit 1 --

A. Yep.

Q. -- Paragraph 49, the table under Table 2, these numbers are different, correct?

A. These numbers are different, yes.

Q. Do you know why they're different?

A. Well --

MR. WARWICK: Wait a minute. I don't --

What do you mean, they're different?
MS. MEAD: Well --
MR. WARWICK: Which one is different? It says 100,000, 300,000, and 155,000.
Which specific number? They look the same to me.
MS. MEAD: I'll point you back to Young Exhibit 10. The numbers here are 45,000 --
MR. WARWICK: Oh.
MS. MEAD: -- 300,000, and 155,000.
THE WITNESS: Yep.
BY MS. MEAD:
Q. So the numbers, for the Patersons, in Young Exhibit 10, the exchange agreement, are different than in your Table 2, in Young Exhibit 1, correct?
A. Yeah.
And it looks like it's the signature collection, right?
Q. Right.
Do you know what -- what signature points are, by the way?
A. No, I don't remember.
Q. Okay. Do you know why this discrepancy exists?
A. Well, I --
MR. WARWICK: Object to form.

THE WITNESS: Again, I don't, but as I mentioned to you already, that was for illustrative purposes; I'm not providing you a -- a damages calculation at this moment in time.

I will, once I get all the data.

BY MS. MEAD:

Q. But in calculating a price per point, the total number of points purchased affect that price, correct?

MR. WARWICK: Object to form.

THE WITNESS: Yeah. But it's --

Again, as I mentioned to you, it's for illustration purposes, right? So all you have to do is change the number, and it changes the points; pretty -- pretty easy math, right?

So as soon as we get all the data and we know the data is accurate and correct, all that information will be updated and we'll --

MS. MEAD: Mark as --

THE WITNESS: -- and we'll provide you with an economic damages analysis.

MS. MEAD: I'll mark, as Young Exhibit 11, a document titled, "Holiday Inn Exchange Program Membership Agreement," last name Gilliam, dated June 30 -- June 3rd, 2017.

(Deposition Exhibit 11 was marked.)

MR. WARWICK: This is 10?
MS. MEAD: Yes -- this is 11. Eleven.
MR. WARWICK: It's 11?
MS. MEAD: Excuse me. No, it is 11.
BY MS. MEAD:
Q. Young Exhibit 11 is the Holiday Inn Club Exchange Program Membership Agreement, last name Gilliam, for primary member, dated June 3rd, 2017. Okay?
And I'll point you under -- to C, Ownership Information, and under number of points, it says 210,000.
Do you see that?
A. I do.
Q. And I will point you back to Young Exhibit 1, Table 2. Last row, it says Gilliam and Fidilio, 125,000 points.
Do you know why the number of points between Young Exhibit 11 and your report, Young Exhibit 10, are different?
A. Well --
MR. WARWICK: Object to form.
THE WITNESS: -- I mean, this is -- this -- this 5/13/2019, and the other document that you gave me was 2017.

BY MS. MEAD:
Q. Fair enough.
So do you know --
A. Is that not right?
I mean, did I -- did I miss that? Because that's a little small.
Q. That is fair enough, but --
A. And the same -- by the way, the same -- the same was for the prior one, one -- there was two different dates. One was from 2019, and one was from 2018, so --
Q. But do you know --
Do you know how many points any of these purchasers had, when they entered the purchase agreements reflected in Table 2 of Young Exhibit 1?
MR. WARWICK: Object to the form.
THE WITNESS: I don't remember, off the top of my head, no.
BY MS. MEAD:
Q. Okay. And if we look at Young Exhibit 1, Table 2, in the price per point, this ranges from 15? per point to up to 27? per point, correct?
A. Yes, ma'am.
Q. And that date range is from May 4, 2019 -- strike that.

The date ranges here range from May 4, 2019, to August 10, 2021, correct?

MR. WARWICK: Object to form.

THE WITNESS: Yes.

BY MS. MEAD:

Q. And if you look at the price per point, in fact, it goes as high as 30? per point, right?

A. Right.

Q. So, in fact, the price per point, on Table 2, ranges from 15? per point to 30? per point, correct?

A. Correct.

Q. And that means that the variance, in price per point, is roughly 100 percent, correct?

MR. WARWICK: Object to form.

THE WITNESS: That's not the variance, no.

BY MS. MEAD:

Q. The --

A. The variance is -- is -- the statistical definition of variance -- that's not -- that's not the variance.

Q. Okay. The -- have you done any analysis of how the value of points changes here, from February 2018 to February 2023?

MR. WARWICK: Object to form.

THE WITNESS: I have not because it's

irrelevant. It's not -- it's not -- you don't -- you don't care about the price changing; what you care about is what was the price paid.

BY MS. MEAD:

Q. Now, if someone purchased points, on May 4 of 2019, and used 100 points two years later, the purchase price does not reflect the points when they are used, does it?

A. I don't know what that means. I'm not understanding your question.

Q. Did you do any analysis of how point values changed over the class period here?

A. I just had --

MR. WARWICK: Object to form.

THE WITNESS: I just said that to you.

BY MS. MEAD:

Q. Okay.

A. I just said I did not because it's irrelevant. All you care about -- all we need to care about is, What was the price actually paid? All right? That's going to be your up-front cost, right? Plus -- plus fees paid, right? So you take your cost up front, plus your fees paid. And perhaps, if the judge requires, you would reduce that by an offset.

I've explained to you what an offset is and how

we get to the offset, and that's what my report is about.

You do not -- you do not need historical data; all you need to know is the actual data. This -- that's why I'm saying this analysis is pretty simple.

Q. What --

A. All you need to do is the -- all you need to use is the actual data.

Q. Well, in fact, you're just looking to the purchase price, correct?

A. I don't know what that means, I'm just "looking to the purchase price."

Q. Well, you're saying that the harm caused by the purchase is measured by the purchase price, correct?

MR. WARWICK: Object to the form.

THE WITNESS: I'm not just saying that, no.

BY MS. MEAD:

Q. All right. What is --

A. I'm saying it's purchase prices, plus fees each year, paid since the purchase.

Q. Okay. What role does price per point pay -- play in your analysis, if any?

MR. WARWICK: Object to form.

THE WITNESS: Yeah. So if you go to my report --

MS. MEAD: Uh-huh.

(Pause in the proceedings.)

THE WITNESS: I'm just finding the paragraph.

(Perused document.) So if you go to Page 20, Paragraph (c) of my report --

Hold on. It might not be (c). Bear -- bear with me a moment. (Perused document.)

(Pause in the proceedings.)

THE WITNESS: I'm just looking at a -- I'm looking for one sentence that says that the value of the points -- the value of the points to use, for certain exchanges, was set at the purchase.

(Perused document.) Ah, here we go.

Mr. Gould -- the reason I think those points are important is, according -- this is Paragraph 54 --

Are you there?

Hello?

MR. WARWICK: We can hear you.

MS. MEAD: Yes.

THE WITNESS: So these points are important because you see, according to Mr. Gould, "Holiday Inn point holders can purchase additional points to complete a reservation or a transaction and explains that Holiday Inn point holders pay cash for

additional points. When asked who sets the purchase price for additional points, he states: 'They're set at'" the "'inception of the program.' Therefore, you could determine the value of Holiday Inn points using Holiday Inn's pricing schedule or calculate the value of Holiday Inn points by dividing the price to purchase additional points by the number of points purchased to complete a transaction."

So it's my understanding that those points are -- you can purchase additional points using the value that I established in that schedule.

BY MS. MEAD:

Q. Well, this is a reference to complete a specific reservation or transaction, correct?

A. Yes.

Q. Have you ever seen any document addressing the purchase of additional points, to complete a transaction?

A. No. Again, that's data that we're looking for, and once we obtain it, we will calculate the economic damages to the --

Q. Well --

A. -- to the class.

Q. -- you don't know what that data is going to

say, until you see the data, right?

A. Well, no. You -- you know what it's going to say because it's got to -- it's got to -- the only way -- the only way that an individual -- the only way you can actually give somebody service, in an exchange, is both parties need to know the information.

So, of course, I'm going to have to -- the data's going to be available.

Q. Do you know how many Holiday Inn Club Vacations, in fact, use cash to purchase additional points, to complete a reservation or a transaction?

A. I don't --

MR. WARWICK: Object to form.

THE WITNESS: I don't -- I do not know, but, again, it's irrelevant. All I need to know is -- all I need to do is see a series of transactions, and I think that's what -- what's -- what's happening here is we have multiple ways to calculate points; there's multiple. There's not just one way, there's -- there's multiple ways.

And so you -- your original question was: Why did you put those points there on that schedule? Well, it helps you identify things, such as this, which is, we can buy additional points to effectuate a transaction.

BY MS. MEAD:
Q. But, in fact, in Table 2, you're citing to purchase agreements with owners, not the purchase of additional points to complete a reservation or transaction, correct?
A. Not sure -- not sure of the relevance of that, but what I'm pointing to is that we know the price per points when we purchase the properties or when you purchase the -- the timeshare; and, therefore, we know -- we know what the price is to buy additional points, if I need to effectuate a transaction with another vendor.
Q. So --
A. It's all set; we know it up front.
Q. How do you know that the purchase in a purchase agreement is the same as a purchase to -- for cash to complete a specific reservation or transaction?
A. Because Mr. Gould says, "at inception."
Q. Where does he say that in this quoted section?
A. No.
Q. He says --
A. They're set -- they're set at the -- at the inception of the program.
Q. Do you know whether that is a reference to the inception of, for example, the Orange Lake trust, in

February of 2018?
MR. WARWICK: Object to form.
THE WITNESS: I don't know. I'm just going by what he says here. He says, "Therefore, you" -- you can determine -- "you could determine the value of Holiday Inn points using Holiday Inn's pricing schedule or calculate the value of Holiday Inn points by dividing the price" of the purchase of -- or -- I'm sorry -- "price to purchase additional points by the number of points purchased to complete a transaction."
And that's referencing the inception at --
BY MS. MEAD:
Q. Okay.
A. -- at the inception of the program.
Q. Do you know if that program is referring to the program that permits the purchase of additional points, to complete a specific transaction or purchase with cash?
MR. WARWICK: Object to form.
THE WITNESS: I don't know. I'm just going by what Mr. Gould -- Mr. Gould stated. Mr. Gould stated that this is, in fact, something that can be done.
And so if it can be done, then as soon as we

get the data, we'll be able to calculate what the economic loss is.

MS. MEAD: I'll mark, as Young Exhibit 12, a document titled "Valuation of a 22.5 percent interest in River Rock Sports Bar & Grille, Corp.," your name, Christopher W. Young, Ph.D., and dated November 28, 2022.

(Deposition Exhibit 12 was marked.)

BY MS. MEAD:

Q. Do you recall preparing this report?

A. I do.

Q. And did you provide a copy of this report to your attorneys in this case -- or strike that.

Did you provide a copy of this report to the Plaintiffs' attorneys in this case?

A. No, of course not.

Q. Why not?

A. Because all of this information is covered in our confidentiality agreement.

Q. Do you know if this report had been publicly filed in a court?

A. I don't know.

Q. Did you assess whether any of your prior reports have been publicly filed in courts?

A. Maybe the ones that go to trial, but most

often, this information does not get in the court record.

Q. Okay. Did you provide any of your prior reports that have been publicly filed, in courts, to your lawyers? To the Plaintiffs' lawyers here?

A. No.

MR. WARWICK: Object to form.

THE WITNESS: Not at all, no.

MR. WARWICK: Objection.

BY MS. MEAD:

Q. Did you provide any of your testimony that has been publicly pro- -- provided -- filed in courts, to the Plaintiffs' lawyers?

MR. WARWICK: Object to form.

THE WITNESS: No.

BY MS. MEAD:

Q. Did you provide any copies of any testimony you've given, in a publicly open court, to any of your -- to the Plaintiffs' lawyers here?

MR. WARWICK: Object to form.

THE WITNESS: The Plaintiffs' lawyer has my CV, where I provided testimony, in cases.

All of that is available for your parol- -- perusal.

BY MS. MEAD:

Q. Okay.
A. You have all of -- you have all of the cases in which I testified, up until February or March of 2024. The CV needs to be updated since then, but you have -- you have all of that data.
Q. Okay. I'll point you to Page 35, and here there's a certification.
And it affirms that -- and it goes down to Number 5. "My work product aligns with the Statement of Ethical Principles and Principles of Professional Practice of the National Association of Forensic Economics and the Professional Standards of the National Association of Certified Valuators and Analysts."
Do you see that?
A. Yes, ma'am.
Q. Why did you not include a similar certification here?
MR. WARWICK: Object to form.
THE WITNESS: Sure.
Go -- go to the very first page.
BY MS. MEAD:
Q. Sure.
A. What does that say in the middle there? "Red Maple," right?
Q. Yes.

A. Where do I -- where do I presently work?
Q. You presently work at a different company, correct?
A. Correct.
Q. Okay. What does that have to do with the certification?
A. Because the company that I'm presently working for doesn't require me to put a certification.
Q. Okay. Were --
Was your work, in this case, performed consistent with your certification, in the case reflected in Young Exhibit 12?
MR. WARWICK: Object to form.
THE WITNESS: All -- all of my reports follow the Standards of the National Association of Forensic Economics, and should it be a valuation, I -- it would follow the standards of the NACVA.
BY MS. MEAD:
Q. Okay. Now, aside from NACVA standards, do you cite any other standards that govern the expert report you performed here, in Young Exhibit 1?
MR. WARWICK: Object to form.
THE WITNESS: No. I'm a -- I'm a member of two organizations that govern this, the NACVA and the NAFE; both of those, I -- I meet the standards, in

all -- in all capacities.
BY MS. MEAD:
Q. Okay. And for the definition of -- strike that.
MS. MEAD: I'll mark, as Young Exhibit 13, a document titled, "Incongruent Court Advice," and it has a longer title, by Christopher Young and James Janos.
(Deposition Exhibit 13 was marked.)
BY MS. MEAD:
Q. And in the Abstract, it says, among other things, "the three valuation approaches commonly used," open paren, "income, market, and asset, all yield different levels of value."
Do you see that?
A. Yes, ma'am.
Q. Did you evaluate whether the -- strike that.
Did you evaluate whether different valuation approaches would yield different values in this case?
MR. WARWICK: Object to form.
THE WITNESS: Yeah. So I think you're misunderstanding this article. I mean, unless you read it, in detail, which you'd be one of the -- the two, other than my mother, you -- you're misunderstanding the -- the values that are being

created here.

Under the income approach, we create something called a marketable, noncontrolling interest; under the market approach, particularly as it relates to this paper, you are creating a private -- a nonmarketable controlling interest, and under the asset approach, you're establishing a controlling interest.

None of those are relevant here, as it relates to the valuation of timeshare interests.

BY MS. MEAD:

Q. Okay. And if we go back to Young Exhibit 1 --

Oh, and -- and they're not relevant, in part, because these are valuation methods for publicly traded companies, correct?

A. No.

MR. WARWICK: Object to form.

THE WITNESS: These are -- these are valuation approaches for private trav- -- companies.

BY MS. MEAD:

Q. Okay. They are not relevant, in -- in part -- strike that.

They are not relevant because they are valuation approaches for valuing a company, correct?

MR. WARWICK: Object to form.

THE WITNESS: No. They're -- they're --

These are valuation approach -- these three valuation approaches are used to value all types of things.

MS. MEAD: Okay.

THE WITNESS: Intellectual property, your home, your condo, you know, publicly traded companies, private companies. These are three common approaches, but depending on what you're using it for, it's going to determine values.

And the only one that I'm aware of, where you're going to get three different types of values created, is when you're valuing a private company or a public company. It doesn't relate to any other asset --

MS. MEAD: Okay.

THE WITNESS: -- that I'm aware of.

BY MS. MEAD:

Q. Well, do you know, for example, for fee simple real estate, if the income approach can yield a different value than the market approach?

MR. WARWICK: Object to form.

THE WITNESS: I would answer that question if I was a real estate appraiser, but I'm not; so I can't.

BY MS. MEAD:
Q. Okay. For an intangible asset, like intellectual property, do you know if the income, market, and asset approaches ever yield different values?
MR. WARWICK: Object to form.
THE WITNESS: It depends on what type of methodology is being utilized, and it depends on the type of intellectual property.
BY MS. MEAD:
Q. Right.
A. If it's a patent, if it's a patent and we're going to value the patent, like we would a company, then you would have the same issues you have here.
Q. All right.
A. If it's a patent and you're only thinking through the cost approach for balancing purposes, irrelevant.
So, again, this can be contextual.
But I can -- I can tell you that in pretty much all cases, outside of public and private companies, the market, income, and asset, all -- all almost always have the same value or come up to the same value.
Q. And -- and you don't know the answer for real estate, correct?

MR. WARWICK: Object to form.
THE WITNESS: It's not that I don't know the answer. I can't answer. Even if I did have -- even if I did know it, I can't answer it because I'm not a real estate professional, and I'm moving outside of my lines of expertise.
BY MS. MEAD:
Q. Right.
You're not an appraiser, for example?
A. I am not a real estate appraiser, correct.
Q. And if we look at your expert report, Young Exhibit 1, Paragraph 41, you reference, "When determining the value of a tangible or intangible asset, common and accepted valuation methodologies include: The income method, the cost method, and the market approach method."
And then you have a sub- --
And then, in Paragraph 42, you say, "The first approach I considered" is the -- "was the cost approach. The cost approach uses the cost of an asset to determine its value. For example, if the cost to buy a car is $30,000, then its value under the cost approach is $30,000."
And you were footnoting to the Litigation Services Handbook.

Do you see that?
A. Yes, ma'am.
Q. Do you identify any other source, to define valuation methodologies in your report?
A. No. Mainly because it's -- it's so -- it's so prevalent. I mean, it's in every type of valuation book out there; thousands and thousands of books are written that talk about these three approaches, not to -- not to -- not to further mention, the AICPA refers to it; the NACVA refers to; the ASA refers to it -- all right? -- which is the main three governing bodies when -- when valuing things.
So I was pretty comfortable that the Litigation Services Handbook was -- was good enough, but if you --
Q. And the --
A. But if you -- if you need hundreds of citations, I'd be happy to share that with you.
Q. And the AICPA is the American Institute of Certified Public Accountants, correct?
A. Yes, ma'am.
Q. And you are not a member of it, correct?
MR. WARWICK: Object to form.
THE WITNESS: I am not a CPA. I am a member of the AICPA -- or let me -- let me state that.
I have been, in the past, a member of the

AICPA.
BY MS. MEAD:
Q. And the "ASA" is what?
A. The American Society of Appraisers.
Q. Okay. And you are not an appraiser, correct?
MR. WARWICK: Object to form.
THE WITNESS: Well, that appraisal institution, that -- that word is a little bit vague.
Sometimes people use "valuation" and "appraisal" simul- -- interchangeably.
The ASA is -- the American Society of Appraisers is not just appraisers; it's also valuation experts, which make up the majority of the organization.
BY MS. MEAD:
Q. And you do not purport, in Young Exhibit 1, to apply these uniform standards of appraisal practice, for example, do you?
MR. WARWICK: Object to form.
THE WITNESS: No. USPAP is not required here.
BY MS. MEAD:
Q. Okay. And here, instead, you're citing the Litigation Services Handbook, Sixth Edition, Sections 11.5 and 11.8, correct?
A. Yeah. And the -- well, the -- the main reasons

for citing that is that's a -- that's a handbook that is and has been accepted in the courts in hundreds, thousands of cases.

Q. It's generally accepted in your industry, correct?

A. That -- yeah, and it's generally accepted by the courts.

MS. MEAD: Okay. I will mark, as Young Exhibit 14, the Litigation Services Handbook, Sixth Edition.

BY MS. MEAD:

Q. And I will point you to Chapter 11, which is titled, "Business Valuation."

And the highlighting is mine. I apologize.

Do you know if any part of Chapter 11 discusses valuing timeshares?

A. No, it does not.

Q. Do you know if any part of Chapter 11 addresses valuate- -- valuing real estate interests?

A. It does not.

Q. Do you know if any part of Chapter 11 addresses valuing airline tickets?

A. No, it does not. It's -- it's mainly --

It's mainly there to help somebody understand the three approaches --

Q. Right.
A. -- because this book summarizes the three approaches very well.
Q. Oh, okay.
THE VIDEOGRAPHER: Ma'am, could we go ahead and do a quick media change card --
MS. MEAD: Sure.
THE VIDEOGRAPHER: -- change the card.
MS. MEAD: Sure.
THE VIDEOGRAPHER: The time is 12:14 p.m.
We're going off the record. This concludes Media Card Number 2.
Please stand by.
MR. WARWICK: Do you want to take a --
Is now good for a five-minute break?
MS. MEAD: Yeah, we can.
(Recess taken from 12:14 p.m. to 12:22 p.m.)
THE VIDEOGRAPHER: Okay. The time is 12:22 p.m.
We're back on the record. This is the beginning of Media Card Number 3.
BY MS. MEAD:
Q. Good afternoon, Dr. Young.
A. Good afternoon, ma'am.
MS. MEAD: And I -- I'll go ahead and mark, as

Exhibit 14, the excerpts of the Litigation Services Handbook.

(Deposition Exhibit 14 was marked.)

BY MS. MEAD:

Q. And I will point you to, in the index, a reference to cost approach, and it says, "A general way of determining a value indication of an individual asset, by quantifying the amount of money required to replace the future service capability of that asset."

Do you see that?

A. Yep.

Q. And that differs from the definition you used in your report, Young Exhibit 1, correct?

A. Well --

MR. WARWICK: Object to form.

THE WITNESS: Yes. Yes and -- yes and no. There's actually two parts to it: There's a replacement, and then there's a cost to build it, and then there's an up-front cost. You're just seeing one of -- one of the three components.

BY MS. MEAD:

Q. One of the three components in which? In the definition contained, in Exhibit 14, or in Exhibit 1, your report?

A. Yeah. So you -- you -- you noticed I used

the -- the Litigation Services Handbook to explain, for you, the market approach.

The cost approach is pretty -- pretty straightforward, in all of the -- in all of the content, in all of the materials, in the marketplace.

Q. Okay.

A. One is the cost -- one is the cost to purchase something; two would be the cost to replace something.

So, for instance, if you wanted to replace this asset today with something else very similar or the exact same replica, you would use today's price for that.

Q. And that's --

A. That's the -- that's the --

Q. And that's the definition the litigation handbook is referring to, is the replacement cost, correct?

MR. WARWICK: Object to form.

THE WITNESS: They're -- they're talking to the replacement cost, not the cost approach.

BY MS. MEAD:

Q. Okay. And if you were to look at their definition of "investment value," it says, "The value" --

MR. WARWICK: Grace, it's -- it's not on --

it's not on my screen.
Are you intending to share that on your screen, if you're going to read it?
MS. MEAD: It -- it --
MR. WARWICK: You don't have to. I'm just saying.
MS. MEAD: It should be on there now.
MR. WARWICK: Thank you.
BY MS. MEAD:
Q. "Investment value. The value to a particular investor based on individual investment requirements and expectations."
Correct?
A. Yes.
Q. And, in fact, that would align with the cost paid by a particular purchaser, correct?
MR. WARWICK: Object to form.
THE WITNESS: No, incorrect.
BY MS. MEAD:
Q. Why not?
A. Because I don't see timeshares as a val- -- as an investment.
Q. Okay. But if you look back at Young Exhibit 1 --
A. Uh-huh.

Q. -- and you look at Paragraph 42, where you discuss the cost approach, your only citation is to the Litigation Services Handbook, correct?
A. Yep.
Q. Okay.
A. But the --
Q. And --
A. But -- but I don't reference the investor -- I don't investor -- I don't refer to an investment value at all because this is not an investment.
Q. Nor do you refer to the replacement cost concept, referenced in the Litigation Services Handbook, do you?
A. I do not.
Q. Okay. And --
A. But -- but I -- but I could. And if the value today -- like let's just say, for instance, somebody bought something in 2019, and it was 50,000. You know, the value of that, perhaps, today is now 100,000.
So what that's suggesting is the replacement cost would suggest that the -- it's -- it's more appropriate to use the value today.
I'm simply using the value up front because we -- we know what that value is at this very moment in time.

Q. Well, the value --
A. It's pretty straightforward.
Q. Well, the value could also decline, correct?
So a replacement cost could be lower than the purchase cost, right?
MR. WARWICK: Object to form.
THE WITNESS: Could. Not -- not often -- not often does that happen, especially with the slide that you showed me that showed that the prices of timeshare have increased, over time.
BY MS. MEAD:
Q. Well, have you done any analysis, comparing the pre-COVID timeshare prices to prices today?
A. No. I just saw your graph that said that the prices have gone up dramatically.
Q. Uh-huh. And you've done no research into that issue, before drafting your report, have you?
A. No. Because it's irr- -- again, it's irrelevant. All you need to know is, what did they pay for the asset up front?
If you now want to consider the value of the price today, and prices went up over a period of time, well, then the value might be much higher than what they paid for it.
Q. Okay.

A. So that's irrelevant here.
Q. Were you --
A. We're not talking -- we're not talking about replacement cost; we're talking about cost to purchase.
Q. Okay. And I'll point you, in Exhibit 14, to the market-based approach. It says, "A general way of determining a value indication of a business, business ownership interest, security, or intangible asset by using one or more methods that compare the subject to similar businesses, business ownership interests, securities, or intangible assets that have been sold."
Do you see that?
A. Yes, ma'am.
Q. And do you agree that there must be similarity between the two things being sold?
MR. WARWICK: Object to form.
THE WITNESS: I don't know what you mean by that.
BY MS. MEAD:
Q. Well, you can't -- let's use the example of a security and a share of Coca-Cola.
A. Okay.
Q. You can't use the market approach and assert that a share of Coca-Cola is equal to the share price of Apple, can you?

A. Yes.
MR. WARWICK: Object to form.
THE WITNESS: Yes. Yes. Yes, you can. You just don't -- that's not necessarily going to be a one-to-one ratio.
BY MS. MEAD:
Q. You --
A. You might say -- you might say ten shares of Coca-Cola equal one share of Apple.
Q. And you would have to do an analysis to make those adjustments, correct?
A. Yes.
Q. Where, if at all, in Young Exhibit 1, do you evaluate the similarity between timeshare points and other indicia of value you indicate?
A. It's not --
MR. WARWICK: Object to form.
THE WITNESS: It's not -- it's not relevant. It's not relevant at all. It's already done by your client. That has -- that's -- that's already been -- that's already been established.
BY MS. MEAD:
Q. And how --
A. Through test- -- through test- -- through Mr. Gould's testimony, through what I've already said

already. It's already been established.

Somebody has already said, one point of timeshare -- one -- one point of timeshare is equal to X points of -- or X dollars' worth of airfare; or better said, for every dollar that we -- we buy airfare, it's equal to this number of points.

Somebody's already established that this amount of -- this -- this -- this value of getting a -- a stay, at another location, is equal to this number of points. That's already been established. That market approach has already been done. That's the thing I'm saying to you. I don't have to do that.

Q. Who -- who --

A. Because it's -- because it's after the fact.

Q. Okay.

A. If you said to me, Chris, I need you to value the points five years from now, I would say, Okay. Well, that's going to be a really serious, hard exercise.

But the fact that it's already occurred, it's done already, we have the data. The data's available. We just haven't -- we haven't received it, it's going to be easy to calculate.

Q. Who -- who did that work?

Do you know their name?

A. Which work are you talking about?
Q. Well, you -- this comparability work you're referring to.
A. Well, let -- let me ask you this: How can somebody -- how can somebody exchange one point -- how can somebody exchange one point of timeshare for X points of air, unless the work has been done already?
Q. Oh, you --
A. It has to be done. It has -- has -- has --
I mean, by definition, it's already had to be completed.
Q. But you've not seen any of that work that was done?
A. Because it hasn't been provided yet.
Q. And you don't know whether it's a one-for-one exchange or a one-for-a-hundred exchange, do you?
A. It doesn't matter.
Q. And you don't know --
A. It doesn't -- doesn't -- it doesn't matter whatsoever. It's an easy calculation.
Q. Well, you -- you've never even seen the formula that dictates the calculation, have you?
A. No. Again, it's because the data hasn't been provided, but once the data's provided, those calculations -- these calculations are not --

Q. Do you --
A. You know, this isn't an econometrics exam. This is a pretty straightforward calculation.
Q. Do you --
A. All of these are going to be straightforward calculations.
Q. Do you know if it's dictated by algorithms that take into account demand and seasonality, for example?
A. That --
MR. WARWICK: Object to form.
THE WITNESS: Again, that doesn't matter because it's after the fact.
You keep -- you keep bringing up stuff that's irrelevant. The algorithm is not relevant to the history; the algorithm's relevant to the future.
BY MS. MEAD:
Q. Let's look at the Litigation Services Handbook again, and this is at Page 4, and I'll share my screen.
And it says, "one should scrutinize with professional skepticism any information obtained from a party to the litigation to avoid accepting potential bias in that information. Industry research and company-specific research often yield a wealth of information that provides insight into the substantive issues of the case; this can also prove useful when the

expert develops assumptions for the damages analysis."

You did basically no research into the industry here, before issuing your report, correct?

MR. WARWICK: Object to form.

THE WITNESS: Well, we -- we started -- we've already established that. I gave you all of the info- -- all of the research that has been done. I explained to you what has been done, but you're still missing the overall point.

It doesn't matter. This is -- we're not valuing a company into the future.

So when I value -- when I value a corporation, I have to put together projections into perpetuity. That's what this is referring to.

Your case, our case that we're talking about here, is not about future performance; it's about actual transaction data. We know the data because the transaction has already occurred. We're not looking for something into the future. We know what they paid for it. We can figure out what the offset is, which is an historical event; not a future event, it's an historical event, and then they -- and it's done. We're finished.

BY MS. MEAD:

Q. But -- but you never --

A. Out -- out -- price to pay less price received in value, right?
Q. But --
A. Simple.
Q. And that's based entirely on Mr. Gould and Ms. Brandow's depositions, right?
A. Well, also, your expert says the same thing. Your expert actually says the exact same thing I just said.
Q. Where did our expert say that?
A. All right. Let me find it for you.
Q. Okay. By the way, have you produced, to Plaintiffs' Counsel, this litigation binder you're looking at?
A. Yes. This is everything that you have.
Q. Does it have handwritten notes on it?
A. No, it does not. Other than it says, "intentionally left blank."
Q. And you produced it to them as documents you've reviewed?
A. Yeah. There's a few documents in here. This is the report, the Habibi report, the Young report, and then everything that I cite; that's it.
Q. Okay.
A. I'll tell you where it is.

Bear with me. (Witness perused document.)
I believe it's on Page 6.
Q. You're looking at his report or his deposition?
A. I -- I'm looking at his report.
Q. Okay.
A. Actually, I've probably got a better place for us to go.
Go to his Conclusions, on Page 16.
Q. Uh-huh.
A. I take that back. That one's not the right one.
Let me go over here to -- where is that?
MS. MEAD: Oh, while you're doing that, I will mark, as Young Exhibit --
MS. CANALES: 15.
MS. MEAD: -- 15, the expert report of Paul Habibi, dated April 26, 2024.
(Deposition Exhibit 15 was marked.)
THE WITNESS: (Perused document.) Okay.
On Page 3 --
MS. MEAD: Uh-huh.
THE WITNESS: -- of his analysis, Paragraph (c), he says -- and this is one of multiple places. He gets into this a little bit further down the road.
He says, "The remedies sought by Plaintiffs

would have required an individual analysis of each proposed class member's respective purchase, interest, and use history."

So he's not saying it can't be done; he's saying it can be done.

BY MS. MEAD:

Q. Need it be done on an individualized basis?

A. No. What -- what needs to happen is -- it's a common methodology, across the trust, the class, the trust, and the offset is all known. All that information is already available.

Q. But --

A. And so --

Q. But you --

A. It's a common --

It's a -- it's the common methodology. It's a common methodology across all calculations. I'm not doing a different calculation for Plaintiff A versus a different calculation for Plaintiffs B, C, and D; it's all the same exact methodology, and that's what's very important to understand here.

Q. What -- what is --

What is the source, in literature, of this methodology?

A. Well, I've already explained it to you multiple

times today.
Q. Well, but how do you --
A. There's the cost -- there's the cost -- there's the cost up front, less the value received, right? Or the cost for the price paid versus the price of the services received.
Q. Okay.
A. We know what that is already. That's pretty straightforward stuff.
Q. But in Young Exhibit 1, the only valuation treatise you cite is the Litigation Services Handbook, correct?
MR. WARWICK: Object to form.
THE WITNESS: Yes. Which tell -- which explains to you what a market approach is. I've explained to you what a cost approach is. There's hundreds -- I mean, look, the -- one of -- one of the things about the court system, there's hundreds of treatises that are referenced in the court system, as it relates to the cost approach, the market approach, the asset approach, all of these different approaches.
I think what you're missing is this, this approach that we're talking about, is so trivial; it's so -- it's so basic, and that's what's

important. It's not hard at all to do this calculation. This is -- of all the class actions I worked in, this is going to be the easiest one to calculate.

Cost --

BY MS. MEAD:

Q. If it's so --

A. Cost, right? Cost paid up front, less cost of services received; simple with the data, easy.

Q. If it's -- if it's so easy, do you know why the Plaintiffs failed to obtain it during discovery?

A. I'm just getting involved now.

MR. WARWICK: Object to form.

BY MS. MEAD:

Q. You're just --

A. I have no idea about history. I can't speak for somebody else.

I'm just telling you, if I get access to the data, there's no doubt in my mind that it's going to be calculated pretty easily.

Q. But you don't have that data?

A. I don't have the data yet.

Q. All right. And in Young Exhibit 1, as literature supporting your approach, you cite the Litigation Services Handbook.

Is there any other literature you'd like to identify now, as supporting your approach?
A. Well, I certain -- I -- I spoke to -- to Young and Janos, which talks about the market approach, the income approach, the asset approach.
Q. But that's the article we looked at earlier?
A. Yes, ma'am.
Q. Okay.
A. Pratt has --
Q. Shannon Pratt, correct?
A. Pratt, P-r-a-t-t, has many treatises.
Q. Shannon Pratt, Cost of Capital, for example, is a definitive treatise in the field, correct?
A. Yeah. But, you know, and he's got others. He's got ones that are more nuanced as it relates to, you know, valuation methodologies.
Q. Damodaran, for example --
A. Yeah.
THE COURT REPORTER: One at a time, please.
BY MS. MEAD:
Q. Is Damodaran an authoritative source in the field?
A. So Damodaran -- Damodaran is an author- -- an authoritative source in the field for publicly traded companies. The fact that he will not testify and he

will not go before a judge or a jury or lawyers bothers me a little bit.

So is he authoritative? Yes, he has books. Do I read his books? I do read his books. Is he bright and is he smart? Absolutely.

But he's not my go-to person, as it relates to treatises --

Q. Who else --

A. -- for -- for -- for purposes of litigation.

Q. Who else, in terms of treatise writers, supports the approach you've taken here?

A. You've got --

MR. WARWICK: Object to form.

THE WITNESS: Degabriele.

BY MS. MEAD:

Q. All right.

A. Or Degab- -- or Degabriele.

Oh, and I -- when you say my approach, I'm just going to put it out there that the entire industry accepts my approach, right?

So go -- go -- go -- go onto Amazon and put in valuing of publicly traded companies, valuing of private companies, valuing of assets, and you're going to find hundreds of books and they're all going to say the same thing.

The AI- -- and I also mentioned to you, the AICPA has the same -- the same taxonomy of definitions. The NACVA has the same. The ASA has the same. So all of these organizations all say the same thing.
Q. And they all support the approach you've taken, in Young Exhibit 1, your expert report here?
A. Yes, ma'am.
Q. Okay. Have you ever read the deposition transcript of Sergeant Smith in this case?
A. I believe so, yes.
Q. Okay. Are you offering any opinion here about why any purchaser chose to purchase from Holiday Inn Club Vacations?
A. No.
Q. Are you offering any opinion here about any disclosures that were required by the Military Lending Act that were not made?
A. No.
Q. Can you identify any disclosures required by the Military Lending Act that were not made by Holiday Inn Club Vacations in this case?
A. I'm not a lawyer, so I'm going to refrain from any legal conclusions or opinions.
MS. MEAD: I will mark, as Young Exhibit 16, an e-mail from Mr. Warwick, dated November 9, 2023.

(Deposition Exhibit 16 was marked.)

BY MS. MEAD:

Q. And I will share my screen. And it's to Ms. Nathan. It says, "As discussed on the call yesterday, Plaintiffs' expert does not have sufficient time to evaluate class information and damages prior to Plaintiffs' current expert report deadline."

Do you see that?

A. I do.

Q. Had you been in -- strike that.

Had you had any communications with Plaintiffs' Counsel, by November 9 of 2023?

A. No.

MS. MEAD: Okay. I will mark, as Young Exhibit 17, an e-mail from Mr. Warwick, dated December 19, 2021 (sic).

(Deposition Exhibit 17 was marked.)

BY MS. MEAD:

Q. And in the second paragraph, it says: "That being said...with the holidays, I am confident my expert will need more time than 3 days to produce his report. Our report is currently due January 26th."

Had you had any communications, with Plaintiffs' Counsel, by December 18, 2023?

A. No.

MS. MEAD: I'll mark, as Young Exhibit 18 --
That is right?
MS. CANALES: Uh-huh.
THE WITNESS: You have my engagement letter, yes, ma'am?
That was -- that was submitted to you in -- in discovery.
MS. MEAD: We do.
I'll mark, as Young Exhibit 18, an e-mail from Mr. Brochu, dated December 29, 2023.
(Deposition Exhibit 18 was marked.)
BY MS. MEAD:
Q. It says, in the third paragraph, "Plaintiffs expert will require 45-days to review production and draft their reports."
Had you had any communications with Plaintiffs' Counsel by December 29 of 2023?
A. I don't remember having a conversation at that point.
MS. MEAD: Okay. I'll mark, as Young Exhibit 19, a document titled, "Plaintiffs'" on a motion -- "Unopposed Motion to Modify Scheduling Order," with a filing date, up top, of December 29 of 2023.
(Deposition Exhibit 19 was marked.)

BY MS. MEAD:
    Q.   And in Paragraph 8, it says, "Once Plaintiffs receive this additional discovery from Defendants, Plaintiffs and their expert(s) require adequate time to review and analyze it."
         Does this refresh your recollection that you had had any communications with Plaintiffs' Counsel, by December 29 of 2023?
         MR. WARWICK:  Object to form.
         THE WITNESS:  No.
BY MS. MEAD:
    Q.   "No"?  I just didn't hear you.
    A.   No, it -- it does not.
         Do you mind going to the front of that document for me?
    Q.   Sure.
    A.   (Witness perused document.)  No, that does -- does not -- does not help me at all.
         MS. MEAD:  I will mark, as Young Exhibit 20, a letter dated May 8, 2024, on Resolution Economics letterhead.
         (Deposition Exhibit 20 was marked.)
BY MS. MEAD:
    Q.   And I will point you to the second page, which has a signature.

Is that your signature?
A. Yes, it is.
Q. And is this your engagement letter for this case, to which you were referring me earlier?
A. Yes.
Q. And how long, before executing May 8, 2024, did you start having communications with Plaintiffs' Counsel?
A. Don't remember.
Q. Do you know whether you had communications with Plaintiffs' Counsel, within a month before executing this letter?
A. I don't know or remember exactly the -- the period, but it wasn't -- wasn't too far afield from the engagement date.
Q. Do you --
A. Four weeks, maybe, six weeks maximum, but I believe it was after April 14th.
Q. After April 14?
And why do you say after April 14?
A. Because I was on military duty from April 14th to May 25th, and I had multiple conversations with plaintiff while I was on military -- or Plaintiffs' Counsel, while I was on military service.
Q. Have you sent any invoices to

Plaintiffs' Counsel that would reflect when you first had communications with them?

A. I have not delivered an invoice in this case yet. They go out this week.

Q. Okay. And if you look at Paragraph 6 of your terms and conditions, on invoices, it says, "ResEcon will prepare invoices in this matter on a monthly basis."

So are you a little bit behind on invoices?

A. Yes, I am.

Q. Okay. And for what period of time will those invoices cover? From April to today?

A. From the engage --

MR. WARWICK: Object to form.

THE WITNESS: From the engagement date till -- till approximately last week -- no -- till approx- -- till approximately the end of May, I believe.

BY MS. MEAD:

Q. How many hours did you spend, before issuing your expert report?

A. Me or the entire team?

Q. Well, both.

A. I think we're at about 100 and -- 120 hours, 115 to 120 hours.

Q. How many hours did you personally bill, before issuing the expert report?
A. About 40.
Q. How many hours did your other team members bill, before issuing the report?
A. I think the total is about 120 hours. And that -- you know, I don't have the invoice in front of me. That might be up until about today.
So the invoice that's going out might be slightly shy of today's numbers, but I think we're at about 120 hours, plus this deposition time, which is not included; so another 80 hours, for the rest of the team.
Q. Okay. So between May 8 and the date on which you issued your report, that was about 20 days, correct?
A. Yes.
Q. Is there any reason you could not have done that 20 days' work, from February of 2023 to February of 2024?
MR. WARWICK: Object to form.
THE WITNESS: I wasn't engaged in February of 2023.
BY MS. MEAD:
Q. Had you been engaged, in 2023, is there any reason you could not have done the work then?
MR. WARWICK: Object to form.

THE WITNESS: I can't answer that because I -- I don't remember. I don't remember last week, never mind February of 2023.
BY MS. MEAD:
Q. Did you have any input into any of the discovery requests that Plaintiffs issued here?
A. I did not.
MR. WARWICK: Object --
THE WITNESS: I -- I do have -- I did speak with Counsel after I was engaged, you know, asking for various materials, which, I believe, are being sought.
BY MS. MEAD:
Q. Do you know if the word "rebuttal" appears anywhere, in Young Exhibit 1, your expert report?
MR. WARWICK: Object to form.
THE WITNESS: I don't know. That might be to rebut the -- Mr. Habibi's report.
BY MS. MEAD:
Q. Have your opinions ever been excluded by a court?
A. No. No, they have not.
MS. MEAD: I'll mark, as Young Exhibit 21, a document titled, "Jersey Datacomm & Cable, LLC," Christopher Young, dated November 30, 2015.

(Deposition Exhibit 21 was marked.)
BY MS. MEAD:
Q. Is this an expert report you prepared?
A. Looks like it, yes.
Q. And I'll point you to Page 13.
And is part of what you computed here the loss of salary to one Jack Palmer?
MR. WARWICK: Object to form.
Dr. Young, if you need to review the rest of the document, feel free.
THE WITNESS: Yeah. I -- it's been a while, right?
BY MS. MEAD:
Q. I mean, we'll e-mail it around, or I'll show you any part you want.
All right. I'll e-mail it around.
A. Great. (Witness perused document.)
Q. Let me know when you're finished reviewing it.
MR. WARWICK: Dr. Young, that e-mail just came through, if you need to open it and look at it.
THE WITNESS: Yeah, I -- I think this is it, but it says Young Exhibit 20, 17, 18, and 19, but I thought you just had Exhibit 1 up there.
BY MS. MEAD:
Q. This is Young Exhibit 21, for today's

deposition. It --
A. I didn't -- I didn't -- I didn't receive that yet then.
Q. Okay.
MS. MEAD: Leslie, is it going around?
MS. CANALES: Uh-huh. It's already gone.
MS. MEAD: Oh, it's already gone. Okay. From Ms. Canales.
THE WITNESS: And what e-mail did you send it to?
MS. CANALES: Cyoung@r-e-s-e-c-o-n.com.
THE WITNESS: Okay. It should pop up here shortly. I just -- I don't have it yet.
(Pause in the proceedings.)
THE WITNESS: Hmm. Oh, here we go. I got it. Just give me one moment to look at it.
BY MS. MEAD:
Q. Of course.
A. (Witness perused document.) Okay.
Q. And Young Exhibit 21, your expert report, in Jersey Datacomm, part of what you were estimating was the loss of salary to Jack Palmer, correct?
A. That looks like what I was doing, yes.
MS. MEAD: I'll mark, as Young Exhibit 22, a document titled, "Order" in Jersey Datacomm & Cable

versus Walker and Associates.
(Deposition Exhibit 22 was marked.)
BY MS. MEAD:
Q. And I'll point you to the second-to-last paragraph. It says, "It is hereby further ordered that Defendants' Motion to Exclude Expert Testimony under Fed Rule of Evidence 702 is granted in part as to Jack Palmer's salary and otherwise denied."
So does this refresh your recollection that, in the Jersey Datacomm case, part of your opinion was stricken?
A. Never.
MR. WARWICK: Object to form.
THE WITNESS: This is the first time I heard about this.
BY MS. MEAD:
Q. Do you know if your expert opinion may have been excluded in other cases, of which you're unaware?
MR. WARWICK: Object to form.
THE WITNESS: I do what's referred to as a Daubert check, which is provided by the AICPA, and I have never seen a Daubert -- a successful Daubert challenge.
BY MS. MEAD:
Q. Okay. Do you know what Federal Rule of

Evidence 702 is?
A. I do, yes.
Q. Okay. And what is it?
A. Federal Rule 702 is that there's three standards by which the expert needs to meet, in order for the report to be admitted.
MS. MEAD: Okay. I will mark, as Young Exhibit 23, a document titled Hamilton versus Bayer Healthcare --
THE WITNESS: And by the way, just for -- just for -- just so the record's crystal clear, they didn't say that the report was not admitted, just to be clear, right? They didn't --
BY MS. MEAD:
Q. Well, that was --
A. They didn't say it was fully removed, right?
Q. They said --
A. In part.
Q. -- Defendants' Motion to Exclude Expert Testimony under Federal Rule of Evidence 402 (sic) is granted, in part, as to Jack Palmer's salary --
A. Right.
Q. -- correct?
A. Yep. Only in part, right? Not in -- not in -- not in entirety. So there's a part of it that was

clearly something the judge did not agree with, and I don't know what that is because this is the first I am reading it, but obvious -- obviously the rest of it was denied.

Q. How many expert opinions have you provided, over the years, in litigation?

MR. WARWICK: Object to form.

THE WITNESS: I've written over a thousand reports.

MS. MEAD: I'll mark, as Young Exhibit 23, a document titled, Hamilton --

MR. WARWICK: Grace, just -- just for clarification -- I'm sorry -- going back to that, Exhibit 22, that order, that was the first page that you had up there.

Is the exhibit the entire order?

MS. MEAD: Yes.

MR. WARWICK: Not just the first page? Okay.

MS. MEAD: Yes.

I'm marking, as Young Exhibit 23, an order, in a case, titled Hamilton versus Bayer Healthcare, dated October 18, 2019.

(Deposition Exhibit 23 was marked.)

BY MS. MEAD:

Q. And the order says, "In light of the court's

rulings on the motions for summary judgment of Plaintiffs and Mutual of Omaha Insurance Company" -- "Daubert motion to exclude testimony of Plaintiffs' expert witness, Christopher W. Young, Ph.D." -- "is granted. Dr. Young's testimony was relevant only to the extent Plaintiffs could pursue their claim for repudiation. The Court has determined that claim fails as a matter of law." -- "there is no reason for Dr. Young to testify."

So in this case, too, your opinion was excluded, correct?

A. No.

MR. WARWICK: Object to form.

THE WITNESS: No, no, no. Totally wrong. Totally misreading that.

Read it again, clearly, where it says that the case in which I -- or the counts in which I prepared a report were no longer relevant; and, therefore, the report wasn't relevant. They're not saying that the report did not meet standard.

Let's just be -- be clear.

BY MS. MEAD:

Q. Well --

A. The motion -- the -- the -- the count itself, in which I prepared a report, was no longer relevant in

the case, and that's the only aspect of my report that I addressed.

If that's no longer part of the case, then my report's no longer part of the case.

Q. And I was not --

A. And -- and read -- and read further, where it says, "Dr. Young's testimony was relevant only to the extent" -- "could pursue their claim for repudiation."

Repudiation went away; my report goes away.

It's not being excluded for Daubert motions as it relates to the -- the three -- the three standards. That's not -- that's not what that is saying.

It's saying that because of the count going away, my report was no longer relevant.

And I'm happy to get the attorney -- I'm happy to -- happy to get the judge on the phone to explain to you what that -- what that's about because when I heard this, I knew about this, but I don't look at this as my report being stricken in any capacity, whatsoever.

Q. So of the 1,000 or so -- strike that.

Of the 1,000-plus reports you've issued, what process did you go through to determine whether your opinion had ever been previously stricken?

You said you went to the AICPA?

A. There's a Daubert -- there's something called a

Daubert database. You should have access to it. You go in there, and you put in the person's name and their firm, and then you can find any successful Daubert challenges.

Q. Do you know what the scope of coverage is --

A. No.

Q. -- for that?

A. No, I do -- I do not. That's for you to figure out.

MS. MEAD: We'll take a ten-minute break, and it's poss- --

Well, no.

BY MS. MEAD:

Q. Actually, if you don't mind -- I know there's some more work I have to do.

Let's go back to Young Exhibit 1, which is your report.

In Paragraph 13, you reference --

A. I don't see the -- I don't see the report.

Q. Sure, I'll put it up.

In Paragraph 13, you reference, "Mr. Smith and Ms. Lingard purchased various interests in Holiday Inn timeshares from 2016 through 2021."

Do you see that?

A. I do see that, yes.

Q. And do you understand the class period here begins in February 2018?
A. Yes, I do.
Q. What happens to the loans for the purchases they made before February of 2018, if you know?
A. I don't know. That's going to have to be a legal conclusion that I can't draw.
Q. Do you know if Ms. Lingard had entered into any contracts before February of 2018?
A. All I know is what's written in the report and the -- what the complaint says.
I'll go to my report again.
Q. Sure.
A. (Witness perused document.)
Do you have the contracts that were -- that were provided in this con- -- in this case, that you could share?
Q. I do, but if you don't know them, perhaps it's --
A. Well --
Q. Well, let me ask you a hypothetical question.
A. The -- the date -- the date is available, right? I just don't know the dates.
Q. Right.
A. The date is available, though, right?

Q. Right.

Let me point you to Paragraph 36 of your report. You say, "Holiday Inn should know the value of the underlying contracts they have with Holiday Inn point" owners (sic) "because:

Prior to entering into a contract with any plaintiff, Holiday Inn likely assesses the profitability of the contract, this assessment cannot be made without knowing the value of a point."

"Similarly, when Holiday Inn is rolling over existing contracts into new contracts, Holiday Inn must be considering the value of a point to determine the value of the equity used in the new contracts."

Have you --

Do you cite any documents here, indicating that rather than Holiday Inn should know, Holiday Inn, in fact, does know?

A. Well, by -- by definition, they have to know.

Q. Okay. Do you cite any documents on that here?

A. No. Because it's general logic. If I'm going to exchange one contract for another contract and I'm going to either give more points or take more points away, by definition, you know the value per point.

It's no -- there's no citation needed; it's just simple mathematics.

Q. You say, "Holiday Inn likely assesses the profitability of the contract."
Do you cite to any documents, indicating it does?
A. No. But I can't imagine that a company that is as large as Holiday Inn would not know the profitability per contract.
Q. Do you know if they are measuring those metrics at the individual owner level or at some higher level?
MR. WARWICK: Object to form.
THE WITNESS: Don't -- don't know.
But, again, not -- not as -- not as relevant as the second point, which is the value of the -- of the exchange. When I exchange one contract for another contract and I change the points, then obviously I have to know the value per point.
BY MS. MEAD:
Q. Do you know if Holiday Inn Club Vacations does any global modeling to assess profitability, rather than looking at it, on a contract-by-contract basis?
A. I don't know.
Q. Okay. It says, "When Holiday Inn is rolling over existing contracts into new contracts, Holiday Inn must be considering the value of a point."
You cite to no documents there, correct?

A. Right. Because, again, that's the -- the general logic. If I'm going to exchange one thing for another thing, and the mechanism of -- of payment are points, well, then we have to know the points. We have to know what the points given up or received were.

Q. Do you know if they do that at an owner level or through aggregate measures?

A. They have to do it at the owner level because the owner needs to understand what they're receiving.

Q. But this is written from Holiday Inn's perspective, correct?

A. No. This is just saying that Holiday Inn has to know the data because they are the ones that are negotiating with the Plaintiffs.

If the plaintiff's going to -- the plaintiff's going to know the data, then they're going to know the data, and they're going to have much more data than the plaintiff would.

So clearly -- clearly, Holiday Inn knows the value of the points when they're doing an exchange.

BY MS. MEAD:

Q. Were --

A. It's a math -- it's a simple mathematical -- mathematical calculation.

Q. Paragraph 37, "Mr. Habibi has failed to review

any of Defendants' analysis that a company would typically do to assess its financial performance and operations when setting the price of points at the outset."

Now, you have no experience with what timeshare companies typically do, to set the price of points, correct?

MR. WARWICK: Object to form.

THE WITNESS: I -- I do not, but this --

BY MS. MEAD:

Q. Okay.

A. This -- well, let me -- let me finish.

This here goes to the fact that there's been no -- Mr. Habibi did absolutely no work, in his report, where he looks at the financial performance, the financial metrics, the exchange of points. He didn't even -- in his testimony, he didn't even ask if an exchange of points was -- were known.

So we -- we -- we -- I have been saying, all along, and will continue to say, once we have the data, coming up with the value per point is the easy -- is the easy part, right?

Q. Well --

A. So normally you do a financial -- you do a financial analysis, to determine the price of a point or

you look at what other exchanges are.
This is just simply suggesting that Mr. Habibi did none of that.
Q. But -- but do you know if Holiday Inn Club Vacations instead does this sort of modeling that RCI does?
A. That's irrelevant.
Q. Okay. And you cite to no documents or testimony here, right?
A. It doesn't have to be cited to any testimony. This is just comm- -- common -- common -- a business practice that he -- he did -- I mean, look, it's not -- I don't even need a treatise to look at Mr. Habibi's report and suggest that he did no financial analysis. It's -- it's clear.
He even -- he even testified in his own deposition. When he was asked, Did you look at any financial -- did you look at any of the financial record?
And his point was no.
So it's not like I have to cite something for this -- for this statement.
Q. I'll point you to Paragraph 44, and you have a list here of five groups of purchasers.
Do you know how these five groups of purchasers

were selected?

A. No.

Q. Do you know who selected these five groups of purchasers?

A. I believe I asked Tyler to pick a -- a handful of them.

Q. And "Tyler" is Mr. Ford?

A. Yes.

Q. If you look at Paragraph 51, it says, "The second approach I considered was the market approach. The market approach uses analysis of market data on transactions or other relative value indicators that are comparable to the item or entity being valued."

What work did you do here, if any, to establish the relationship between Holiday Inn Club Vacation points and IHG points?

MR. WARWICK: Object to form.

THE WITNESS: So -- so in my -- in my report -- we already talked about it earlier -- is we know that there's an exchange of points. There's a -- there's a value of Holiday Inn points and then there's a value of -- of IHG points. We know they can be exchanged one for another, right?

And the fact that they can be exchanged, one for another, means that they have comparability,

comparability around price.

And so, as we already talked about, I went to the IHG website. We -- we discussed that earlier today.

But I also mentioned to you multiple places in the report that there's other comparable market analyses, right?

We know that there's a comparable market analysis for -- for airlines. We know there's a comparable market analysis for -- for rental cars. We know that that exists. That's what this is referring to. The market approach uses this. All right?

We know the transaction value between the Holiday Inn points, and we know the transaction value with -- or I should say we -- we -- we -- we can clearly identify, with the proper data, that an IHG point equates to X dollars of rental cars or X dollars of cruises or X dollars of other resorts.

That's what this is referring to.

BY MS. MEAD:

Q. Do you know what that exchange rate is?

A. I don't know what the exchange rate is because I don't have all of the data.

Q. Do you know --

A. Once I -- once I get the data, we will perform
that analysis.
Q. Do you know if that exchange rate has changed
over time?
A. It's irrel- -- it's irrelevant if it changes
over time because I'm only looking at a point in time,
right?
So all I need to know is: When did plaintiff
exchange points for something else? That's all I need
to know. I don't need to know anything else.
Q. And without looking at underlying data, how do
you -- how can you establish comparability?
MR. WARWICK: Object to form.
THE WITNESS: Because -- because Mr. Gould has
already established that there's comparability.
Your client has already established there's a
comparability. He -- he has said that we can take
points, and we can exchange them for airlines. We
can take points, and we can exchange them for -- for
cruises.
We can do all of these different things with
our points; that was the whole idea of moving to the
point system, was that we could take the points, and
we can trade them for something else. That trade is
the -- is a comparable trade in value.

BY MS. MEAD:
    Q. Can you point to a single document or a piece of paper that ascribes a dollar value to the use of Holiday Inn Club Vacations points, outside the Holiday Inn Club Vacations network?
        MR. WARWICK: Object to form.
        THE WITNESS: Again, once I get all of the data, we can calculate all of -- all of -- I can give you thousands of calculations, but once we get the data -- because I -- because Holiday Inn has all of this information because they have to have this information.
        And so once we receive that information and we can look at all of the various exchanges, when somebody gave up points on -- one of the plaintiffs gave up points for a rental car or somebody gave up points for an airline, I can calculate what the value of those points were at that point in time.
BY MS. MEAD:
    Q. And you --
    A. That's your -- that's your offset. That's all you need. You don't need anything else.
    Q. And --
    A. That's what I'm saying, you don't need anything else, other than that.

Q. And you reached that conclusion that you can make those calculations before receiving the data, correct?

MR. WARWICK: Object to form.

THE WITNESS: I do not have the data yet; that is correct. But Mr. Gould has said that that data exists.

BY MS. MEAD:

Q. You --

A. By -- by the way, it has to exist, as I already mentioned. I just want to make sure that this was crystal clear.

It has to exist at the individual level because there's no way, in the world, that a -- a plaintiff would exchange something for something else, without knowing the exchange rate. And so that means that if the plaintiff could know it, if we could go back and pull up the records, then that means that Holiday Inn has to know it as well.

Q. Have you --

A. And Holiday Inn I'm sure knows it much better than the plaintiff would.

Q. Have you seen those records for Mr. Smith or Ms. Lingard?

A. Which records are you talking about?

Q. Well, you just said the plaintiff has to have that data.
A. Yeah. Meaning, once we go into your system, I can pull what was shared with the plaintiff.
Q. Okay. But have you seen, from Plaintiffs --
A. No.
Q. -- any documents or data about their use of HICV points for anything outside the Holiday Inn Club Vacation network?
A. No.
Q. And you --
A. But, again -- but, again, once I get the data from the defendant, we can calculate that pretty easily.
Q. And presumably, the Plaintiffs' Counsel has access -- had access to data and documents, from the individual plaintiffs, since they filed this lawsuit in February of 2023, correct?
MR. WARWICK: Object to form.
THE WITNESS: Yeah. Except that that's only going to give me part -- part of the data; it's not giving me the value of the exchange, right?
It's just simply saying that I took a -- I took some points over here, and I got myself a rental car. I don't know what the value of the rental car is, but we know that Holiday Inn has the value of

the rental car.
So if I give up -- if I give up points and I get a rental car -- well, the rental car -- the price of that rental car has to be known by Holiday Inn. I need to have that data in order to calc- -- to make those calculations.
BY MS. MEAD:
Q. And sitting here today, you have none of that data, correct?
A. I do not have that data, correct.
MS. MEAD: Okay. Let's take a ten-minute break -- I might be done -- and I'll talk to folks.
MR. WARWICK: All right. Thanks.
MS. MEAD: All right.
THE VIDEOGRAPHER: All right. The time is 1:19 p.m. We're going off the record.
Please hold. Clear.
(Recess taken from 1:19 p.m. to 1:31 p.m.)
THE VIDEOGRAPHER: The time is 1:31 p.m.
We're back on the record.
MS. MEAD: All right, Dr. Young. I have no further questions at this time.
I believe there were documents discussed that were not produced that were agreed to be produced, and we'll review the transcript and determine if we

need to reopen the deposition.

So subject to that and any questions, as follow-up, to questions your counsel may have, I am done for now.

THE WITNESS: Thank you.

MR. WARWICK: Grace, thank you very much.

I have no follow-up questions.

MS. MEAD: Okay.

THE COURT REPORTER: Please stay on the line.

MR. WARWICK: On the record, we'll read and sign.

THE WITNESS: Yep. Bye, you all, have a good weekend.

MR. WARWICK: Thank you all.

THE VIDEOGRAPHER: Courtney, would you like anything else on the record?

Any orders or anything?

MS. MEAD: No.

THE VIDEOGRAPHER: So the time is 1:32 p.m. -- the time is 1:32 p.m.

This concludes today's testimony given by Christopher W. Young. The total number of media used was three and will be retained by Veritext Legal Solutions.

Please stand by.

Okay. You're clear.
THE COURT REPORTER: Okay. And would you like this transcribed?
MS. MEAD: Yes. And we need that expedited.
We're in the middle of briefing, so --
THE COURT REPORTER: When would you like it by?
MS. MEAD: Is Tuesday going to cause enormous hardship, or --
THE COURT REPORTER: I can accommodate that.
MS. MEAD: Thank you.
THE COURT REPORTER: Would you like a copy, sir?
MR. WARWICK: Yeah. We'll take a copy, but I don't need it by Tuesday, but --
MS. MEAD: Yeah. They're not briefing; we are.
(Deposition concluded at 1:33 p.m.)

CERTIFICATE OF OATH

(VIA VIDEOCONFERENCE)

STATE OF FLORIDA:

COUNTY OF PINELLAS:

I, COURTNEY N. LANGHOFF, RDR, CRR, FPR-C, Notary Public, State of Florida, do hereby certify that CHRISTOPHER W. YOUNG, Ph.D., personally and remotely appeared before me via Zoom videoconferencing on June 28, 2024, and was duly sworn and produced his State of New Jersey driver's license as identification per FSC AOSC20-23.

DATED this 2nd day of July, 2024.

COURTNEY N. LANGHOFF, RDR, CRR, FPR-C

Notary Public, State of Florida
My Commission No.: HH 062066
Expires: 03/05/2025

CERTIFICATE OF REPORTER

(VIA VIDEOCONFERENCE)

STATE OF FLORIDA:

COUNTY OF PINELLAS:

I, COURTNEY N. LANGHOFF, RDR, CRR, FPR-C, Notary Public, State of Florida, certify that I was authorized to and did stenographically and remotely report the Zoom videoconference deposition of CHRISTOPHER W. YOUNG, Ph.D.; that a review of the transcript was requested; and that the foregoing transcript, pages 9 through 191, is a true and accurate record of my stenographic notes.

I further certify that I am not a relative, employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

DATED this 2nd day of July, 2024.



COURTNEY N. LANGHOFF, RDR, CRR, FPR-C

CHRISTOPHER W. YOUNG, Ph.D.
cyoung@riseecon.com

July 2, 2024

RE: (LINGARD, et al., VS. HOLIDAY INN CLUB VACATIONS, INC.)
(JUNE 28, 2024/CHRISTOPHER W. YOUNG, Ph.D./6765593)

The above-referenced transcript is available for review.

You should read the testimony to verify its accuracy. If there are any changes, you should note those with the reason on the attached Errata Sheet.

You should, please, date and sign the Errata Sheet and e-mail to the deposing attorney as well as to Veritext at Transcripts-fl@veritext.com, and copies will be e-mailed to all ordering parties.

It is suggested that the completed errata be returned 30 days from receipt of testimony, as considered reasonable under Federal rules*, however, there is no Florida statute to this regard.

If you fail to do so, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

*Federal Civil Procedure Rule 30(e)/Florida Civil Procedure Rule 1.310(e).

(LINGARD, ET AL., VS. HOLIDAY INN CLUB VACATIONS, INC.)
Job No. FLA6765593
(JUNE 28, 2024/CHRISTOPHER W. YOUNG, Ph.D.)

E R R A T A  S H E E T

PAGE ______ LINE ______ CHANGE ______________________________
____________________________________________________________________
REASON ____________________________________________________________
PAGE ______ LINE ______ CHANGE ______________________________
____________________________________________________________________
REASON ____________________________________________________________
PAGE ______ LINE ______ CHANGE ______________________________
____________________________________________________________________
REASON ____________________________________________________________
PAGE ______ LINE ______ CHANGE ______________________________
____________________________________________________________________
REASON ____________________________________________________________
PAGE ______ LINE ______ CHANGE ______________________________
____________________________________________________________________
REASON ____________________________________________________________

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_________________________________ ________________________

CHRISTOPHER W. YOUNG, Ph.D. DATE

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.